UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | |
| ) | No. 08 CR 115 |
| MARK POLCHAN, ) | |
| MICHAEL SARNO, ) | Hon. Ronald A. Guzmán |
| also known as, "Big Mike, "Mikey," ) | |
| "Large," and "the Large Guy," ) | |
| SAMUEL VOLPENDESTO, ) | |
| ANTHONY VOLPENDESTO, and ) | |
| CASEY SZAFLARSKI ) | |

**Memorandum Opinion and Order Determining Defendant Polchan's Motion to Preclude Hearsay Admissions or in the Alternative, Motion for Severance [#202], Supplemental Severance Motion [#279], and Szaflarski's Motion for Severance [#303]**

The defendants are charged in a multiple count indictment with racketeering conspiracy (Count One), illegal gambling (Count Two), arson, conspiracy to commit arson and use of a destructive device in connection with the bombing of C & S Coin Operated Amusements (Counts Three through Five), conspiring to obstruct justice (Counts Six and Seven), receipt of goods stolen from interstate and foreign shipments (Count Eight), and multiple related tax fraud offenses (Counts Nine through Sixteen). In connection with their association with this enterprise, the defendants are alleged to have engaged in a wide array of crimes between 2001 through the date of the return of the indictment. Those crimes included certain of the substantive offenses listed above, as well as robbery, access device fraud, and interstate transportation of stolen goods, for the purpose of generating money for themselves.

The government gathered the evidence it intends to use in this prosecution in a variety of ways, including: wire taps, hidden microphones and cameras, consensually recorded conversations by cooperating individuals. According to the government, the evidence so gathered established that Sam Volpendesto and Mark Polchan were involved in the bombing of C & S Coin Operated Amusements in 2003; that Polchan utilized the Goldman Jewelers as a

place to buy and sell a variety of stolen merchandise, and to coordinate an illegal gambling business and other illegal activities with Michael Sarno, that Anthony Volpendesto provided stolen goods to Polchan until his arrest; that Dino Vitalo, a corrupt Cicero police officer, provided law enforcement sensitive information to Polchan in an effort to uncover and thwart the federal investigation, and that Szaflarski participated in conducting the enterprise's illegal gambling business.

Polchan moves to exclude conversations between Mark Hay and Anthony Volpendesto, or in the alternative for severance. Specifically, Polchan moves to exclude the following conversations:

> **February 17, 2005 Recording:** Near the end of the conversation, and in reference to Polchan, Volpendesto remarked, "at least he (Polchan) could give me an old pinball machine; I blew up enough of them."
>
> **March 25, 2005 Recording:** Volpendesto complained about "working" with Polchan; claiming Polchan never does any of the "work." Volpendesto explained that, on the night of the alleged bombing, there was a "cop" sitting at gas station at 16th and Ridgeland in Berwyn near the location of C&S and that Polchan told Volpendesto that he was worried about the cop and wanted to "wait til' the cop left" to do the bombing.
>
> **May 17, 2005 Recording:** In reference to the bombing of C&S Amusement, Volpendesto stated:
>
> "we blew part of that away."
>
> Volpendesto explained that it was "Mark" [Polchan] who involved Volpendesto in the bombing:

> "Mark was the original guy that knew what the fuck it was about, you know what I mean?"
>
> "Goldberg [Polchan] made money [from the bombing], I made shit,"
>
> "yeah, a brown van, that's not what we had,"
>
> "we laughed the next day when we found out that they (the police) were saying it was a van."
>
> CW also relays to Volpendesto that he told "Goldberg" that a brown van had been spotted at the scene of the bombing to which Volpendesto replied "He [Polchan] told me".

