UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 08 CR 115-3 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SARNO | ) | |

**DEFENDANT MICHAEL SARNO'S EMERGENCY PETITION FOR COMPASSIONATE RELEASE UNDER 18 U.S.C. § 3582(c)(l)(A)(i)**

Defendant, MICHAEL SARNO, by and through his attorney, JOHN W. CHWARZYNSKI JR. moves this Honorable Court to grant him release, pursuant to the First Step Act, 18 U.S.C. § 3582(c)(l)(A)(i). In support of this motion, Mr. Sarno states the following:

### I. INTRODUCTION

Mr. Sarno is a 62-year old man who suffers from a multitude of health problems which include empyema of the lungs, chronic obstructive asthma, iron deficiency anemia, benign hypertrophy of prostate, an enlarged gallbladder, renal failure, an elevated white blood cell count, he is 100% incontinent, hypertension, osteoarthritis of the knees requiring two total knee replacements, and is unable to walk and ambulates with a wheel chair. Mr. Sarno is at grave risk for a variety of other diseases and health conditions. His health problems have worsened since his incarceration in December 2010, and the COVID-19 pandemic poses an additional deadly risk to Mr. Sarno. The Centers for Disease Control and Prevention ("CDC") has stated that "[b]ased on currently available information and clinical expertise, older adults and people of any age who have serious underlying medical conditions might be at higher risk for severe illness from COVID- 19."[1] Mr. Sarno is a senior citizen and has serious medical conditions. Furthermore, Mr. Sarno has recently been transferred to an undisclosed medical facility and has had no contact in weeks with his family or attorneys. Given the recent transfer to an undisclosed facility and history of poor medical treatment, and lack of medical treatment since his incarceration, Mr. Sarno's Petition for Compassionate Release requires immediate

---

[1] *Coronavirus Disease 2019 (COVID-19) People Who Are At Higher Risk for Severe Illness* (last updated May 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher- risk.html.

action to avoid and prevent serious and irreparable harm to Mr. Sarno.

Recent data shows the severity of the COVID-19 pandemic, and how it is continuing to spread across the world. Leading health institutions including the CDC and the World Health Organization ("WHO") have reported that as of May 16, 2020, the worldwide number of confirmed cases of COVID-19 has reached nearly 4.6 million.[2] The new strain of coronavirus, which causes COVID-19, has killed nearly 310,000 people. *Id.* The severity of COVID-19 is clearly obvious, and the WHO officially declared it a global pandemic on March 20, 2020.[3] Likewise, Governor Pritzker issued a disaster proclamation for Illinois on March 9, and the President of the United States declared a national emergency on March 13.[4]

COVID-19 has not confined its spread by racial, religious, or socioeconomic boundaries, and it has endangered lives in every state throughout the country. Without question, however, incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe."[5] Not surprisingly, "infection control is challenging in these settings," as evidenced by the fact that the virus ripped through prions across China.[6] Similarly, the situation in Iranian prisons became so alarming that Secretary of State Mike Pompeo urged the Iranian government to release any Americans in its prions, arguing that their "detention amid increasingly deteriorating conditions defies basic human decency."[7] Ultimately, Tran released tens of thousands of people from its prisons throughout the country. *Id*

---

[2] *COVID-19 Dashboard by the Center/or Systems Science and Engineering (CSSE),* Johns Hopkins University, https://gisanddata. maps.arcgis.com/apps/opsdash board/index. htm I#/bda7594740fd40299423467b48e9ecf 6 (last visited May 16, 2020).

[3] *WHO Characterizes COVID-19 as a Pandemic,* World Health Organization, https://bit.ly/2W8dwpS (last visited May 16, 2020).

[4] *Pritzker declares slate of emergency for COVID-19,* The State Journal-Register https://www.sj-r.com /news /20200309/pritzker-declares-state-of-emergency-for-covid-I 9, (last visited April 25, 2020); *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak,* www.whitehouse.gov/presidential-actions/proclamation-declaring- national-emergency-concerning-novel-coronavirus-disease-covid-I 9-outbreak/ (March 13, 2020).