The Government first argues that these statements are admissible as statements against penal interest. A hearsay statement is admissible under this exception to the hearsay rule if (1) the declarant is unavailable; (2) the statement was against the declarant's penal interest at the time it was made; and (3) corroborating circumstances exist indicating that the statement is trustworthy. *United States v. Garcia*, 897 F.2d 1413 (7th Cir. 1990); Fed. R. Evid. 804(b)(3). In each of these conversations with Hay, Volpendesto admits knowing who got paid for doing the bombing when he tells Hay that his friend Knight was right that Polchan got paid and Knight did not. He also admits knowing what part Knight played in the bombing and that he was helped by Polchan. Volpendesto further admits participation when he states to Hay that:

> "Goldberg [Mark Polchan] made money, I made shit. I paid him [Kyle Knight] for the, for the equipment. I don't know if he told you that. I gave him for what money that he put out, but he didn't get a bonus or he didn't over charge. I gotta say he was fair."

Clearly, Volpendesto is admitting his participation in the bombing which is a criminal act. The statements therefore are against his penal interests. He is not attempting to distance himself from the crime, nor is he attempting to put the blame or even increase the amount of blame on Polchan. Volpendesto goes on to explain why neither he nor Knight made any money on the bombing in spite of their participation. These statements all implicate Volpendesto in the bombing and qualify as statements against penal interest. However, the statements which describe Polchan's relationship to the victim and in which Volpendesto voices his opinion as to who owns some video gambling machines do not directly implicate Volpendesto in any crime. The government points out that these statements establish Polchan's motive for the bombing. They may very well, but that merely makes them relevant. These statements are not sufficiently related to the actual commission of a particular offense. They may not be admitted under the exception for statements against penal interest.

Next, Volpendesto and Hay talk about the bombing itself and Volpendesto boasts that "we blew part of that away" and "oh yeah, nice job". These statements are clearly incriminating and qualify as an exception to the hearsay rule.

The next series of statements include Polchan indicating that the government's investigation is misdirected because they are working on the belief that a brown van was involved in the bombing. In pointing out how wrong the government was Volpendesto admits that they did not use a brown van in the bombing: "We didn't have a brown van." Also, "But it wasn't us. No we didn't have a van. That's why we laughed the next day when we found out that they were saying it was a van." That statement is clearly incriminating and qualifies as an exception to the hearsay rule for statements against penal interests. He also opines that Polchan did have a brown van and that is why the government concluded that a brown van must have been involved. This opinion is incriminating only in the sense that it reflects Volpendesto's knowledge of Polchan and his interest in the police investigation of the bombing. It is not sufficiently incriminating in regard to a particular criminal act as to qualify as a statement against penal interest.

Volpendesto's statements concerning the makeup of the bomb – specifically how many wicks it had and the length of the wicks and his statement that he was not present when the fuse was actually lit are clearly against penal interests as they tend to incriminate him and qualify as exceptions to the hearsay rule. The Court cannot determine what incident Volpendesto's statements regarding a woman watching him from a window and jumping down from a van relates to. According to Volpendesto this segment of the conversation occurred five or six years ago. The Court cannot tell whether these statements are against the declarant's penal interest or not.

Volpendesto's statements about the bomb are sufficiently trustworthy. They are corroborated in part by Knight and Hay who will testify that Knight provided Volpendesto with explosive material (Knight's own testimony itself is corroborated by an undercover recording of Knight made before he began cooperating, in which he admits providing Volpendesto with bomb-making material). Volpendesto's statements regarding the wick used in the bomb are further corroborated by forensic evidence collected at the scene of the crime.

In addition to falling under the penal interest exception to the hearsay rule, the government argues that Polchan's statements are admissible against Polchan because they are not hearsay under Fed. R. Evid. 801(d)(2)(E). To qualify for admission under Rule 801(d)(2)(E), the government must prove "that (1) a conspiracy existed; (2) the defendant and declarant are members of the conspiracy; and (3) the offered statement was made during the course of and in furtherance of the conspiracy." *United States v. Troop*, 890 F.2d 1393,1403 (7th Cir. 1989). The cases hold that updates on a conspiracy's progress, *United States v. Potts*, 840 F.2d 368, 371 (7th Cir. 1987), conversations concerning planning or review of co-conspirators' exploits, *United States v. Molt*, 772 F.2d 366, 368-69 (7th Cir. 1985), statements that maintain cohesiveness among conspirators, *United States v. Rahme*, 813 F.2d 31, 35-36 (2d Cir. 1987), and statements that give confidence about the declarant and about the stability of the organization, *United States v. Sophie*, 900 F.2d 1064, 1073 (7th Cir. 1990), qualify as statements "in furtherance" of the conspiracy.