[5] *Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders.from Public Health and Legal Experts in the United States,* (March 2, 2020), https://b it.ly/2W9V6oS.

[6] *Chinese jails have become hotbeds of coronavirus as more than 500 cases have erupted, prompting the ouster of several ojjicials,* Business Insider (Feb. 21, 2020), https://www.businessinsider.com/500- coronavirus-cases-reported-in-jails-in-ch ina-2020-2.

[7] Jennifer Hansler and Kylie Atwood, *Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak,* CNN (March I 0, 2020), https://www.cnn.com/2020/03/1 0/poli tics /mi ke-pompeo-iran-re lease-detain ed-americans- coronavirus/index.htm l.

Just like it did in prisons in other parts of the world, COVID-19 has spread rampantly throughout jails and prisons in the United States. Through May 14, 2020, the Illinois Department of Corrections has confirmed that 160 staff members contracted COVID-19, along with 192 inmates who contracted the virus.[8] Similarly, the Minnesota Department of Corrections has reported that as of May 14, 2020, 48 of its staff members have tested positive for COVID-19, and 114 inmates have the virus.[9] Like state prisoners, federal inmates are also facing the effects of the rapidly spreading virus. Data from the Federal Bureau of Prisons shows that 2,325 inmates are infected with COVID-19, and another 503 staff members have tested positive.[10] These numbers show that the country's jails, both state and federal, truly are "petri dishes" for the spread of the novel coronavirus.[11]

## II. BACKGROUND OF MR. SARNO'S CASE

Mr. Sarno's imprisonment stems from a 2009 indictment in which the government charged him with violations of 18 U.S.C. §1962(d) and 18 U.S.C. §1955 after the Federal Bureau of Investigations conducted a three-year surveillance of Mr. Sarno and his co-defendants, Mark Polchan, Samuel Volpendesto, Mark Hay, and Anthony Volpendesto.

The government alleged several different crimes as part of the charged criminal enterprise, including jewelry store robberies and the bombing of a rival video gambling business. However, nearly all the evidence that related to Sarno centered on his alleged involvement in gambling activity. *See United States v. Volpendesto*, 12-1656 (7th Cir. 2014)(noting that "Sarno's connection to the robberies was less overt than his connection to the gambling" and that the government instead relied on pieces of "circumstantial evidence"). Mr. Sarno was *not* charged with the bombing or with any of the jewelry store robberies. Although the stated purpose of the alleged enterprise was the making of money, there was no evidence whatsoever that Mr. Sarno received income

---

[8] Illinois Department of Corrections, COVID 19 Response, https://www2.illinois.gov/idoc/facilities/Pages/CovidI 9Response.aspx (last visited May 14, 2020).

[9] Minnesota Department of Corrections, COVTD-19 Information, https://mn.gov/doc/about/covid- 1 9- updates/ (last visited May 16, 2020).

[10] Federal Bureau of Prisons, COVID-19 Cases (August 2, 2020), https://www.bop.gov /coronavirus/.

[11] Timothy Williams, *Jails are Petri Dishes: Inmate Freed as the Virus Spreads,* shttps://www. ny ti me s.com/2020/03 /30/us/coronavirus-prisons-jai ls.htm l (March 30, 2020)

from *any* of the six robberies or the bombing. There was no evidence that Mr. Sarno was even aware of any of the six robberies. The only evidence regarding any of the robberies was an alleged conversation between Mr. Sarno and the owner of one of the stores – LD Jewelers – that allegedly took place *after* the robbery. The sole source of this evidence was the uncorroborated testimony of the government's informant. The owner of the store denied that such a conversation ever took place.

Mr. Sarno went to trial and was found guilty on December 22, 2010. On February 8, 2012, he was sentenced to Two Hundred and Forty Months on Count I and Sixty Months on Count II, with the terms of custody to run consecutively to the term of custody on Count I. Mr. Sarno had prior convictions of racketeering, running an illegal gambling operation, and extortion in the 1990's.