The Court finds that the government's Santiago proffer is sufficient to establish, for purposes of determining the admissibility of coconspirator statements, the existence of the conspiracy alleged in the charging documents; that the participants in the conversations Polchan objects to were members of that conspiracy and that the statements were made in the course of and in furtherance of the conspiracy. The Government's Santiago proffer is extensive and includes the proffered testimony of Mark Hay and Kyle Knight.

Mark Hay is expected to testify to a series of criminal activities including multiple robberies that he engaged in with Mark Polchan and others. Hay met Mark Polchan in or around 2000. At that time, Hay asked if Polchan could "move stuff" and Polchan affirmed that he could. Shortly thereafter, Hay began bringing stolen merchandise to Polchan obtained from various thefts and robberies. For example, Hay brought diamonds stolen from The Gold Mine, a jewelry store located in St. Charles, Illinois. Polchan asked Hay where Hay had obtained the diamonds. Polchan explained to Hay that he wanted to know, so that Polchan didn't sell them back to somebody Hay had taken them from. Polchan also indicated that he wanted to know in case law enforcement came looking for the jewelry. Hay informed Polchan that he had taken the jewelry from a store in St. Charles.

In 2001 Hay began watching Polchan's Goldberg jewelers store for him on occasion. In 2001, Hay and Polchan broke into the Roosevelt Currency Exchange, located right next to Goldberg Jewelers. Polchan entered the Roosevelt Currency Exchange through the floor, which was accessed through the crawl space at Goldberg Jewelers. Polchan radioed Hay and told him that he could not use the drill on the safe within the Currency Exchange because it was coated in cement. Polchan had to "peel" the safe. It took Polchan about 20 minutes to open the safe. Polchan also had taken a brown duffel bag to fill with cash. When Polchan returned, the duffel bag was full of cash. Polchan told Hay to get his van. Once Hay got the van. Hay drove to the rear of the business, behind Goldberg Jewelers. Polchan entered the van, with a duffel bag. Polchan and Hay drove separately to Erricos', a private membership bar in Cicero. Upon their arrival, Hay will testify that he and Polchan split up the money recovered from the Roosevelt Currency Exchange. Hay received approximately $17,500.00. Polchan instructed Hay to open Goldberg Jewelers the following day at 11:00 a.m. because Polchan was tired.

The government's proffer goes on to describe that Hay will testify in detail about a series of other thefts and robberies that Hay engaged in with various combinations of Kyle Knight, Anthony Volpendesto, Sam Volpendesto, Formato and Polchan in 2002 and 2003 all working in concert. These include the theft of automobiles to be used as getaway cars for certain robberies, the robbery of Lina's Jewelers in Hinsdale, Illinois, Jacqueline's Jewelry in Valparaiso, Indiana, Husar's House of Fine Diamonds in West Bend, Wisconsin, LD Jewelers in Hickory Hills, Illinois, Marry Me Jewelers in La Grange Park, Illinois, as well as the bombing of C&S Coin Operated Amusements in Berwyn, Illinois, and residential burglary in Berwyn, Illinois. The descriptions in the government's proffer of these other robberies or burglaries are detailed as to the involvement of each of the participants. Hay's proffered testimony establishes the existence of an agreement among the defendants to act in concert in a series of criminal acts over a significant period of time including, theft, burglary, breaking and entering, selling of stolen property, interstate transportation of stolen property, obstruction of justice and acts in concert meant to hide and protect the members of the conspiracy from being arrested by law enforcement authorities. Most of the conspiracy members were well aware of the existence of the other co-conspirators and had some knowledge of the existence of a structure or hierarchy within the conspiracy.