Further, the statutory-mandatory minimum was a fine or prison not to exceed 20 years pursuant to 18 U.S.C. § 1962(d). The statutory-mandatory minimum was a fine or prison not to exceed more than 5 years pursuant to 18 U.S.C. §1955.

At the outset of Mr. Sarno's sentencing the government informed the Court that classifying Mr. Sarno as a career offender would be the "key driver" in determining Mr. Sarno's sentence, as it would obviate any other guideline disputes. The sentencing court thus made a threshold determination that Mr. Sarno was a career offender on the basis of two prior convictions: A 1991 conviction for racketeering and operating an illegal gambling business and a 1996 conviction for making extortional extensions of credit. The 1991 conviction was determined to be a career offender predicate based upon the so-called residual clause of U.S.S.G. Section 4B1.2. As a career offender, Mr. Sarno's guideline range automatically jumped to 360 to life.

Additionally, because the jury's verdict did not entail a finding that Mr. Sarno was accountable for the bombing or any of the six robberies, the district court made its own factual findings and arrived at its own conclusion that Mr. Sarno was responsible for both the arson and each and every charged robbery. In reaching its conclusion the district court acknowledged that there was "very little direct evidence of anything." (Exhibit A: 2/8/12 S.Tr. at 37.) Thus, the district court concluded that it was making its determinations based upon reasonable inferences from the evidence. Regarding the robberies, the district court stated in a conclusory fashion that Mr. Sarno "knew of them. He sanctioned them. He had control at least to be able to say, no, those people you can't rob. He had a say as to who did what, at least to the extent of limiting the role that Sam Volpendesto

would have in the robberies." (Exhibit A: 2/8/12 S.Tr. at 39.) There was absolutely no evidence that Sarno knew of, sanctioned, or limited any person's role in any of the six charged robberies. In addition to the factual deficiencies that should not even allowed the judge in Mr. Sarno's case to reach these wholly unsupported conclusions, this type of unconstitutional judicial behavior is rampant and has been criticized by Justice Anton Scailia. Scailia observed that "any fact that increases the penalty to which a defendant is exposed constitutes an element of crime, Apprendi v. New Jersey, 530 U.S. 466, 483, n. 10, 490 (2000), and "must be found by a jury, not a judge." Cunningham v. California, 549 U.S. 270, 281 (2007).

The district court nevertheless found Mr. Sarno liable for the six-armed robberies as well as the bombing that were that were not found by the jury. In the absence of the court's fact-finding, Mr. Sarno's guideline range was 37 to 46 months. But the sentencing court calculated his guideline range at 360 months to life-a near ten-fold increase due to the so-called relevant conduct (and perhaps the sentencing court's mistaken belief that Sarno was a "career offender"). Ultimately, the district court sentenced Mr. Sarno to twenty-five years in prison- the statutory maximum.

Most importantly, it should be noted that Mr. Sarno appealed his conviction and sentence to this Court *United States v. Volpendesto,* 746 F.3d 273 (7th Cir. 2014). The judgment was affirmed on appeal on March 24, 2014. Consequently, the court failed to provide exculpatory evidence regarding its investigation of another person suspected of being the leader of the six robberies that were attributed to Mr. Sarno at trial and sentencing. Mr. Sarno provided a copy of a police report he had obtained through a Freedom of Information Act Request. (Exhibit B: St. Charles Police FOIA response). The report specifically identified Samuel Volpendesto as the leader of the enterprise. Specifically, the report notes that there was:

"a joint investigation involving the FBI, ATF and the US attorney's office." The report noted that the officer provided information to these agencies to assist in their joint operation. The report concluded that "[i]t was also determined that this group was responsible for at least (2) bombings of businesses in the south Chicago suburbs. The group operated at the direction of reputed syndicate figure Samuel Volpendesto. It was also learned that the following subject operated in consort with [redacted] and served as a conduit for the "fencing of jewelry acquired during the robberies." R.9 at 58. Mr. Sarno alleged that this information was in the government's possession based on the report's clear reference to assistance in the federal investigation. Additionally, he alleged that it was classic Brady material because it specifically identified a different suspect as responsible for the crimes for which the government had chosen to prosecute Mr. Sarno.