In some instances, Formato passed information about investigations of crimes other members of the conspiracy had been involved in, even though he himself was not involved in that particular offense. This tends to establish an overarching organization with structure and purpose beyond any individual criminal conspiracy/act. Polchan often acted as the fence, coordinator and spotter of new targets for the crews, as well as providing money to fund expenses of the operations and dividing the proceeds of the crimes between the different participants.

Hay's proffered testimony also describes how Sarno at times protected Polchan and his operation and that he also controlled Polchan to the extent that Polchan had to ask his permission before committing one of the robberies the other members of the team had brought to Polchan as

a plan. He will testify that on many occasions he saw Sarno come to Goldman Jewelers where he and Polchan would talk and Polchan would give him money. Polchan told Hay that Polchan owned poker machines with Sarno and that he would have to ask Sarno about the plan to place poker machines in DuPage County, which Hay had proposed. This testimony is circumstantial evidence that Sarno was also a co-conspirator and member of the alleged criminal enterprise. It also tends to establish the existence of an enterprise with a hierarchical structure.

The evidence is sufficient to establish the existence of the conspiracy. In addition, the statements made by the members of the conspiracy to each other and to others in planning, executing, and covering up the individual criminal acts of the conspiracy are admissible as statements in the course of and in furtherance of the conspiracy. Statements made by the conspirators to cover up the conspiracy, and explanations of the conspiracy's workings and functions also qualify as statements made during and in furtherance of the conspiracy. For example, Polchan's statements regarding his utilization of Sarno to silence the victim of one of the conspiracy's robberies, is a statement in furtherance of the conspiracy. When made to other members of the conspiracy, even after the fact, such a statement tends to promote the conspiracy by describing its power to immunize its members from the effects of their criminal acts.

Hay's accounts of the statements of James Tortoriello Senior, however, do not appear to fall within the co-conspirator exception to the hearsay rule. Although sometimes used as a fence by the conspiracy, Tortoriello's statements that Sarno would require him to pay a street tax on his illegal proceeds from activities he conducted while in Chicago do not appear to be in furtherance of the conspiracy in any way. If anything, Tortoriello seems to be trying to avoid one of the claimed aims of the conspiracy - to collect street taxes from any participants in illegal activity within the conspiracies geographic boundaries. While the statements clearly implicate both Tortoriello and Sarno and explain, by implication, Sarno's position in the criminal enterprise, they do not appear to further the conspiracy in any way. Because it is otherwise hearsay, the statements Hay attributes to Tortoriello are inadmissible.

Kyle Knight is expected to testify as well. His testimony, as proffered, will confirm that he worked together with Mark Hay, Polchan and others in robberies from jewelry stores. The proffered testimony is specific in detail and corroborates the expected testimony of Mark Hay as outlined above; in some cases adding more detail than Hay was in a position to know. His proffered testimony is detailed and self incriminating in the extreme. He also corroborates Hay's descriptions of Polchan as the group member who would often identify possible targets and sell the stolen goods for the group. He will also confirm in much more detail than Hay that he provided the explosives used to by Sam Volpendesto to bomb C & S Coin Operated Amusements in Berwyn.

The bombing of C & S Coin Operated Amusements is evidence of the existence of a very broad conspiracy and is a criminal act in furtherance of the enterprise since it involves a crime committed by Knight and Volpendesto to aid a different aspect of the conspiracy, the control of video gambling machines - an aspect of the conspiracy that, unlike the burglaries and robberies, did not directly profit either Volpendesto or Kyle Knight. The conversations between Kyle Knight, Hay and SamVolpendesto regarding the arrangements for supplying the materials for the bomb and making the bomb are all statements made during the course of and in furtherance of the conspiracy and, therefore, are admissible as are subsequent statements made by co-conspirators which are intended to help cover up and avoid arrest. This includes the conversation in which Sam Volpendesto tells Kyle Knight that he (Sam) and Polchan were a team that worked directly for Big Mike. This is a statement to a co-conspirator explaining and promoting the workings of the conspiracy. The statement was made in the context of attempting to enhance Sam Volpendesto's stature in the conspiracy hierarchy and thus secure future cooperation from Kyle Knight in conspiracy business.