During his more than 114 months of incarceration, Mr. Sarno has been a model inmate. Mr. Sarno has avoided all misconduct while at FCI Petersburg Medium which is evidenced by the fact that there has been

only one incident over 3 years ago for a minor altercation with another inmate. Mr. Sarno's current release date from the Federal Bureau of Prisons (the "BOP") is May 7, 2032.

Mr. Sarno is not a violent offender, nor does he pose any risk to any person or community. It is undisputed that Mr. Sarno has been involved in video gambling for most of his life, which coincidently is legal today. It is also undisputed that the jury during his trial did not find him liable for the bombing or any of the six robberies. Thus, furthering the belief that Mr. Sarno is *not* a violent offender.

### III. THIS COURT SHOULD MODIFY MR. SARNO'S SENTENCE AND RELEASE HIM TO HOME CONFINEMENT

Federal law empowers this Court with broad authority to grant a compassionate release. The current COVID-19 outbreak, combined with Mr. Sarno's age and health conditions, amount to the type of extraordinary circumstances that warrant a sentencing reduction. In addition, the facts of this case fit all of the discretionary factors that courts use in determining whether to grant a defendant's motion for compassionate release. Despite the release, Mr. Sarno will have 6 years of supervised release to serve. Accordingly, this Court should grant this motion, and release Mr. Sarno to home confinement.

Before the First Step Act became law in 2018, only the BOP could move for compassionate release under 18 U.S.C. § 3582. *United States v. Ebbers,* 2020 WL9 I 399 at* I (S.D.N.Y. Jan. 8, 2020). Congress recognized the inefficiency and unfairness of that process and squarely addressed it in Section 603(6) of Public Law 115-391, which it entitled "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-391, 132 Stat. 5239 (2018). Hence, under the First Step Act, either the BOP or the defendant can move for compassionate release. 18 U.S.C. § 3582(c)(l)(A). Since Congress passed the First Step Act, courts now grant compassionate release where the case satisfies four conditions: I) the defendant has exhausted his administrative rights before moving a federal court for release, 2) the defendant has shown that "extraordinary and compelling reasons warrant" release, 3) the court has considered the factors under 18 U.S.C. § 3553(a), and 4) the court has found that release is consistent with the Sentencing Commission's policy statements.

#### A. Mr. Sarno Has Exhausted His Administrative Remedies.

With regard to the first requirement for compassionate release, the BOP, the warden nor the BOP responded to Mr. Sarno's request for a compassionate release within the 30 days of his request which was made on April 4, 2020. (Exhibit C). Furthermore, Mr. Sarno's family has been informed that he has been moved to a medical facility at an undisclosed location. This failure to respond is a final administrative decision, and failure to inform the Sarno family of the location of the medical facility he has been transferred to, "Defendant exhausted his administrative remedies within the BOP" upon receiving BOP's denial of his request. *United States v. Johnson,* 2020 WL1434367 at *2 (W.D. Ark. Mar. 24, 2020). Likewise, the defendant may move for compassionate release if 30 days has elapsed since the warden received his request for release. 18 U.S.C. § 3582(c)(1)(A); *United States v. Moskop,* 2020 WL 1862636 at* I (S.D. Ill. April 14, 2020). Here, Sarno applied for compassionate release through the warden's office at Petersburg FCI. No response has been made by the warden, and since, 30 days have passed, Mr. Sarno has exhausted his administrative remedies.