Volpendesto's discussion, as referenced above, included discussions regarding how members of the conspiracy/enterprise were paid, who owned assets belonging to the conspiracy/enterprise, a review of exploits of conspiracy members – tricks to building a successful bomb, the amount of damage caused by the bomb and law enforcement's lack of success in discovering who was responsible for the bombing as well as prior exploits by him. While some of Volpendesto's statements regarding lack of payment to him and to Knight for the

bombing were critical, nevertheless, these statements were discussing the business of the conspiracy with a fellow conspirator, the manner in which things got done within the framework of the conspiracy, and thus were in furtherance of the overall goal of the conspiracy. Explanations of how conspiracy members are compensated for criminal acts which, unlike burglaries and robberies, do not result in any direct profit to the conspiracy members being tasked to perform them, are statements which tend to promote the conspiracy. In addition, as the government points out, Volpendesto's statements to Hay did confirm that the cost of the materials to make the bomb was paid for by upper levels of the organization through him. He also explains to his coconspirator how he attempted to compensate Knight for his help in the bombing. The fact that one party (Hay) to the conversation was cooperating with the government at the time does not preclude the admission of Volpendesto's statements under the co-conspirator exception. *United States v. Mealy*, 851 F.2d 890, 901 (7th Cir. 1988). Volpendesto's interest in making such explanations to someone he recognized as a co-coinspirator was to promote the smooth functioning of the conspiracy.

Furthermore, the statements are not excludible as evidence whose unfair prejudice "substantially outweighs" its probative value. Fed. R. Evid. 403. The probative value of the coconspirator statements as to Polchan is great. It directly links Polchan to the particular bombing and establishes him as a member of the conspiracy and the corrupt enterprise. At the same time, the evidence is not unfairly prejudicial. It does not suggest to the jury some improper basis for finding the defendant guilty. It does not call upon a jury's passion or prejudice, nor does it require that the trier of fact draw an improper or unwarranted inference or assumption based upon emotion or some popular erroneous belief or misconception. The statements do not play upon or induce popular prejudices or passions. The statements are, by and large, recitations of actual events which comprise the elements of the various offenses charged. Polchan's claim of unfair prejudice appears to actually be an attack on the bases for allowing these out of court statements into evidence as exceptions to the hearsay rule or as non-hearsay. But these exceptions to the general ban on out of court statements are well established and the safeguards to unfair use of such evidence lie in the requirements that certain criteria be met before the statements can be admitted. Those requirements have been met here. The Government's Santiago proffer contains more than enough information to establish the existence of the conspiracy

alleged in the indictment and that the defendants were members of the conspiracy. As the government points out the inability to cross-examine the declarant is not a proper grounds for exclusion of evidence admitted pursuant to the penal interest exception or as statements in furtherance of a conspiracy. *United States v. Centracchio*, 265 F.3d 518, 525 (7th Cir. 2001), *abrogated onother grounds by Crawford v. Washington*, 541 U.S. 36 (2004). Moreover, it is often the case that co-conspirators are unavailable for cross-examination when their statements are admitted pursuant to the co-conspirator exception to the hearsay rule. If the government uses Volpendesto's statements, Polchan retains the right to impeach Volpendesto's credibility in any manner that would be permissible if Volpendesto had testified from the witness stand. Fed. R. Evid. 806.