     **B.    Extraordinary and Compelling Reasons Warrant Mr. Sarno's Release to Home Confinement.**

If the defendant has exhausted his administrative remedies, a court must then also find that "extraordinary and compelling reasons warrant" a compassionate release. 18 U.S.C. § 3582(c)(l)(A)(i). Under§ IBl.13 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines"), "extraordinary and compelling reasons" for release include the defendant's medical condition, a combination of the defendant's health and advanced age, or family circumstances. U.S. Sentencing Guidelines Manual § 1B1.13 Application Notes (2018). In addition, a fourth catch-all provision provides that "other reasons" can qualify as extraordinary and compelling. Courts are divided, however, on whether the Sentencing Commission's statements preclude a court from making its own independent assessment as to whether "extraordinary and compelling reasons" warrant a sentencing reduction.

In *United States v. Young,* for example, the Middle District of Tennessee unequivocally held that "district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." 2020 WL 1047815 at *6 (M.D. Tenn. Mar. 4, 2020). Likewise, **in** *United States v. Beck,*

the Middle District of Carolina explained that although "the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction." 425 F. Supp. 3d 573, 579 (M.D.N.C. June 28, 2019). That court reasoned that the Sentencing Commission's policy statement is not only " inconsistent with the Commission's statutory role, " but also "inconsistent with the First Step Act, which was enacted to further increase the use of compassionate release and which explicitly allows courts to grant such motions even when [BOP] finds they are not appropriate." *Id.* Hence, the *Beck* court held that courts may consider "whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement." *Id.*

Unlike the courts' decisions in *Young* and *Beck,* the Central District of Illinois concluded that courts do not have "the same discretion conferred to the BOP Director by the Sentencing Commission's policy statement." *United States v. Garcia,* 2020 WL 2039227 at *5 (C.D. Ill. April 28, 2020). The court admitted that the Sentencing Commission's "current policy statement is a relic," and also that it did not doubt that the Commission would revise its policy statement to give courts discretion, if it could. *Id.* It held, however, that the Commission's definition of "extraordinary and compelling reasons" is not inconsistent with the text of the First Step Act, and thus courts do not have discretion to independently assess the defendant's proffered reasons. *Id.*

This Court should side with the *Young* and *Beck* decisions, in determining that it does have the power to conduct its own assessment of Mr. Sarno's circumstances favoring compassionate release, apai1 from the Sentencing Commission's stated categories of "extraordinary and compelling reasons." The First Step Act fundamentally changed the procedure for compassionate release under § 3582(c)(l)(A). Defendants can now move for compassionate release, and the court can grant the motion even where the BOP opposes it. Despite that drastic change, which Congress expressly implemented to expand courts' application of the compassionate release statute, § 1B1.13 of the Guidelines still presupposes that only "[u]pon motion of the Director of the Bureau of Prisons," can a court grant a sentencing reduction. U.S.S.G. § lBI.13. That requirement

is wholly inconsistent with the purpose and plain language of the First Step Act. Furthermore, the Supreme Court has cautioned that commentary in the Guidelines is not authoritative where it "is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States,* 508 U.S. 36, 38 (1993). Thus, this court has the power to determine extraordinary and compelling reasons for Mr. Sarno's compassionate release, regardless of either the BOP's, or the Sentencing Commission's, definitions of the qualifying circumstances. Furthermore, it is anticipated that the government will suggest that Mr. Sarno is receiving adequate care and treatment for his multitude of health conditions, however, that is not that case, nor has that been the case since his incarceration, which is obvious in his medical records. As such, Mr. Sarno's medical records are filed under seal.