Polchan also contends that he is entitled to a severance because admission of Sam Volpendesto's statements at a joint trial would be prejudicial. But these same statements would be admissible either as non hearsay or as exceptions to the hearsay rule even if Polchan were to be tried separately. A severance would not result in a trial free of Volpendesto's statements. Further, the inability to cross examine coconspirators is always present in a joint trial and is not by itself a basis for severance. Polchan also argues that statements made by co-defendant Anthony Volpendesto during a proffer-protected meeting entitle him to severance. But this argument, as pointed out by the government's response, is purely speculative. Extremely unusual circumstances would have to occur for this possibility to become a reality in this trial. Volpendesto is a codefendant and he cannot be forced to testify. Furthermore his proffer - protected statements can only be used if he were to testify or to take a position during the trial that is contrary to his statements. Even then, the statements can be redacted to purge any prejudice to Polchan. This possibility does not constitute a serious risk of prejudice to Polchan and certainly is not a basis for ignoring the strong preference for a joint trial.

Szaflarski, who is named though not charged in the RICO count, and charged in a substantive count (Count Two – illegal gambling) that is a predicate of the RICO conspiracy, is properly joined in this indictment. Contrary to his argument, evidentiary spill-over is not normally sufficient grounds for severing a properly joined defendant. *United States v. Abdelhaq*, 246 F.3d 990, 992 (7th Cir. 2001) (citing cases which have rejected severance on the basis of

spillover evidence). In addition, much of the evidence which is offered in support of the RICO count is admissible and/or related to the illegal gambling charge in Count Two. Some of the other predicate acts, such as the bombing of an illegal gambling competitor, were motivated by an attempt to protect the illegal gambling business of the criminal conspiracy. Because the offense in Count Two is closely related in time and motive, and is an integral part of the RICO count, this evidence would have to be duplicated in both trials if Szaflarski were to be tried separately. Szaflarski is named in the RICO count and his actions are an integral part of that offense. This is not a case in which a single defendant who is separate and apart from the overall criminal conspiracy will be prejudiced by the introduction of criminal activity completely separate and apart from him or his alleged criminal conduct. Nor is it a case in which a minimal participant or a defendant as to which there is scant evidence is likely to be overwhelmed by evidence which relates only to other defendants. Szaflarski's alleged criminal conduct is closely related to and a part of the offense in Count One. There is a common aim to protect the criminal enterprise. Volpendesto and Knight are allegedly involved in the robbery and burglary part of the enterprise conspiracy, yet they also are involved in the bombing carried out to protect the illegal gambling activities of the enterprise. Polchan is alleged to be involved in the illegal gambling machines with Salerno, but he is also heavily involved in the robbery and burglary activities and, in fact is a leader of the robbery crews (which include Knight and Volpendesto). Salerno sits atop of the alleged criminal enterprise and is involved in all of its functions. He collects street tax from all of its participants and controls not only where gambling machines can be placed, but also who the robbery/burglary crews may victimize and protects the robbery crew conspirators from victims who are smart enough to guess who has robbed them. The gambling and other alleged predicate acts are not separate, but are intertwined and some of the participants in each share a common control and the common goal of furthering the overall conspiracy. Szaflarski is alleged to be a major participant in one of those predicate acts (Count Two) and is also alleged, but not charged, in Count One with serving the enterprise. Finally, any possibility of prejudice can be addressed with an appropriate limiting instruction.

Szaflarski also complains of violations of his rights under the Sixth Amendment's Confrontation Clause. But conversations between parties who are unaware they are being monitored are not testimonial within the meaning of the Sixth Amendment. *United States v.*

*Hendricks*, 395 F.3d 173, 180-82 (3d Cir. 2005). In addition, for many of the same reasons discussed above, the out of court statements identified by Szaflarski in his motion are admissible pursuant to the co-conspirator exception. The government's Santiago proffer is sufficient to demonstrate that Sarno, Szaflarski, Polchan, Volpendesto and others were all members of a conspiracy to engage in illegal gambling, and that Sarno engaged in a conversation with a co-conspirator concerning the potential placement of video gambling devices at a public establishment. For all of these reasons, Szaflarski's motion for severance is denied.

Dated: October 1, 2010

**SO ORDERED**          **ENTER:**

_____
**RONALD A. GUZMAN**

**U.S. District Judge**