But even if this Court were to confine its analysis to the outdated terminology and policy statement from § 1B1.13, it should still grant Mr. Sarno's release because his circumstances qualify as extraordinary and compelling under the old Guideline standards. Also, in cases where defendants have presented similar circumstances to those that are pertinent to Mr. Sarno' s situation, courts have granted compassionate release. In *United States v. McCarthy,* for example, defendant Joh n McCarthy was serving a sentence for committing armed bank robbery. Case No. l 7-CR-230 (D. Conn. April 8, 2020). The district court granted his motion for compassionate release because McCarthy is a 65-year-old man suffering from asthma and other breathing problems. *Id.* at *4. The court explained that McCarthy's serious medical conditions "substantially increase his risk of severe illness if he contracts COVID-19," and thus he had "demonstrated extraordinary and compelling reasons justifying his release under section 3582(c)(l)(A) and section 1B1.13 of the Sentencing Guidelines." *Id*

Similarly, in *United States v. Gonzalez,* the Eastern District of Washington granted 64-year-old defendant Teresa Ann Gonzalez's motion for compassionate release based on her extraordinary and compelling reasons. 2020 WLl536155 (E.D. Wash. Mar. 31, 2020). The court stated that Gonzalez's chronic obstructive pulmonary disease ("COPD") and emphysema made her "most susceptible to the devastating effects of COVID-1 9," and that she was in the "most

susceptible age category (over 60 years of age)." *Id.* at *3. In another recent case, *United States v. Muniz,* the defendant was serving a 188-month sentence for a drug conspiracy, and he moved the court for compassionate release. Case No. 09-cr-0199-1 (S.D. Tex. Mar. 30, 2020). The court noted that it was

"grievously aware of the current global health crisis caused by COVID-19," and that despite special measures that the BOP is taking, "individuals housed within our prison systems nonetheless remain particularly vulnerable to infection." *Id.* at *2. The court found that the threat from COVID-19, combined with the defendant's health conditions, which included diabetes and hypertension, amounted to extraordinary and compelling reasons warranting compassionate release. *Id.* at *4.

Most recently, in *United States v. Mario J. Rainone,* the Defendant, Mario Rainone, an alleged member of the Chicago Mafia, was in prison since 2009 for being involved in a string of residential burglaries and commercial thefts, during the search of his home authorities found a stolen gun in his nightstand. Due to his long criminal history, Rainone was charged with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922 (g)(1) and 924(e) (1). Rainone was sent to 180 months in prison. Mario Rainone filed a petition for compassionate release pursuant to the First Step Act, and Judge Harry D. Leinenweber found that Mr. Rainone qualified for compassionate release based on extraordinary and compelling circumstances; the Court further found that a reduction in his sentence was warranted, and thus, the Court granted his release. Case No. 09-cr-00206. Unlike, Mr. Rainone, Mr. Sarno was not a violent offender, Mr. Sarno was never found to be in possession of an illegal firearm, and Mr. Sarno was never charged or convicted by a jury of any of the six robberies or bombing that was alleged involving his co-defendants. The Court, on its own, made its own finding of fact and made Mr. Sarno the 'ring leader" of the group. Thus, Mr. Sarno should be released from prison.

The CDC has identified several conditions that expose people to a greater risk of severe illness from COVJD-1 9.[12] Among those are persons 65 years or older and those who have kidney disease and are on dialysis. Furthermore, in a memorandum dated March 26, 2020, the United States Attorney General cited those CDC guidelines as one discretionary factor that the BOP should use in considering an inmate's release to home confinement.[13] Other factors in that directive include: I) "[t]he security level of the facility currently holding the

---

[12] *People Who Are at Higher Risk for Severe Illness,* CDC (March 26, 2020), https://www.cdc.gov/coronavirus/20 I 9-ncov /need-extra-precautions/people-at-higher-risk.htm1?

[13] *Prioritization of Home Co, finement As Appropriate in Response to COVID-19 Pandemic,*
Office of the Attorney General (Mar. 26, 2020),

inmate, with priority given to inmates residing in low and minimum security facilities;" 2) "[t]he inmate's conduct in prison;" 3) the inmate's re-entry plan; and 4) the inmate's crime of conviction. *Id.*

Furthermore, the American Civil Liberties Union has stated that, "even if communities across the United States continue practicing social distancing and following public health guidance – we will still experience much higher death rates if no substantial action is taken to reduce jail populations. We are likely facing massive loss of life – both in jails and in communities around the country – if dramatic steps aren't taken to reduce the incarcerated population in this country."[14] ABC News has reported that the federal prison system has been besieged by the pandemic.[15] As of July 29, 2020, there are now 87,993 cases of the coronavirus in Virginia, but the health department notes that its hospitalization figure – based on status at the time each case gets investigated – "underrepresents" the actual total.[16]

In this case, Mr. Sarno is among the class of people who are most at risk for severe illness and death from COVID-19. Like the defendants in *McCarthy* and *Gonzalez*, Mr. Sarno is a 62-year-old man, which puts him in the "most susceptible age category." 2020 WLI 536155 at *3. Moreover, his health problems are similar in severity to the conditions that the defendants in those cases. Mr. Sarno has empyema of the lungs, chronic obstructive asthma, iron deficiency anemia, benign hypertrophy of prostate, an enlarged gallbladder, renal failure, an elevated white blood cell count, is 100% incontinent, hypertension, osteoarthritis of the knees requiring two total knee replacements, and is unable to walk and ambulates with a wheel chair. Mr. Sarno has been in custody for 114 months and is getting older, weaker, and sicker by the day.

---

[14] "New Model Shows COVID-19 Death Toll Is 100,000 Higher Than Current Projections." *American Civil Liberties Union*, www.aclu.org/press-releases/new-model-shows-covid-19-death-toll-100000-higher-current-projections.

[15] *ABC News*, ABC News Network, abcnews.go.com/Politics/lawmakers-worry-covid-19-spread-bureau-prisons-officers/story?id=71247464.

[16] Smith, Samantha. "Virginia Sees 999 New Coronavirus Cases, Now Reporting 87,993 Statewide." *WSLS*, WSLS 10, 29 July 2020, www.wsls.com/news/virginia/2020/07/29/virginia-sees-999-new-coronavirus-cases-now-reporting-87993-statewide/. "911 More COVID-19 Cases, 16 New Deaths in Virginia." *Fauquier Now*, www.fauquiernow.com/fauquier_news/article/faukquier-911-new-covid-19-cases-16-more-deaths-in-virginia-7-2020.

In addition to the danger of severe COVID-19 illness that Mr. Sarno faces because of his age and health conditions, other factors also favor his release to home confinement. First, Mr. Sarno's crime of conviction was for conspiracy to commit racketeering and corrupt organization, and conducting an illegal gambling business. In *United States v. Johnson,* this Court held that "it is 'the statute of conviction, not actual conduct, that controls eligibility [for relief] under the First Step Act.'" 2019 WL2590951 at *3 (N.D. Ill. June 24, 2019) (quoting *United States v. Davis,* 2019 WLI054554 at *2 (W.D.N.Y. March 6, 2019). Many other districts have reached that same conclusion, "a defendant is eligible for relief under the First Step Act based upon his offense of conviction, as opposed to his actual conduct." *United States v. Williams,* 2019 WL3842597 at *3 (S.D.N.Y. July 3, 20 I 9) (relying on *United States v. White,* 2019 WL 3228335 at *2 (S.D. Tex. July 17, 2019) (collecting more 40 cases from various districts throughout the nation). Here, Mr. Sarno's crime of conviction is conspiracy to commit racketeering and corrupt organization, and conducting and illegal gambling business under 18 U.S.C. § 1962(d) and 18 U.S.C. §1955. For those crimes, the Court sentenced him to the mandatory maximum of 25 years imprisonment.

Mr. Sarno has been incarcerated at FCI Petersburg Medium until recently where he is now at an undisclosed medical facility. According to the Attorney General's March 26 directive, Mr. Sarno's release should have priority over inmates in higher-security facilities. Furthermore, Mr. Sarno has been an exemplary inmate while at FCI Petersburg Medium. Understanding the Affordable Health Care Act, Reality of Re-Entry, Aids Awareness, Exercise for Better Health, and others. Copies of his medical records will be filed under seal.

Mr. Sarno also has a convincing plan for a successful reentry into his community. He would reside with his wife, son, daughter, and 18-month-old granddaughter in the suburbs.

    C.    **This Court Should Grant Compassionate Release Because it is Consistent with the Sentencing Factors Under 18 U.S.C. § 3553(a), and with the Sentencing Commission's Policy Statements.**

Because extraordinary and compelling reasons warrant Mr. Sarno's release, the First Step Act requires that the Court next consider the sentencing factors under 18 U.S.C. § 3553(a). 18 U.S.C. § 3582(c)(l)(A). This Court's previous analysis of the § 3553(a) factors, at the time of sentencing, remain unchanged in certain respects Keeping Mr. Sarno in prison, however, is no longer necessary. The fact he was formerly convicted of

racketeering conduct that occurred decades ago is moot. The Chicago Outfit was demolished by the "Family Secrets" case in 2007. Mr. Sarno has served a substantial portion of his sentence, and releasing him to home confinement would undermine neither the seriousness of the offense, nor respect for the law.

Moreover, in light of his health conditions and the health risks that he faces from COVID-19, continued incarceration would amount to punishment greater than necessary to serve the purposes under § 3553(a)(2). In addition, the applicable § 3553(a) factors do not prevent the Court from granting Mr. Sarno's request for compassionate release. Although his crime of conviction is undoubtedly serious, other courts have granted compassionate release to defendants who were convicted of equally serious and even far worse crimes. *See United States v. A/mantes,* 2020 WL 1812713 at* I (D. Conn. April 9, 2020) (court granted release despite the defendant's conviction for drug trafficking and drug conspiracy); *see also United States v. Wong Chi Fai,* 2019 WL3428504 at *1 (E.D.N.Y. July 30, 2019) (court granted compassionate release where the crimes of conviction were extortion and racketeering conspiracies involving multiple murders). Hence, while the seriousness of the offense is certainly an appropriate consideration, the First Step Act's compassionate release provisions apply with equal force to all defendants.

Finally, this Court must consider whether compassionate release "is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(l)(A)(i). Section IBl.13 of the Guidelines provides that the defendant must not be a danger to any person or to the community. U.S.S.G. § I B1.13(2). Mr. Sarno is a senior citizen with severe medical issues and can only ambulate with a wheelchair. Given his health conditions and the demolition of the The Chicago Outfit, Mr. Sarno is isn't even remotely close to being a danger to any person or to the community.

Furthermore, Mr. Sarno poses no danger to any person or to his community. Between his multitude of medical issues and confinement to a wheel chair, he is no longer the Michael Sarno of the past. Instead, he is an ailing senior citizen with a myriad of medical issues.
Mr. Sarno's case qualifies for compassionate release under the First Step Act because he first exhausted his administrative remedies with the BOP. In addition, the combination of his health problems and the unique risks that the COVID-19 pandemic poses to him, amounts to extraordinary and compelling reasons that

warrant his release. Furthermore, compassionate release comports with both the § 3553(a) factors, as well as the Sentencing Commission's policy statements because Mr. Sarno has served a substantial sentence, and his further incarceration would be greater than necessary to achieve the goals of the sentencing factors. Moreover, Mr. Sarno poses no risk of recidivism, and is not a danger to anyone. Therefore, this Court should grant Mr. Sarno compassionate release to home confinement.

## IV. CONCLUSION

WHEREFORE, Defendant, Michael Sarno, respectfully requests that this Honorable Court modify his sentence under 18 U.S.C. § 3582(c)(l)(A)(i) and release him to home confinement, or hold a hearing as soon as possible. Mr. Sarno also moves for any additional relief that he might be entitled to by law, or that this Court deems just.

Respectfully submitted,

MICHAEL SARNO,

By: */s/ John W. Chwarzynski Jr.*
Attorney No. 6327836
HALE & MONICO, LLC
53 West Jackson, Suite 337
Chicago, IL 60604
(773) 307-3157
jwc@halemonico.com