```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        )
                                      )
 4              Plaintiff,            )
                                      )
 5     v.                             )  No. 08 CR 115-3
                                      )
 6   MICHAEL SARNO,                   )  Chicago, Illinois
                                      )  February 8, 2012
 7              Defendant.            )  10:30 a.m.

 8              TRANSCRIPT OF PROCEEDINGS - SENTENCING
                BEFORE THE HONORABLE RONALD A. GUZMAN
 9

10   APPEARANCES:

11   For the Plaintiff:        HON. PATRICK J. FITZGERALD
                               United States Attorney
12                             BY:  MR. AMARJEET SINGH BHACHU
                                    MR. TINOS DIAMANTATOS
13                                  MR. MICHAEL T. DONOVAN
                               Assistant United States Attorneys
14                             219 South Dearborn Street
                               Suite 500
15                             Chicago, Illinois  60604
                               (312) 353-5300
16
     For the Defendant:        GENSON AND GILLESPIE
17                             BY:  MR. TERENCE P. GILLESPIE
                               53 West Jackson Boulevard
18                             Suite 1420
                               Chicago, Illinois  60604
19                             (312) 726-9015

20                             LAW OFFICES OF JEFFREY B. STEINBACK
                               BY:  MR. JEFFREY BRUCE STEINBACK
21                             53 West Jackson Boulevard
                               Suite 1420
22                             Chicago, Illinois  60604
                               (847) 624-9600
23

24

25
```

Nancy C. LaBella, CSR, RMR, CRR
Official Court Reporter
219 South Dearborn Street, Room 1222
Chicago, Illinois  60604
(312) 435-6890
Nancy_LaBella@ilnd.uscourts.gov

1  APPEARANCES:  (Continued)

2  For the Defendant:          MS. GABRIELLE R. SANSONETTI
                               Attorney at Law
3                              53 West Jackson Boulevard
                               Suite 1750
4                              Chicago, Illinois  60604
                               (312) 697-0007
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Proceedings heard in open court:)

2          THE CLERK:  08 CR 115-3, United States of America v.

3    Sarno.

4          MR. BHACHU:  Good morning, your Honor.  Amar Bhachu

5    on behalf of the United States, together with Tinos

6    Diamantatos and Michael Donovan.

7          MR. DIAMANTATOS:  Good morning, your Honor.

8          MR. DONOVAN:  Good morning, your Honor.

9          MR. GILLESPIE:  Good morning, your Honor.  Terry

10   Gillespie, Jeff Steinback and Gabrielle Sansonetti on behalf

11   of Michael Sarno, who is present in court.

12         MR. STEINBACK:  Good morning, your Honor.

13         THE COURT:  Good morning, everyone.

14         Are we prepared to proceed to the sentencing?

15         MR. BHACHU:  Yes, Judge.

16         MR. GILLESPIE:  Yes, sir.

17         THE COURT:  Very well.  I think we still have pending

18   post-trial motions for a new trial and judgment.

19         MR. BHACHU:  Yes, Judge.

20         THE COURT:  Does either side wish to argue that?

21         MR. BHACHU:  No, Judge.

22         MR. GILLESPIE:  We don't, Judge.

23         THE COURT:  Okay.  Those motions are denied.

24         MR. BHACHU:  Judge, I also had two other housekeeping

25   matters if I could bring to the Court's attention.  I have a

```
 1    preliminary order of forfeiture I would like to submit to the

 2    Court, as well as a restitution chart.  With regards to the

 3    restitution chart, the total amount on the chart reflected is

 4    $1,784,077.

 5            THE COURT:  I assume the defense has seen this.

 6            MR. GILLESPIE:  Yes.

 7            MR. STEINBACK:  We have, Judge.

 8            THE COURT:  Is there an objection to the terms of the

 9    preliminary order of forfeiture?

10            MR. GILLESPIE:  Yes, sir.

11            THE COURT:  Do you wish to be heard?

12            MR. GILLESPIE:  No, your Honor.

13            THE COURT:  Okay.  The Court will enter the order.

14            PROBATION OFFICER:  For the record, your Honor, Todd

15    McKechnie on behalf of the probation office.

16            MR. GILLESPIE:  Your Honor, I just brought up to

17    counsel -- and I'm not sure that that chart -- we just got it

18    a few minutes ago.  As the Court knows, you'll recall from the

19    trial -- it was a long time ago now -- that there was some

20    money found at Mr. Sarno's house.  And we presented some

21    evidence in relation to some Christmas cards and that the

22    money belonged to Angelica, the daughter.

23            THE COURT:  Birthday cards I think.

24            MR. GILLESPIE:  Birthday or graduation.  I think it

25    was graduation.
```

1          THE COURT:  Okay.

2          MR. GILLESPIE:  But, at any rate, I think we -- I

3     hope your Honor saw it this way, but I think we made a fairly

4     strong case that that money belonged to this young lady here.

5     And I think that money is -- ends up to be in that order, at

6     least Amar tells me that that's the case.

7          MR. BHACHU:  It is on page 3, Judge, a reference to

8     the funds in the amount of $17,380.  What I would suggest,

9     rather than holding up our proceedings right now, is that

10    perhaps counsel and I can confer either towards the end of our

11    proceedings today or immediately following the proceedings and

12    see if we can't come to a resolution as to that issue here.

13         MR. GILLESPIE:  That would be fine with me, your

14    Honor.

15         THE COURT:  Do you want to set a date for that now?

16         MR. BHACHU:  Judge, I think we could do that for

17    sure.  Perhaps -- I think it wouldn't take very long, so if we

18    could do it maybe this Friday, if that's available to the

19    Court.

20         MR. GILLESPIE:  Perhaps we can do it by agreement and

21    just --

22         THE COURT:  If you want to set a date in case you

23    can't, and that way we can have a hearing and make a

24    determination.

25         MR. GILLESPIE:  Friday one of us will be available

1    I'm sure.

2            THE COURT:  Okay.  Friday at 9:30.  Preliminary order

3    of forfeiture, specifically the issue with respect to the

4    money confiscated during the execution of the search warrant.

5            MR. GILLESPIE:  Thank you, sir.

6            THE COURT:  I'm looking for guidance.  What issue do

7    you wish to take up first?

8            MR. STEINBACK:  Your Honor, before we entertain a

9    variety of issues -- and I have some suggestions there -- we

10   would like the opportunity -- in light of some recent health

11   circumstances which have arisen in connection with Mike's

12   case, particularly his hospitalization at Thorek and then

13   later treatments down in Kankakee -- to be able to supplement

14   the existing presentence report, as well as the supplemental

15   report recently received regarding Michael's health so that it

16   will follow him to the Bureau of Prisons and enable the Bureau

17   of Prisons to better evaluate and treat those issues.

18           The physical conditions which have since emerged

19   concern, among other things, something called a significant

20   pleural effusion, which, as I understand it, has to do with

21   the filling up of fluids of the left lung.  And Michael had to

22   be taken to the hospital for the better part of two months

23   where a tube was stuck in his left lung to remove a variety of

24   fluids and to enable him to be able to breathe.  That

25   condition also required hospitalization and treatment down in

 1   Kankakee where Michael was placed on a series of antibiotics.

 2   That condition has not completely cleared up.  And in the

 3   process, we believe that there's also the diagnosis of

 4   hypertension and some diabetes.  And so we would like the

 5   records concerning his medical condition to reflect that and

 6   for leave to be able to submit that to the probation office

 7   and then to the Court so that it can be included in the

 8   presentence report.

 9            THE COURT:  Government?

10            MR. BHACHU:  No objection, Judge.

11            THE COURT:  Okay.  You're given leave to do so.

12            MR. STEINBACK:  Now, your Honor, with respect to the

13   variety of matters that are before the Court, there are, of

14   course, guideline issues and then issues in mitigation and

15   aggravation.

16            I think that the guideline issues sort of lay out

17   into two categories.  One would concern rather

18   fact-intensive-based guideline considerations concerning, for

19   example, leadership, whether, in fact, your Honor is going to

20   find Mr. Sarno responsible from an accountability standpoint

21   for certain acts that are alleged and were discussed during

22   trial.  Those fact-intensive arguments we hope your Honor will

23   allow Mr. Gillespie to address.

24            And then there is the issue with respect to the

25   criminal history category, which is a mixture, in my judgment,

1   of law as it exists today, as it existed in 1996, as well as

2   3553(a) considerations.  And I would like the opportunity to

3   address that issue.

4        MR. BHACHU:  Judge, if I may kind of chime in?  The

5   issue I think that is pretty well going to be the key driver

6   or may be the key driver in this case is if your Honor makes a

7   determination that defendant Sarno is a career offender.  That

8   will, I think, potentially obviate other guidelines disputes

9   down the road, given the fact that there's a restricted

10  guideline range of up to 300 months in this case.

11       If Mr. Sarno is considered to be a career offender

12  and accountable for some -- for at least the robberies or the

13  robbery that the sentencing -- sorry -- probation office holds

14  him accountable for, his guideline range is 292 to 365 months.

15  So I would propose that we start with the issue of whether or

16  not Mr. Sarno is a career offender.

17       THE COURT:  Okay.  The government's -- well, I guess

18  the supplemental presentence investigation as well as the

19  government's position is that.  So I'll let the government go

20  first.

21       MR. BHACHU:  Judge, with respect to the issue of

22  whether or not Mr. Sarno is a career offender, I think the

23  answer is very clear from the guidelines under 4A1.2 that he,

24  in fact, is.

25       The issue that has been raised -- I think there's two

1  issues that the defendants have raised -- or the defendant I

2  should say -- has raised with respect to whether or not

3  Mr. Sarno is a career offender.  One is whether or not he has

4  two prior convictions for a crime of violence.  And the second

5  one is whether or not the current offense of conviction is, in

6  fact, a crime of violence.

7         With respect to the first issue, whether or not he

8  has two prior convictions for a crime of violence, the

9  contention made by the defendants is that his prior

10  convictions in the Infelise case and the Castaldo case should

11  be considered as one conviction.  That request recognizes that

12  under guideline 4A1.2 as it's currently written, they would be

13  counted separately, I believe.  Guideline 4A1.2 says that

14  sentences resulting from offenses contained in the same

15  instrument, charging instrument, or sentences that are imposed

16  on the same day are considered to be one offense or one

17  conviction.  That's quite obviously not the case here.  The

18  Infelise and Castaldo convictions arose from separate charging

19  instruments, and the sentences were imposed on different days

20  as well.  So under the clear terms of section -- guideline

21  section 4A1.2, those sentences are, in fact, to be considered

22  separately.

23         The defendant suggests that that somehow poses an ex

24  post facto problem.  That contention has been already rejected

25  by the Seventh Circuit in United States v. Demaree.  Because

1  of the fact that the guidelines are advisory and because your

2  Honor has the discretion, if you wish, to impose a

3  non-guideline sentence even if Mr. Sarno is considered to be a

4  career offender, there is no ex post facto problem at all.

5  The second issue with regards to whether or not the

6  current offense of conviction is a crime of violence would

7  point towards the other -- I think some of the factual issues

8  that we have -- or have discussed in our papers; one, whether

9  or not Mr. Sarno is accountable for the arson activity during

10  the prior -- or during the instant crime of conviction or,

11  two, whether or not he's accountable for the robbery activity.

12  We would submit to your Honor that the defendant is

13  certainly accountable for the arson activity in this case

14  because he, in fact, is the one that commanded the arson to

15  take place.  We have a series of facts that all point towards

16  demonstrating that the defendant is accountable for that

17  activity.

18  We have his visit to Vince Dublino in the summer of

19  2002, which demonstrates his involvement in the illegal

20  gambling activity, but also implies that he believed that he

21  was in a position of command and should be obeyed because of

22  who he was and what type of business he was in.

23  We also have the recording that was made of Sam

24  Volpendesto.  Sam Volpendesto admitted his role in the arson.

25  He also admitted in that same recording that he did Michael

1   Sarno's dirty laundry.  He also admitted that he had not been

2   paid upwards of $20,000 by Michael Sarno for his prior work,

3   and that he also follows, in this sense, Michael Sarno's

4   orders.

5          In addition to that, you have the recording from Kyle

6   Knight and Kyle Knight's testimony.  Kyle Knight, during his

7   testimony, established that Sam Volpendesto actually did that

8   bombing at the behest of Michael Sarno because Vince Dublino

9   was putting gambling devices in locations where he shouldn't.

10  And his testimony was confirmed by the recording where he

11  actually says Sam Volpendesto told him why it was he was doing

12  what he was doing.  And the notion that somehow Sam

13  Volpendesto was the person that was independently responsible

14  for conducting this bombing obviously is entirely incredible.

15         The fact that Mr. Sarno had a motive to conduct the

16  bombing due to his control of the gambling activity, that's

17  set forth in our papers; but I'll just touch on a couple of

18  highlights there.

19         The fact that Mr. Sarno was, in fact, in charge of

20  the gambling activity that was involved here is very clear.

21  The records that were introduced at trial showed that Casey

22  Szaflarski had machines at the 47th Street Grill, which was

23  the location that Mr. Sarno ordered Vince Dublino to stay away

24  from prior to the bombing.  The records and interceptions in

25  this case showed that Michael Sarno was in contact with Casey.

1    There was an interception between him and Mark

2    Polchan in Goldberg Jewelers. And during that interception,

3    which took place I believe -- let's see. It was an

4    interception at -- yes, at Goldberg Jewelers between Mark

5    Polchan and Mr. Sarno. Mr. Polchan mentions the guy at No

6    Name, which was one of the locations where Casey Szaflarski

7    had machines located. Mr. Sarno tells Mr. Polchan, No, just,

8    ah, Casey told me a little something about it. And then Sarno

9    goes on to say, He's got one and we're going to get the whole

10   stop. Polchan tells Mr. Sarno, Tell him, tell him, tell him

11   get the whole stop, kick the guys out of there. And then

12   reaffirms again, Tell him get the whole stop, kick the guys

13   out of there.

14   The other fact that we know is Raymond Rossi called

15   Mr. Sarno for permission to install gambling devices at the

16   Lista Lounge. And in advance of actually having the

17   substantive call where they discussed placing gambling devices

18   at that location, there was a preceding call that took place

19   on Mr. Sarno's telephone where there was a reference again to

20   the guy with the H3 stopping by, a reference to Casey

21   Szaflarski, and the need to discuss business with Casey

22   Szaflarski.

23   The fact that the defendant Sarno controlled Casey

24   Szaflarski is also demonstrated by the fact that Casey

25   Szaflarski himself told one of his workers, John Scardina I

1    believe -- sorry -- Victor Sheehan, that he wasn't really in

2    control of where machines were being put.  This is in

3    reference to a situation where Victor Sheehan was reluctant to

4    put machines in a particular location because he thought that

5    there was going to be video monitoring of that location and he

6    didn't want to put machines in there because of the risk

7    involved.  And Casey told him it wasn't his choice as to where

8    to put machines.  John Scardina is the individual that

9    testified about the territorial nature of this business; the

10   fact that he was told to stay away from Cicero.

11          The territorial nature of this business is further

12   emphasized by the fact that Vince Dublino is visited by this

13   man, by the defendant, who tells him to stay away from a

14   particular stop, as if to say it was his territory.  He was

15   the person that was going to decide what type of business was

16   going on there.

17          And then finally, Judge, with respect to Mr. Sarno's

18   involvement, in addition to his motive for participating in

19   the bombing, we have the interception at Goldberg Jewelers.

20   That interception taking place shortly after Kyle Knight was

21   charged with providing explosive materials for the bombing.

22   And we have a closed-door meeting between Mark Polchan and

23   Michael Sarno in the business at that time.  The government

24   obtained the shreds from the shredder, as you'll recall, and

25   the two men were conferring about articles relating to the

1    bombing.  Of course, the fact that they were conferring in a

2    closed-door session about those articles and then thereafter

3    Mr. Polchan shredded them is further evidence of the two men's

4    involvement in the bombing, particularly so since neither man

5    was actually mentioned in the charge that was lodged against

6    Mr. Knight or in the newspaper articles that followed.

7              So all of those factors, Judge, demonstrate that

8    Mr. Sarno was, in fact, a participant and commanded the arson

9    activity that took place and demonstrates that, as to

10   Mr. Sarno, the conviction is a crime of violence.  That alone

11   would be sufficient in our view to demonstrate that

12   Mr. Sarno's prior -- current count of conviction is, in fact,

13   a crime of violence.

14             And then there's also the information that we have

15   provided in our papers with respect to his involvement and

16   knowledge of robbery activity.

17             With regard to that, Judge, he was not personally a

18   participant in these robberies.  But the guidelines permit

19   accountability where somebody enters into a joint agreement or

20   a joint undertaking with others.  The Seventh Circuit

21   requires -- and we would ask your Honor to find -- specific

22   findings of fact as to this issue.  And I would note that

23   because in recent cases, the Seventh Circuit has admonished us

24   prosecutors to make sure that such findings of fact are, in

25   fact, made by the district courts where we proceeded under a

1   theory of joint accountability.

2        There are three factors that the Seventh Circuit
3   looks at in this regard.  One, it asks for the finder of fact
4   to consider the scope of the criminal activity the defendant
5   agreed to jointly undertake.  Two, whether the conduct of
6   others was in furtherance of that joint criminal activity.
7   And, three, whether the conduct was reasonably foreseeable to
8   the defendant in connection with the joint criminal activity.

9        Now, the probation office is in agreement as to one
10  of the robberies, the LD Jewelers robbery; that, in fact,
11  Mr. Sarno was accountable with respect to that robbery.

12       The point of departure, I think, that the probation
13  office had with regards to the other robberies that were
14  charged and proven at trial is that the defendant didn't seem
15  to have any actual knowledge of those robberies through the
16  proof that was introduced.

17       As we mentioned in our papers, the reasonable
18  foreseeability component, that third prong if you will, does
19  not require actual knowledge of the actions of
20  co-conspirators.  And we cited United States v. Aslan, 644
21  F.3d 526, at page 537, which was a Seventh Circuit decision
22  that came out last year.

23       But let me touch, if I can, upon some of the evidence
24  that demonstrates first -- or actually demonstrates all three
25  of those factors, namely that Mr. Sarno agreed to participate

1    in the affairs of an enterprise through a pattern of

2    racketeering activity that included robbery.  And I think to a

3    lesser extent obviously the robberies that were committed by

4    these individuals, we would submit that the evidence

5    demonstrated that those robberies were in furtherance of the

6    joint criminal activity and that, in fact, was reasonably

7    foreseeable to the defendant.

8            Our papers demonstrate that Mr. Sarno was a person

9    that was in a position to actually sanction robbery.  With

10   respect to that issue, your Honor heard testimony of Mark Hay

11   who indicated that he actually went to Mark Polchan and

12   discussed with him the issue about robbing a dice game which

13   occurred in the winter of 2002.  And in that situation,

14   Mr. Polchan sought the approval of Mr. Sarno to actually

15   conduct that robbery.  It was not permitted; and for that

16   reason, Mr. Hay did not engage in the robbery.

17           That -- there was a lot of back and forth, your Honor

18   may remember, at trial about what we could elicit from Mr. Hay

19   about that issue, about why he was prepared to follow

20   Mr. Sarno's direction.  Because, in your Honor's estimation,

21   one of the issues presented there was, well, why would it be

22   the case that Mr. Hay would follow Mr. Sarno's direction.  The

23   reason why Mr. Hay would be compelled to follow a direction

24   issued by Mr. Sarno is because it would demonstrate enterprise

25   and it would show connectivity and structure between the

1   defendants.  And that's precisely what it did do.  Mr. Hay did

2   not rob that dice game.  He followed the instructions that

3   were sent down to him through Mr. Polchan.

4        And there are other factors also that demonstrated

5   that Mr. Sarno was -- had agreed to jointly undertake a

6   criminal activity that involved robbery.

7        We also had the LD Jewelers robbery.  In that

8   instance, there was testimony that Mr. Polchan had used

9   services of Mr. Sarno to intercede with respect to the owner

10  of LD Jewelers to prevent him from asking questions about who

11  was responsible for the robbery; and that that had been

12  successful.  You might recall from the LD Jewelers robbery

13  that in that situation, the owner's wife was tied up, the

14  establishment was robbed and then the jewels in that instance

15  that were stolen were actually moved in Florida.  Mr. Polchan

16  had the relationship with Lenny DeGrado and, for that reason,

17  did not feel comfortable in actually moving the jewels himself

18  here in the Chicago area.

19       There's also interceptions that reflect that

20  Mr. Sarno had knowledge of the activities and had the ability

21  to control the activities of the enterprise as they related to

22  robbery.

23       With respect to the recordings that we mentioned in

24  our papers with Anthony Baldassano, Mr. Baldassano calls up

25  Mr. Sarno, reports to him that his house has been robbed and

1    that he asks him to check with his shops to see if any of the

2    goods taken had ended up there.  The immediate call that

3    Mr. Sarno places immediately after receiving that call from

4    Mr. Baldassano is a call to Mr. Polchan asking if anybody has

5    brought these goods to his location.  And Mr. Sarno --

6    Mr. Polchan indicates that has not happened.  And Mr. Sarno

7    says, I wish it had.  Mr. Sarno wishes those goods had shown

8    up at Goldberg Jewelers because if they had shown up, then

9    Mr. Sarno could have had them returned to Mr. Baldassano.

10          Mr. Polchan also says during an interception where

11   he's talking about the prospect of how -- how difficult his

12   life is and during that interception that we mentioned in our

13   papers, he talks about how he's worried about getting arrested

14   every day.  And in the context of doing that, he also mentions

15   that he has to take care of his boss as well.  His boss is

16   nobody else than Mr. Sarno.

17          There is a contention from the defense side that he

18   must be talking about somebody else.  There is nobody else

19   that fits the bill of boss.  Mr. Sarno is the one that we have

20   seen throughout the case is the one that says, I'm the one

21   that thinks for other people.  If you'll recall that

22   interception between him and David Kantowski.  In that call he

23   says, you know, I -- let me do the thinking.  He's the guy

24   that's in control.  He's the guy that orders the bombing.

25   There is nobody else that fits the bill for someone that would

1    qualify as Mr. Polchan's boss.

2          We also have interceptions where Mr. Polchan is

3    actually paying money to Mr. Sarno in Goldberg Jewelers.  A

4    wad of cash is delivered in April of 2007, perfectly

5    consistent with the testimony of James Wagner.  James Wagner

6    testified in the Family Secrets case.  We attached his

7    testimony as one of our exhibits.  And Mr. Wagner explained

8    there are concepts such as street tax that, where you operate

9    illegal activity, you're obligated to pay a percentage of your

10   ill-gotten gains as street tax if you're associated with an

11   Outfit member.

12         These things all demonstrate, Judge, that Mr. Sarno

13   is accountable for the robbery activity.  The fact that he may

14   not have known about a particular robbery does not mean that

15   he's not accountable for it as part of the joint undertaking

16   that he agreed to join.

17         Those are the issues I think that clearly pertain to

18   the career offender issue in particular, whether or not the

19   prior -- or, sorry -- the current offense of conviction is, in

20   fact, a crime of violence.

21         MR. STEINBACK:  Your Honor, it's for those reasons

22   that I believed the issues with respect to the robberies and

23   the arson, as well as the guidelines that pertain to them, are

24   fact intensive and are really predicate for the argument with

25   respect to criminal history.  That's why I suggested that

1   those factual disagreements need to be resolved before we can

2   go on to the next issue.  And I believe Mr. Gillespie is

3   prepared to address what has been raised.

4          MR. GILLESPIE:  I am, your Honor.

5          THE COURT:  I can see you can hardly wait.

6          MR. GILLESPIE:  With the Court's permission, I'll

7   address those issues.  And Mr. Bhachu has covered just about

8   all of the areas that I intended to cover at any rate.  So

9   I'll just stick with my script and proceed.

10         I think -- we don't have a lot of disagreement, if

11  any at all, what the evidence was at trial, the prosecution

12  and I.  We do have a great difference as to what you can take

13  from it, what conclusions you can make from it, and the way he

14  characterized it.  I mean, but what actually was said at trial

15  and who said what, we don't have much of a disagreement.  And

16  I know your Honor listened as carefully as -- as could be to

17  all of this trial and took notes throughout.  If we did have a

18  disagreement, you know what was said.  And at the end of the

19  day, you will make the determination as to what those facts

20  and what that testimony means.

21         The government has contended here in a very broad

22  sweep right from opening statements that Mike Sarno is the

23  boss; everything that was done here by every one of the

24  individuals that have been charged here, all of the deeds that

25  they were involved in, running the gamut from scandalous and

1  craven to run-of-the-mill criminal activity, activity such as

2  armed robberies, knifing people, burglaries, the whole kit and

3  caboodle, Mike is in for a penny, he's in for a pound; he's

4  responsible for all of that.

5       The probation department has concluded that basically

6  for guideline purposes, Mike is responsible at sentencing here

7  for the gambling, the arson and one of those robberies that

8  they determined to be reasonably foreseeable.

9       We disagree with those conclusions; not with the

10  underlying facts, but with those conclusions.

11       Ordinarily, your Honor, I think when there is such

12  disagreement, this Court would look to the jury verdict and

13  make a determination from the verdict what did the jury

14  determine was the conduct that they attributed to the

15  defendant.  I know in this case, that task falls upon you.

16       Count One in this indictment, as you're well aware,

17  included all of that nefarious activity that we're talking

18  about, from armed robberies, knifings, all the way down to

19  gambling.  And Count Two that Michael is charged with charged

20  him with the very same evidence -- or the very same acts in a

21  gambling conspiracy.  And it's a pretty good guess, if your

22  Honor was to look at the verdicts, you could conclude -- a

23  reasonable conclusion indeed from the evidence in that

24  verdict -- that this jury found Michael guilty of being

25  involved in gambling.

1          They did not make a determination, nor do they have

2     to make a determination or are they called upon to make a

3     determination, as to what other predicate acts they found

4     attributable to him.  That's the nature of that charge.

5     That's the nature of this conspiracy to commit racketeering.

6          Unlike the other defendants in this case, the

7     prosecution did not charge Mike with hard counts of the arson

8     or substantive counts of the arson or those armed robberies,

9     so you don't have the luxury -- and, again, it's a luxury; you

10    at the end of the day make the decision -- but you can't look

11    to what the jury was thinking or what the jury attributed to

12    Mike regarding the arson.

13         Now, I have a few things to say about that.  One is,

14    it's their prerogative.  They get to decide the charges.

15         Two is, they're pretty smart folks.  They decided

16    these charges for a particular reason.  There would had to

17    have been -- and God knows there was -- some thoughts that

18    went into how to charge Mike Sarno in this.

19         And the third thing I know about that, as I said, you

20    can't look to those verdicts to find out what the jury was

21    thinking.  So, unlike with a lot of the other defendants, you

22    have to look and you have to make determination from the facts

23    and the evidence as you heard them what is reasonable to

24    conclude regarding the evidence in this case, what is

25    reasonably foreseeable for Michael to be charged with for him

1  to be sentenced on.

2      I'm not going to give you my closing argument again

3  here today.  You sat through it once.  You listened to it.

4  Our position papers clearly indicate how we strenuously

5  disagree and we strenuously disagreed with -- to the jury that

6  much of the activity in this case cannot be attributed to

7  Mike.

8      Counsel went over and gave his opinion about a lot of

9  the arson evidence, what he took from that arson evidence.  I

10  don't agree with that, and I've indicated to your Honor why I

11  don't agree with that in closing argument.  I indicated to

12  your Honor why I don't agree with that in our position papers.

13  But I know your Honor has listened to that evidence, not

14  necessarily his characterization of that evidence, but you

15  listened to that evidence.  You read those papers.  And I know

16  from previous sentences that occurred in this case generally,

17  your Honor probably has made a determination regarding the

18  arson and Mr. Dublino and all of the evidence that related to

19  that arson.

20      What is most important and what I'd like to address

21  with the Court here today is this robbery evidence.  That

22  evidence, as counsel has indicated, not only impacts the

23  career offender aspect of it, but it impacts the sentence that

24  you will -- the sentencing guidelines that you will give to

25  Mike Sarno.  And that's where I would like to spend a few

1    minutes in addressing your Honor on those facts because I

2    think that that area of the case is crucial in your

3    determination as to what the appropriate sentence is here.    In

4    that area of the case, I couldn't -- I disagree with

5    Mr. Bhachu, as we have on many occasions about lots of areas

6    in the case, but this particular area in the case, I

7    strenuously disagree with his conclusions about what that

8    evidence was and what your Honor should determine from that

9    evidence.

10         The probation department -- counsel has basically

11    said, as I indicated, he's in for all of them; he knew about

12    all of them or he should have known about all of them; he knew

13    about the general scheme about all of them and there's

14    evidence to indicate that he was aware of the robberies.    The

15    probation department has indicated to your Honor the L and D

16    Jewelry he should be responsible for.    As I indicated, we

17    disagree.    And I'd like to discuss that with your Honor for

18    the remaining few minutes that I have.

19         There were five weeks of trial here.    One full week

20    was related to these robberies.    You know from that testimony

21    that years of investigation went on by some of the best law

22    enforcement agencies in the world concerning these robberies.

23    They were all over these robberies.    All types of evidence was

24    presented to this jury and your Honor heard concerning these

25    robberies.    All kinds of forensic evidence.    Nothing -- not

1    one bit of forensic evidence, not any of this CSI type of

2    stuff that we see and hear about indicated --

3           THE COURT: You watch that?

4           MR. GILLESPIE: I don't, but my wife does and I have

5    to hear it from the next room.

6           But, at any rate, not one bit of it is attributed to

7    Mike.

8           We had phone evidence. None of that phone evidence

9    has -- tells you anything about these robberies at all

10    involving Mike. Surveillance, GPRs or GPSs or whatever they

11    are in his car, following him, nothing about the surveillance

12    over all of that time. Wires, wires up on phones, wires up in

13    Goldberg Jewelers. None of that. Nobody talks about Mike

14    being involved in these robberies.

15           Then we have a search of his house. They go out

16    there and they spend a whole day out there with a whole army

17    of federal agents and they go over that place with a

18    fine-toothed comb. And there's jewelry there and there's

19    records there and there's money there. Nothing, not one

20    scrap, not one pinky ring, nothing is attributed to any of

21    these jewelries.

22           As I indicated, the tapes, nobody on the

23    tapes that -- I think everybody has to agree, nobody knew

24    those tapes were going on -- nobody knows -- on any of those

25    tapes is Mike's involvement in these robberies that evidence

1   was presented to this jury and Court concerning ever brought

2   up.

3           Then we had the testimony of the inside guys that

4   committed the robberies.  We not only had all of the forensic

5   type evidence, but we also had the inside guys that come in

6   here and testify.  And they told you Michael was never

7   involved in the planning of any of the robberies.  He was

8   never involved in the splitting up of any of the money of any

9   of the robberies.  No street tax was put aside for Michael --

10  this supposed street tax business -- regarding robberies.

11          Mr. Hay testified that on two occasions while he was

12  at Goldberg Jewelers, where he hung around apparently night

13  and day for forever, he saw Polchan give Mike Sarno two

14  envelopes.  My recollection of that testimony is he didn't

15  know how much was in it or what it was for.  But we do know --

16  well, he opined that it might be for street tax.  But we do

17  know it wasn't for any street tax that had anything to do with

18  the robberies.  He never said that, and it's not a fair

19  conclusion to be made.  They never put anything aside for

20  street tax for those robberies.  If they did a score, these

21  rascals, they split it however many ways were involved in it.

22  If there were five people involved, there were five splits;

23  that is, unless they were stealing from each other.  That's

24  the way the evidence was presented regarding those robberies.

25  There was no street tax.

1          The one other time we have evidence of Michael

2     getting money, it's on tape.  He gives Polchan some money.

3     And guess what?  Polchan gives him some back.  We know from

4     the evidence that there was gambling activity between the two.

5     Why is it reasonable to infer that that was street tax or it

6     had anything to do with the robberies?  I submit to your Honor

7     that it isn't.

8          What it comes down to, what the entire evidence

9     concerning these robberies comes down to, is this fellow Hay.

10    When you shake the tree and you're all done, what you're left

11    with -- I submit to this Court, what they're left with is this

12    fellow Hay and his three "my guy" statements.  That's what

13    this case is about.  His three "my guy" statements.

14         First -- so I'd like to talk about Hay.  Now, I've

15    been doing this for a while, and I know your Honor has seen

16    them come and go for a while here; and I submit that very few

17    individuals have ever walked into a courtroom that have more

18    credibility issues than Mr. Hay.  You would have to go far and

19    wide to find somebody that brought more credibility baggage

20    than that individual.  That's all I need to say about that.

21         We also know that his three "my guy" statements

22    that -- which I'll address in a minute -- which the government

23    has made a big deal out of, they contend draws Mike into these

24    robberies.  We also know that none of them are corroborated.

25    None of them.  Not one of them is corroborated by a tape.  Not

1   one of them is corroborated by another individual.  Not one of

2   those "my guy" statements is corroborated.  And we know that

3   in all the time that he was talking to the government, all the

4   time he was talking to the FBI, he never once told them

5   Polchan referred to Sarno as "my guy."  The first time he said

6   that was in the courtroom.  That was a stipulation.  So that's

7   what we -- that's the hanger which they basically put this

8   cloak on to try to bring Mike underneath for these robberies.

9          The first "my guy" statement is, My guy said he'd be

10  pissed if he found out you were using Sammy for some kind of

11  robbery involving baseball cards.  Now, once again, I -- it's

12  uncorroborated, this guy's credibility issues.  But how does

13  that mean that Mike was involved in the robberies; that if he

14  found out he would be pissed?  How in the world does that "my

15  guy" statement indicate in any fashion that Mike could foresee

16  or was involved in those robberies?  The King's English tells

17  me, your Honor, just the opposite.  If he did know, he would

18  be angry.

19         The second "my guy" statement is the one that they

20  put a little more emphasis on.  Not a little more.  A great

21  deal more emphasis on.  And that's the protect the gambling

22  game that Polchan said he -- this was Hay's testimony.  Hay

23  said him and Formato -- him and Formato -- decided that they'd

24  go to Polchan.  And Polchan said he'd go to my guy to find out

25  if the game was protected.  That's -- he didn't say, I'll go

1   to my guy to find out if we can rob this game or I'll go to my

2   guy and tell him how this robbery was to occur and when it was

3   to occur and can we do it.  Hay says, with all his credibility

4   issues -- no time, no place, no indication of where this

5   occurred -- he said Polchan said he'd go to my guy and find

6   out if the game was protected.  Polchan comes back and says my

7   guy supposedly said the game was protected.  That's what they

8   want you to basically sentence Mike as being -- having these

9   robberies reasonable -- incidentally it was not a robbery that

10  was presented to this jury.  It wasn't a robbery that

11  occurred.

12          And Mr. Formato came into this courtroom -- Detective

13  Formato.  He was supposedly involved in this.  And he sat up

14  here and testified for half a day or whatever -- however long

15  he was here -- and he did not say one word about this.  He did

16  not say one word about this game or one word about this

17  proposed robbery.  How could that be?  They didn't forget to

18  ask him, your Honor.  He did not say one word about this, nor

19  have they submitted anything at this sentencing hearing

20  indicating that he would say anything about this.  In my

21  recollection, there's not a piece of evidence that I know of

22  that the game actually occurred at that location.  So how

23  could that mean Mike is responsible for robberies, a robbery

24  that didn't occur, that Formato does not corroborate on a "my

25  guy" situation?  How could that be?

1           And the third one, I think the most serious one, the

2    most serious because probation has attributed these robberies

3    to Michael, on the L & D Jewelry.  And that's very important.

4    Not counsel's conclusions of what happened there, but what the

5    evidence was regarding the LD Jewelry.

6           Basically, as I recall the testimony, Hay testified

7    that Polchan was concerned because Lenny DeGrado thought he

8    was involved in this robbery of his store.  And he went to --

9    Polchan supposedly went to Mike.  Hay says my guy said he was

10   going to go to talk to Lenny DeGrado and basically tell Lenny

11   DeGrado Polchan had nothing to do with it.  That's the

12   testimony concerning that "my guy."  Mike was supposedly going

13   to Lenny DeGrado.  He wasn't going to him to say, Polchan did

14   the robbery; my gang did the robbery; we were involved in the

15   robbery.  He was supposedly to go -- and the inference from

16   that, I think, is clear.  He was supposedly to go to Lenny

17   DeGrado, if you believed Hay -- undated, unsourced,

18   uncorroborated -- if you believed him, he was supposedly to go

19   to Lenny DeGrado and say, you're claiming Polchan did this; he

20   had nothing to do with it.  That's what I got out of that "my

21   guy."  That's -- nothing about, from Hay, that Mike was

22   involved in the robbery.  This is after the fact.

23          Well, we heard -- Ms. DeGrado was in the courtroom.

24   She didn't say anything about that.  Not a word.  She didn't

25   identify Michael in this courtroom.  And we know that the

1   government didn't call Lenny DeGrado.  It's, again, their

2   prerogative.  But we know that they talked to him, and we know

3   Lenny DeGrado said he never talked to Mike; that Mike never

4   said anything at all like that to him.  So I don't know what

5   it means.  I don't think it means what they say it means

6   anyway.  I don't think counsel's inference of what it means is

7   fair.  And I don't think it occurred at all.  The witness says

8   it didn't occur.  The owner of the store who they interviewed

9   say -- says it didn't occur at all.

10          But then we have this Baldassano thing.  Mike's

11  mechanic calls him up and says, My house just got robbed.  And

12  if you read that transcript, at one point he says, I know you

13  know, and then they talk over.  The inference that's fair to

14  be made of that is that -- not that Mike owns the stores or

15  Mike owns all of the Goldberg Jewelers.  They searched

16  Goldberg Jewelers from top to bottom.  Tens of thousands of

17  records.  You'd think something would be in there, something

18  would be in there that would connect that store to Mike Sarno.

19  Nothing.  Not a thing.  They searched his house, as I said,

20  top to bottom.  Nothing that connects it to Goldberg Jewelers.

21          He says, Mike, you know people in the pawn shop

22  business; check and see if any of my property that just got

23  stolen is there.  And he does.  A policeman walks in during

24  the same time frame, does the same thing.  Hey, did you see

25  any stolen property from so-and-so.  Nothing unusual.  And the

1   conclusion counsel asks you to make is not fair, and I don't

2   think it's reasonable.

3           The final thing is this boss situation.  Now,

4   Mr. Bhachu is a pretty smart guy, and he has his opinions.  As

5   my grandmother used to say, opinions are like noses;

6   everybody's got one.  But the facts of this case don't exclude

7   the whole world from being his boss.  There's nothing in this

8   case that excludes -- this had to be Mike Sarno because he's

9   the only one that could be his boss.  This coming from the

10  prosecutor.  Well, he's got an opinion.  That's good.  It's

11  not -- it's not an inference that has to be taken from that or

12  should be taken from that.  And even if it's taken from that,

13  why is it taken that he's the boss of the robberies?  We know

14  they had a relationship regarding the gambling.  I don't think

15  those inferences are fair.

16          In conclusion, your Honor, the one area of this case

17  that I find the most problematic because of the real unfair

18  twisting or reading of the evidence is regarding this robbery

19  and this robbery gig.  I think with the effort that went into

20  it, the time that went into it, they would have come up with

21  evidence if it was there.  They didn't.  What they come up

22  with is asking you to take inferences from neutral -- if that,

23  if believable -- neutral statements, neutral facts and make a

24  leap of faith that I don't think is warranted.  So regarding

25  that area -- and I think it does have a very important impact

1    on the sentencing -- I'd ask your Honor to conclude, which I

2    think reflects the reality of this case and the evidence in

3    this case, that Mike Sarno didn't have a darn thing to do with

4    the robberies in the case.

5            Thank you, your Honor.

6            MR. BHACHU:  May I respond briefly, Judge?

7            THE COURT:  Brief.

8            MR. BHACHU:  Thank you, Judge.

9            First of all, with regards to this issue, the issue

10   about being a career offender, if your Honor finds the

11   defendant was responsible for the arson, that is enough for

12   purposes of your decision to make him a career offender.

13           But I want to touch on these issues about the

14   robberies.  First of all, this issue about, well, you didn't

15   find proof when you searched Goldberg Jewelers, et cetera.  We

16   had wire interceptions in Goldberg Jewelers in 2007.  All the

17   robberies took place in an earlier period of time.  By the

18   time we were up on that wire, many of the people that were

19   involved in those robberies had been either arrested or,

20   alternatively, were working for the government.

21           There is also talk about Lenny DeGrado; that the

22   government chose not to call Lenny DeGrado at trial.  Well,

23   the testimony at trial was also that Lenny DeGrado was

24   involved with Mark Polchan in potentially trying to rob the

25   jewelry salesman that visited his store in 2001.  What was the

1    government going to do, call a guy that was in fact in league

2    with Mark Polchan as a witness at trial?

3         The other fact is and that counsel -- they've seen

4    Lenny DeGrado's prior 302s. His story changed over time.

5    When he was initially approached before Mark Polchan was

6    arrested, in June of 2008, he denied being contacted by

7    anybody about the robbery, which is true. But he also denied

8    having any clue who was actually responsible for the robbery.

9    After Mark Polchan was arrested, his story changed and he said

10   he always thought that Mark Polchan was involved in the

11   robbery and then gave us specified reasons for why he actually

12   thought Mark Polchan was involved.

13        When he was asked about Mr. Sarno, he grew very

14   agitated. That's in the 302s that counsel has. He was, in

15   the words of the 302s, very angry and very apprehensive and

16   asked why he had to mention an Outfit guy in his statement.

17   He acknowledged that he knew Michael Sarno is a powerful

18   member of the Chicago Outfit and that he'd actually met

19   Mr. Sarno through Mark Polchan.

20        When he was asked at the very end whether or not

21   Michael Sarno had sent him a message, he told us to, quote,

22   read between the lines and, quote, I don't want to get anyone

23   else involved that doesn't have anything to do with it.

24        After that, in September of 2008, he was interviewed

25   again. And then he went on to tell us that he had met Sarno

1    several times after the robbery, five to six times; and one of

2    those times was at his brother's jewelry store, which implies

3    obviously, Judge, that there was something there that caused

4    him to be particularly apprehensive.  And the other fact is,

5    he was probably, you know, based on the evidence that we heard

6    at trial, potentially in league with Mr. Polchan as well.

7         The fact that Mr. DeGrado denied receiving a message

8    from Mr. Sarno doesn't, I think, in any way take away from the

9    testimony of Mr. Hay, whose testimony was corroborated in

10   multiple ways.  Mr. Hay gave his statements to us, Judge, well

11   before we had a bug up in Goldberg Jewelers, well before we

12   actually started making recordings of Sam Volpendesto.  When

13   he first started giving statements to us, many of the

14   statements that he gave to us were corroborated by the

15   subsequent recordings that were made, by the other

16   interceptions that we made in Goldberg Jewelers.

17        There's this talk about, well, he used the words "my

18   guy" at trial.  Well, he gave that information prior to trial

19   about Mr. Sarno's involvement in terms of sanctioning

20   robberies.  He may not have used the exact phrase "my guy" as

21   opposed to identifying Mr. Sarno by his other monikers, such

22   as Large Guy.  But that doesn't detract from the fact that

23   prior to that point in time, he had given that evidence

24   before.  If he had for the first time at trial identified

25   Mr. Sarno as being the one that had been the intermediary and

1    interceding with regards to Mr. DeGrado, we would have heard

2    about that at trial.

3          To say then that his credibility is -- you know, is

4    something that you can't rely upon, you can because he was

5    corroborated in multiple ways through other recordings.

6          There was also some talk about, well, there's no

7    records found in Goldberg Jewelers.  Well, we didn't find much

8    of any records in Goldberg Jewelers about anything when it was

9    searched.  Mr. Polchan didn't keep records over there.  He

10   didn't have records of his own financial transactions for the

11   most part at Goldberg Jewelers.

12         And then, finally, there's this issue about my

13   opinion about whether or not Mr. Sarno is Mark Polchan's boss.

14   It's not my opinion.  It's based on the evidence in this case.

15   You know, who else was Mr. Polchan's boss?  We had a pole cam

16   in his business.  We had a video running in his business.

17   There wasn't anybody else that showed up there who Mr. Polchan

18   was like, oh, hey -- you know, treated in a deferential

19   manner.

20         The person that would show up -- you heard repeated

21   testimony from people -- that would show up at Goldberg

22   Jewelers over the course of the enterprise's activity would be

23   Mr. Sarno.  Mr. Sarno would receive cash payments from

24   Mr. Polchan.  People were not included in the conversations

25   between Mr. Polchan and Mr. Sarno, but they were kept alone.

 1   They were apart.  There was no evidence in any form that there

 2   was some other boss person out there that Mr. Polchan was

 3   reporting to other than Mr. Sarno.  They had a long-standing

 4   relationship.  And that that -- there's no other reasonable

 5   conclusion to be drawn when somebody says, I have to take care

 6   of my boss.  He's not talking about his wife.  He's talking

 7   about Mr. Sarno.

 8           So for those reasons, Judge, we'd ask that you find

 9   Mr. Sarno accountable for both the arson activity and the

10   robbery activity as well.

11           THE COURT:  Well, the difficulty, of course, is that

12   we're talking here in inferences.  There is, as defense

13   counsel has pointed out, very little direct evidence of

14   anything.  In that regard, I have to say that while true, it's

15   not surprising.  There was direct evidence that the defendant

16   was extremely careful about giving up any form of direct

17   evidence.  He used multiple phones.  He had a code language

18   with people who called him to tell them in code -- why he

19   would feel that was necessary we can only infer -- when not to

20   speak on that phone but to call him back on another phone.

21   "Call Alice" I think was one of the things he would say.

22           At one point, he actually gives up a little bit of

23   direct evidence in which -- when he tells someone who is

24   calling him, oh, my God, don't use those names; don't use

25   names in your conversations with me; believe me, I've got real

1  good reasons for saying that.  And the caller actually

2  apologized, if I remember correctly, saying how sorry he was

3  to have actually used somebody's real name, which brings me to

4  another point.

5       You didn't hear anybody's real names in those

6  recordings.  Everybody had nicknames.  They were all referred

7  to in one way or another; the other guy, the guy in the --

8  with the Hum- -- Hummer automobile.

9       MR. BHACHU:  H3, the guy with the H3.

10      THE COURT:  The guy on such and such street, 18th

11 Street, Goldberg.  Who is Goldberg?  There wasn't any Goldberg

12 in the case.  That name appears all over the place.  Everybody

13 uses it.

14      MR. GILLESPIE:  I think it was Goldberg Jewelers.

15      THE COURT:  Yes.  But who was Mr. Goldberg?  There

16 were references to Goldberg doing this and Goldberg doing that

17 and Goldberg's place, but there was no Mr. Goldberg.  It was

18 shorthand for Mr. Polchan.  So that lack of evidence doesn't

19 surprise me in the least.

20      It's clear that this defendant, as well as the others

21 but particularly this defendant, was going to great pains to

22 limit his direct contact with anything that might incriminate

23 him and was acting at all times as if he was under

24 surveillance, which, of course, he actually was.  Only the

25 surveillance, it turns out, was much more effective than he

1   gave credit.

2          The inferences, as we tell the jury, have to be

3   reasonable and they have to be based on the facts in the case.

4   I find that there are many facts that lead to the inescapable

5   inference that Mr. Sarno was both accountable for and, in

6   several very important ways, in control of the robbery

7   activities that the criminal enterprise soldiers, if you will,

8   were involved in.  It would take a tome to list all of those

9   here.  It would take a recitation of the evidence during the

10  four weeks of testimony.  And I'm not going to do that.

11         But I do find that there is clear evidence, in my

12  opinion, that the defendant ordered and directed the bombing

13  of C & S Amusements; that he is accountable for the robberies

14  engaged in by his co-defendants.  He knew of them.  He

15  sanctioned them.  He had control at least to be able to say,

16  no, those people you can't rob.  He had a say as to who did

17  what, at least to the extent of limiting the role that Sam

18  Volpendesto would have in the robberies.  All of which makes

19  perfect sense that this would be very important to him or

20  anyone in his position because if you've been convicted twice

21  already -- my goodness, for part of the time he was still I

22  believe on court supervision -- so you know how it happens.

23  If one of those robberies fails and somebody gets arrested,

24  that person becomes a potential witness against you.  It makes

25  perfect sense for Mr. Sarno way up the ladder in this

1    conspiracy to be worried about what happens to the little guys

2    during these robberies.  And why would he be worried about it

3    at all?  Why would he care if it weren't for the fact that

4    they could turn out to be evidence against him and his

5    involvement?

6         He also had quite effective power to provide

7    protection for, in one case, Mr. Polchan from possible

8    retaliation by victims who suspected him of having been behind

9    one of the robberies.

10         It's clear to me that after you look at all of the

11    evidence in the aggregate, draw all the reasonable inferences

12    that come from that evidence -- the testimony, the actions of

13    the defendant in going in secrecy to see co-defendant Polchan

14    when news media events, reports, begin to show that there's a

15    leak in the organization.  Why would he care?  Why would he

16    bother to go speak to Polchan, go into a room, view a document

17    which Polchan then shreds which is then recovered by the FBI,

18    put together and shown to be a document which informs them for

19    the first time apparently that they likely have a leak in

20    their organization? -- the reasonable inference is that he

21    would only care about those things if he was involved in the

22    organization.

23         One small fact I recall that hasn't been mentioned

24    here, but for some reason you recall some things better than

25    others, was Mr. Polchan's preparation of Mr. Hay the first

1    time he was to introduce Hay to the defendant, Mr. Sarno; how

2    he described to Hay how he should act in front of Sarno, how

3    he should be quiet, how he should be careful, clearly --

4    clearly -- considering this a very important person.

5         Now, I sentenced Mr. Polchan previously; and I can

6    tell you, he's not a person, from all that I learned about

7    him, who is easily impressed by anything but raw power.  He

8    was clearly impressed by Mr. Sarno.  At least that's what he

9    expressed to Mr. Hay.

10        Based upon all of these circumstances, the inferences

11   to be drawn from them, I am well-satisfied and convinced that

12   the government has met its burden in establishing that

13   Mr. Sarno is accountable in the legal sense of the word for

14   the robberies engaged in by his co-defendants, knew of them,

15   sanctioned them, controlled them to a great extent; and that

16   they were -- these robberies were clearly within the scope of

17   the RICO conspiracy and actually known to him to some extent

18   and reasonably foreseeable to him when not actually known to

19   him.

20        As I indicated previously, I find that the evidence

21   is more than sufficient to establish that Mr. Sarno ordered

22   the bombing at C & S Amusements.  He had the motive.  He had

23   previously threatened the owner of C & S Amusements.  They

24   were in direct conflict over the territory in which the

25   gambling machines, the illegal gambling machines, were being

1    deployed.  Sam Volpendesto's rambling conversations implicate

2    him convincingly.

3           I draw different inferences than those urged by the

4    defense with respect to Mr. Sarno's conversations when he

5    says, I didn't get blank from Sarno.  The defense concludes

6    that that is a statement that he was not actually getting

7    anything from Mr. Sarno.  I think when you read all those

8    statements in context, what he was complaining about was not

9    that he wasn't getting anything from Mr. Sarno or didn't have

10    anything to do with Mr. Sarno.  What he was complaining about

11    was the fact that Mr. Sarno was a lousy supervisor and a

12    terrible boss because he paid him in small little dribbles of

13    nothing instead of giving him a piece of the action, which, if

14    I recall correctly, is what he said a man wants when he takes

15    chances like he took; a piece of the action.  A piece of

16    something I think he said.  Instead, he was getting gas money

17    and an automobile at one point.

18           So my inferences, I think, parallel those of the

19    jury.  It's clear that the jury believed in the credibility of

20    the co-defendants who testified, the government informants and

21    cooperators, or they would not have convicted all of these

22    defendants.  And the Court is in sync with the jury in those

23    determinations as well.

24           The testimony of the main witnesses in this case,

25    however suspect their characters are, is reinforced and

1  corroborated by dozens of bits of actual concrete evidence as

2  to how things happened, when they happened.  All of that put

3  together weaves a convincing account which has Mr. Sarno as a

4  person who is in control of much of the action and certainly

5  accountable for virtually all of it.

6          In addition to that, I think the other elements with

7  respect to the career offender status are met here.  The

8  defendant is clearly over the age of 18 years at the time of

9  the commission of the current offense.  He has two prior

10  felony convictions for crimes of violence; a conviction of

11  February 6, 1990, in which he pled guilty to racketeering

12  conspiracy and operating an illegal gambling business --

13  sounds familiar, doesn't it? -- was sentenced to 78 months;

14  and the conviction of May 28, 1996, in which he pled guilty to

15  extortionate extensions of credit.

16          I'm well-satisfied that the defendant meets the

17  criteria for career offender status.  And in this case, what

18  that means is that his criminal history category moves to a

19  Category VI.

20          What do you wish to take up next?

21          MR. BHACHU:  Judge, with that determination, the

22  guideline range exceeds the statutory maximum for the

23  defendant.

24          We also had, for the record, a motion for an upward

25  departure relating to the ties of the defendant to organized

1    crime, and also for his prior recidivism as your Honor just

2    mentioned.  In light of your Honor's ruling with respect to

3    the issues you've just set forth, I don't think it's necessary

4    for us to actually -- as an academic matter -- to reach the

5    organized crime motion for upward departure or for recidivism.

6    And we'd argue those as 3553(a) factors if we may.

7              THE COURT:  There's a question of the defendant's

8    position of leadership.  Does anybody wish to address that?

9              MR. BHACHU:  Judge, I think -- I don't think it

10   actually changes the guideline range.  I'm happy to argue it.

11             THE COURT:  There are so many different possible

12   permutations of this guideline range that --

13             MR. BHACHU:  That's correct, Judge.

14             THE COURT:  -- I think under some possible

15   combination of determinations, it could.

16             MR. BHACHU:  Right.  I'm happy to argue it briefly.

17             I think the evidence definitely shows that Mr. Sarno

18   was a leader, for many of the reasons your Honor just

19   mentioned.

20             To the extent he was directing other people to commit

21   an arson, I think that implies a -- his leadership.

22             His leadership was even more strongly established

23   with respect to the illegal gambling activity, which I

24   discussed earlier.  He was actually authorizing or sanctioning

25   where illegal gambling devices were being placed.  And it was

1   clear that -- even from the accounts that Mr. Volpendesto

2   gave -- that Mr. Sarno was the one that was in charge of

3   illegal gambling activity in Cicero.

4           So for those reasons, we would ask you to find as

5   well that -- with respect to Count One -- that a four-level

6   enhancement was appropriate.

7           There was some suggestion that somehow his leadership

8   points should be apportioned across different type of

9   activity.  United States v. Damico indicates the Court is not

10  to do that.  The leadership enhancement is to be applied with

11  respect to the count of conviction as a whole.  And if he, in

12  fact, is found to occupy a leadership position with respect to

13  a particular racketeering act, that enhancement applies across

14  the board under our understanding of Damico.

15          THE COURT:  Defense.

16          MR. GILLESPIE:  Well, Judge, I have never been strong

17  in academics, but maybe I -- I will address briefly the

18  organized crime.

19          THE COURT:  Did you say I've never been strong in

20  academics?

21          MR. GILLESPIE:  He said it was academic, the

22  organized crime points in this case.  But academic or not, I

23  suspect your Honor will have to make a conclusion in that

24  regard, unless they're not asking for it anymore.

25          MR. BHACHU:  Well, Judge, what I just addressed was

1    the leadership role.  I can also address the organized crime

2    enhancement now so that counsel can respond.

3            MR. GILLESPIE:  Well, if they don't want to ask for

4    it, then I don't have to respond.  That would be all right

5    with me.

6            MR. BHACHU:  For purposes of the record, Judge, it

7    wouldn't hurt if your Honor makes a ruling on both just so

8    that, you know, there's -- it would be, I think, frankly

9    easier with regards to issues that might arise on appeal.

10           If I might just briefly, with regards to the

11   organized crime issue.  I think we set that forth in great

12   detail in our filings about a motion for upward departure.  I

13   see your Honor nodding.  I apologize for the length of some of

14   our filings.  But I think it was important to lay out a

15   history with respect to Mr. Sarno so that your Honor could be

16   fully informed in making a determination about whether or not

17   these crimes were committed in -- through Mr. Sarno's

18   association with organized crime.

19           What we laid out in our papers in brief, Judge, is

20   that Mr. Sarno has previously pled guilty to being a part of

21   the Ferriola Street Crew.  That was from 1975 to 1989.  He

22   entered into a written plea agreement with the government in

23   that case.  And in that case, he admitted, essentially, for

24   that 14-year period being involved in the affairs of an

25   enterprise through a pattern of racketeering activity that

1    included illegal gambling and multiple acts of extortion.  He

2    was imprisoned on that case, the Infelise case, as well as the

3    Castaldo case, up until approximately, I think, 1999.

4           We set out in our filing that immediately thereafter,

5    after his release, there's informant information indicating

6    his continued involvement with organized crime, his continued

7    involvement with other organized crime figures such as Outfit

8    boss James Marcello.  And then in addition to that informant

9    information, we supplied to the Court for your consideration

10   prior to today certain video recordings that further

11   corroborated the fact that Mr. Sarno remained involved in

12   organized crime activity.  Those recordings were from 2003.

13          Your Honor may recall -- I believe the first

14   recording takes place in June of 2003.  It's actually a news

15   story done by Chuck Goudie from ABC 7 channel news.  At the

16   time he's got dark hair.  It's now gray.  But what it shows is

17   that Mr. Sarno is mentioned in a story relating to James

18   Marcello, James Marcello's efforts to actually get out of

19   jail, to get in a supervised release living situation.

20          Shortly after that recording, several days

21   thereafter, there's an interception at Milan prison between

22   James Marcello and Michael Marcello.  And in that

23   interception, the two men discuss the news story that's

24   appeared, that Chuck Goudie has featured on his broadcast.

25   And one of the things they talk about is -- you know,

1    Mr. Marcello is telling him, well, who's in the news story.

2    And he mentions Mutt and Jeff.  And then he holds up his

3    finger and says, The big guy only.  And we know from other

4    testimony in this case that one of the monikers that Mr. Sarno

5    was addressed by was the big guy.  In fact, Mr. Knight

6    testified that Sam Volpendesto referred to Mr. Sarno as the

7    big guy.

8           And thereafter we have another recording -- I think

9    it's several months thereafter -- between Mr. Marcello and --

10   sorry -- James Marcello and Michael Marcello, again at Milan

11   prison.  And this time they're talking about illegal gambling

12   activity.  And the reason we know they're talking about

13   illegal gambling activity is because they mention the ins and

14   the outs and whether or not they can try to switch over to

15   some sort of lease arrangement in an effect -- in a means of

16   trying to shield themselves from being culpable for the

17   illegal gambling activity that's taking place at various

18   locations.

19          And in relation to that conversation, they again

20   ask -- or Mr. Marcello, James Marcello, asks how are Mutt and

21   Jeff doing.  And Michael Marcello discusses how much profit

22   they're making from their operations.

23          These facts demonstrate, Judge, that Mr. Sarno did

24   not end his Outfit activities in 1989 when he was convicted,

25   when he was arrested for his participation in the Ferriola

1   Street Crew.  It continued onward after he was released from

2   custody in 1999 and continued onward into the time period

3   that's covered by this racketeering conspiracy.

4          The notion that somehow Mr. Sarno wasn't involved in

5   illegal gambling activity in the Cicero area and that his

6   front business, if you will, Amusements Inc., took over

7   territory, when he is specifically referenced in recordings

8   between the Marcello brothers, when he has ties that are

9   confirmed through informants and his own prior convictions to

10  the Chicago Outfit is incredible.

11         One of the other things that's notable about James

12  Wagner's testimony from the Family Secrets case is that you

13  take an oath and you take an oath for life when you become a

14  made member of the Chicago Outfit.  This is consistent

15  behavior with the fact that Mr. Sarno was associated with

16  organized crime and was able to try to dictate what was going

17  on in territory that was under his control in Cicero.  That

18  also explains why Mr. Sarno had the notion in his head that it

19  was okay for him to visit Vince Dublino and tell him what he

20  was and what he was not going to do.

21         All of these factors, Judge, demonstrate that the

22  illegal gambling activity that forms both part of Count Two

23  and Count One was done through the defendant's associations

24  with organized crime.

25         And the fact that Mr. Polchan also provided street

1   tax, in our estimation of the evidence, to Mr. Sarno is also

2   demonstrated by the fact that Mr. Sarno was involved in

3   organized crime because that's the modus operandi of organized

4   crime.  You take a cut of illegal activity from your

5   subordinates.

6         So for those reasons, Judge, we would ask that you

7   both find that he occupied a leadership role with respect to

8   the conspiracy charged in Count One and also that both the

9   activities in Count One and Count Two were committed through

10   the defendant's associations with organized crime.

11         MR. GILLESPIE:  I'm sorry I brought it up.

12         THE COURT:  Yes, well, there you go.

13         MR. GILLESPIE:  Your Honor, there's no question

14   that -- and your Honor has the previous pleas of Michael.  And

15   there's also -- you have the submissions of the government and

16   these tapes and Mr. Wagner's opinion and Mutt and Jeff.

17   You've also seen in there footnotes that Mutt and Jeff

18   apparently can refer to different people.

19         But here's the point, maybe -- and I don't think it's

20   just academic.  I think that this is the point regarding that

21   upward departure:  This case was not an Outfit case.  In this

22   case the enterprise was not the Outfit.  The cases cited by

23   the government were.  The two cases where the upward departure

24   was given, organized crime or the Outfit was the driving force

25   of those cases.  It's clear from the facts.  There's

```
 1    stipulations through the plea.  That's not the case here.
 2    Your Honor did not let Outfit or mob or that type of stuff --
 3    or tried very carefully to preclude anything like that from
 4    coming into this case.
 5              THE COURT:  Only because you asked me to.
 6              MR. GILLESPIE:  I did.  Well, the jury did --
 7    apparently it didn't need it to come to its conclusion.  I
 8    think the proof of the pudding is in the eating here.  This is
 9    not an Outfit case.  It wasn't presented to the jury.
10              THE COURT:  So we did good?
11              MR. GILLESPIE:  Pardon me, sir?
12              THE COURT:  So we did good?
13              MR. GILLESPIE:  You did good?
14              THE COURT:  You and I, in keeping that out?
15              MR. GILLESPIE:  Well, your Honor does good in almost
16    everything.
17      (Laughter.)
18              MR. GILLESPIE:  Well, reserved until after the
19    sentencing.
20              But at any rate, my point is that this was not an
21    Outfit case.  The jury didn't consider it an Outfit case.
22    Your Honor didn't allow it to be considered an Outfit case.
23    And an upward departure in that area is not warranted by the
24    cases they cite that I see.
25              MR. BHACHU:  The only thing I would add on that
```

1    score, Judge, with regards to the Hanhardt case, that was not

2    an Outfit case, if you will, in the sense that the Outfit was

3    not mentioned in the indictment in that case at all.  That was

4    obviously a jewelry theft and robbery ring as well.  There was

5    some connection to organized crime in that case that aided in

6    the commission of the crimes, but it certainly wasn't charged

7    as an Outfit street crew case by any means.

8              MR. GILLESPIE:  Your Honor, I believe -- I'm sorry --

9    but I believe there were stipulations in that case and in the

10   plea that Outfit crews were involved in this case, and indeed

11   it was an important part of the case.  Counsel for

12   Mr. Hanhardt is in court.  He can address that clearly.  But

13   it's my understanding that the plea and the sentencing clearly

14   indicated that that case was driven by Outfit.

15             THE COURT:  Okay.  First, as to the position of

16   leadership, I think the comments I previously made with

17   respect to the inferences I've drawn regarding the arson

18   bombing and the robbery aspects of the enterprise indicate my

19   reasoning for believing that the government has met its burden

20   in establishing that the defendant had a leadership role in

21   the organization.  I think that's even more strongly borne out

22   with respect to -- or by the evidence with respect to the

23   gambling activities where the defendant was clearly a leader.

24             In addition to the things that have been mentioned, I

25   recall, I think fairly accurately, the conversation between

1    this defendant and Mr. Polchan when they were discussing

2    rolling out the new machines in the Outlaw clubhouses all over

3    the -- in different parts of the state and Mr. Sarno voicing

4    words of approval, such as "that's what we like to hear" when

5    Mr. Polchan described his plan for doing so, clearly

6    indicating a supervisory position over what was taking place.

7            Along with everything else, I find that the evidence

8    does establish that the defendant held a position of

9    leadership in the organization.

10           With respect to the upward departure for utilizing

11   connections within organized crime, I have a bigger problem

12   with that request by the government.  I think it's -- you

13   know, you can get carried away making determinations in these

14   cases unless you stick to the basic rules that we're supposed

15   to follow, which, once again, is that whatever inferences we

16   draw have to be reasonable inferences and they have to be

17   based on the facts before us.  And that's where I have a

18   problem.

19           I have no problem drawing inferences from the facts

20   in this case.  I heard the facts.  I'm intimately familiar

21   with those facts.  I was able to see the witnesses, judge

22   them, judge their credibility, as the jurors did, and I've had

23   the benefit of those observations.

24           The inferences necessary to come to a determination

25   that the defendant was utilizing connections within organized

 1   crime, although tempting, are based on so many different

 2   sources of information -- bits of transcripts of

 3   conversations, newspaper and television reports of

 4   conversations referencing those reports -- I don't feel

 5   comfortable making inferences to a preponderance of the

 6   evidence standard from those sources.  Inferences have so much

 7   to do, as I indicated before in my prior analysis, with the

 8   context of things, the full context, the full background, all

 9   that was being said and considered.  And although the

10   government has done, I think, an absolutely splendid job of

11   laying its view of what those background facts are and all of

12   the context surrounding the conversations, I don't, frankly,

13   feel comfortable coming to those conclusions from sources that

14   I don't have the full background on.

15        So the Court makes no finding with respect to an

16   upward departure for utilizing connections with organized

17   crime.

18        MR. GILLESPIE:  Thank you, sir.

19        MR. BHACHU:  Just for purposes of completeness,

20   Judge, we also had made a motion for upward departure relating

21   to -- I guess what we sometimes call for being a hard learner;

22   that is to say, for recidivism with regards to the fact that

23   this is defendant Sarno's second conviction for both

24   racketeering conspiracy and his second conviction for illegal

25   gambling.  We, again, can address that in the context of the

1   3553(a) factors.

2           THE COURT:  I think that probably comes in best under

3   the context of the 3553 factors.

4           MR. BHACHU:  Very good, Judge.

5           THE COURT:  I think that then addresses all of the --

6           MR. BHACHU:  Judge, and I --

7           THE COURT:  -- all of the basic actual calculation

8   issues, right?

9           MR. BHACHU:  I believe so, Judge.  I think, based on

10  your Honor's rulings, that the guidelines calculation is a

11  level 42, Criminal History Category VI, which yields a range

12  of 360 to life.

13          THE COURT:  Took the words right out of my mouth.

14          MR. STEINBACK:  I have to consult with counsel for a

15  moment, please.

16          THE COURT:  Sure.

17    (Brief pause.)

18          MR. BHACHU:  Judge, could we have one moment?

19          THE COURT:  Yes.

20    (Brief pause.)

21          MR. STEINBACK:  Your Honor, I understand how the

22  government and the Court have come to their decisions.  The

23  position papers of the parties have already been presented and

24  the Court has studied them.

25          There is some question legally with respect to how to

1    calculate leadership enhancements with respect to each of the

2    predicate acts and then compiling them in such a way that they

3    result in what's -- something that would be greater than each

4    of the individual parts.

5         And, essentially, the government at one point had

6    said he is, according to Damico, a leader of the overarching

7    conspiracy, therefore he gets a four-level increase for it;

8    and now jumps to the conclusion that he is therefore the

9    leader of each and every robbery that occurred, when, in fact,

10   some of those robberies happened without his knowledge --

11   according to the government's own confession here -- without

12   his participation and he's only accountable after the fact and

13   therefore cannot be a leader in connection with those.  So

14   where we jump from a 35 to a 42 is problematic to me.

15        I understand the Court's consideration.  It is my

16   belief that the guideline range, based on your Honor's

17   rulings, legally is 35, criminal history level VI; not 42,

18   criminal history level VI.  And that it would be inappropriate

19   under the facts and the law to effectively increase by seven

20   levels that which is already accounted for.

21        So that's the reason for the disagreement between the

22   parties.

23        MR. BHACHU:  Judge, if I might just respond quickly.

24        The level 35, Criminal History Category VI that

25   counsel is referring to is if the defendant was held solely

1   responsible for the LD Jewelers robbery.  Because he's

2   accountable for all the robberies, the four-level increase

3   would take effect -- or, sorry -- the upward -- or sorry --

4   the total calculation with regards to Count One would include

5   a responsibility for the Marry Me Jewelers robbery, which has

6   an offense level of 38.  And then there are additional units

7   assigned to the other robberies.

8          THE COURT:  The Marry Me Jewelers robbery was the

9   robbery in which the victim, the jewelry salesman, was shot --

10          MR. BHACHU:  Correct, Judge.

11          THE COURT:  -- in the chest, correct?

12          MR. BHACHU:  Which has a higher guideline calculation

13   than the LD Jewelers robbery does.

14          THE COURT:  It's a 38.

15          MR. BHACHU:  And so other robberies are assigned

16   either a unit or a half unit correspondingly.  I would refer

17   counsel to page 31 of our government's version of the offense

18   which sets out the calculations as we calculated them.

19          And to the extent counsel lodges an objection to the

20   application of the leadership enhancement, as we noted in our

21   papers, we specifically discussed in detail the application of

22   United States v. Damico and the fact that that four-level

23   increase occurs with regards to all underlying acts.

24          THE COURT:  I'm aware of the defendant's position in

25   that regard.  I reviewed the submissions of the parties.  I,

 1   like Mr. Gillespie claimed not to be an academic at all, I --

 2   however, having been forced to look at these issues, I

 3   conclude that I agree with the government's position.  I think

 4   it is correct.  I think they properly applied the leadership

 5   enhancement.  And, of course, the government's guideline

 6   calculation is 44.  Mine is 42 because I do not add the

 7   two-level increase for organized crime association, as to

 8   which I've made no finding.

 9          The Court then concurs with Mr. Bhachu's

10   pronouncement, that is, the combined total adjusted offense

11   level is 42.  The defendant's criminal history category, I

12   find, to be VI.  The resulting guideline range, if calculated

13   in the normal manner, is 360 months to life in prison.  The

14   statutory maximum penalty for Counts One and Two, however, is

15   a total combined 300 months and thus the default guideline

16   range, I think, becomes 300 months.

17          3553 factors.  Government first.

18          MR. BHACHU:  Judge, we'd ask that you impose the

19   sentence called for by the guidelines, a sentence of 300

20   months.  We'd also ask, in light of all the conversation that

21   we've had for the last, I guess, hour and a half, that you

22   also expressly state that you would impose that sentence even

23   if the guidelines were calculated in some different

24   permutation than they were.  There are many reasons why a

25   300-month sentence is appropriate in this case, Judge.

1    I've obviously been present when your Honor sentenced

2 some of the co-defendants in this case, and your Honor is

3 thoroughly familiar with the facts of this case and the

4 reasons why such a sentence is -- the one we're asking for is

5 appropriate.

6    When we look at the nature of this offense and also

7 the history of this defendant, a 300-month sentence calls out

8 for imposition.  This man has been a member of organized crime

9 for a long period of time, and I respect your Honor's decision

10 with regards to that as we just discussed.

11    But in terms of his history, he has been a member of

12 the Ferriola Street Crew for 14 years, has engaged in multiple

13 acts of extortion, attempted extortion, bookmaking, illegal

14 gambling.  Judge Williams when she was a district court judge

15 found him to have extorted individuals in that prior case as

16 well; notably, one of those extortions in which he was

17 accompanied by his co-defendant in this case, Mark Polchan.

18 So he bears a dubious distinction that some of his other

19 co-defendants don't have, which is to say that he has a prior

20 conviction which is based upon 14 years of criminal activity.

21    We had Sam Volpendesto who has -- had no notable

22 prior convictions; similarly, Mr. Polchan; two subordinates

23 that this man directed in the bombing of C & S Coin Operated

24 Amusements who received sentences that far exceed the

25 guidelines sentence that we're asking for with respect to this

1    defendant.

2            Not only did he have 14 years, Judge, of criminal

3    activity, he was previously described by an AUSA, Mitch Mars,

4    in that prior case as being a professional criminal back then.

5    He has another eight years on top of it after he gets out of

6    prison here, again, directing the commission of violent

7    crimes, asserting his ability to dictate how other people

8    conduct their business.  And he's doing this while he's

9    actually on supervised release from another case.

10           Clearly this man is incorrigible.  He does not care

11   about the law.  He has gotten up before a judge before and --

12   you know, got up before Judge Andersen and talked to Judge

13   Andersen about how he was going to turn over a new leaf.  That

14   obviously was not true.  And he's prepared to dedicate the

15   rest of his life to criminal activity because that is the only

16   thing he knows.

17           His prior convictions for the exact same crimes which

18   I discussed moments ago also dictates that he gets a sentence

19   of 300 months.  He's previously been convicted of racketeering

20   conspiracy.  And yet here we are back again once more,

21   Mr. Sarno not only convicted of both racketeering conspiracy

22   with violent elements to it, but also again illegal gambling

23   activity.  It just seems as if Mr. Sarno doesn't learn.  And

24   because he doesn't learn, we need a sentence of 300 months to

25   both incapacitate him, to protect the public and also to

1 discourage him from continuing this type of activity in the

2 future.

3   And I do think a stiff sentence like this, Judge,

4 will also deter others out there that are involved in criminal

5 activity that is of an organized nature. There are going to

6 be other people -- again, I respect your Honor's decision not

7 to impose the organized crime enhancement, but I can guarantee

8 you that there are many individuals out there who understand

9 who Mr. Sarno is and what his position is in the Chicago

10 Outfit. And those people will be dissuaded by a strong and

11 stiff sentence that is meted out against Mr. Sarno. And it's

12 something that I think your Honor should bear in mind in

13 regards to how he is sentenced here today.

14   Finally, I'd like to touch on some of the mitigation

15 evidence, Judge, that has been brought before you. And it was

16 rather -- I think it was kind of focused on his family

17 activities and his relationship with his friends.

18   As I noted in our filings, that's the same strategy

19 Mr. Sarno used when he was sentenced before Judge Andersen.

20 There was this boast about, well, I've gotten a hundred

21 people -- X number of people to write letters for me. It

22 doesn't matter. In fact, this type of evidence, in my mind,

23 is actually aggravating. And I say that because what we have

24 is a man who has done this before. He knows the consequences

25 of being involved in criminal activity of this nature. He

1    knows what type of costs his family actually will bear if he's

2    captured or if he's caught.  He understood that, at least in

3    part, by the levels of precautions he took to avoid his

4    activities coming under surveillance.

5           He is prepared to threaten people.  He's prepared to

6    order a bombing.  He's prepared to orchestrate illegal

7    gambling activity.  He's prepared not to file tax returns to

8    hide his illegal income.  And when he's committing these

9    crimes, he doesn't care obviously what cost it's going to have

10   on his family.

11          And then after he's done bullying people, after he's

12   done terrorizing people in the community, then what does he

13   do?  Well, that's when he sends us letters from his family

14   members.  I think that tells you a little bit about the

15   character of Mr. Sarno and what he's about.  He's going to put

16   his own family's happiness on the line when he's committing

17   these crimes for the Outfit, but then thinks that when it's

18   time to pay the price, he's shameless enough to have them

19   submit letters on his behalf.  It shows a lack of character in

20   my mind.  And it certainly is not something that deserves any

21   mitigating consideration by the Court.

22          So for those reasons, Judge, we would ask that a

23   guideline sentence of 300 months be imposed upon the

24   defendant.

25          THE COURT:  Defense.

1          MR. STEINBACK:  Well, there's some things to say,

2     your Honor.

3          I understand that the Court has sentenced other

4     individuals in this case.  I understand the guideline range

5     established.  I would be foolish to blink my eyes that the

6     sentence imposed on Polchan, the sentence imposed on

7     Volpendesto and think that I can walk into this courtroom and

8     ask your Honor for something less than the top of the

9     guideline range or, in this case, the statutory maximum.

10         And if I were to take the government's

11    characterizations at face value -- and I don't, as much as I

12    respect them -- then I wouldn't have much to say and we'd

13    pretty much be through.  But there are some things to be said,

14    and there are some things that perhaps would cause your Honor

15    to view things in a different light.  And I believe your Honor

16    can bear up under the heavy mantle of differing views and sort

17    out the characterizations from reality and perhaps look at

18    this individual in a light other than the one that has been

19    partially portrayed by the picture drawn by the prosecution in

20    this case.

21         Now, I want to talk a bit for the sake of clarity and

22    hopefully -- because I think that I'm right about this -- your

23    Honor might agree, that simply because the guidelines as they

24    exist today require a Criminal History Category VI, that

25    therefore that is the proper criminal history category.  It's

1   never really been articulated thus far in this hearing what

2   exactly the contrast is.  And I'd like to make that clear.

3         The contrast is relatively simple to state.  Once,

4   under the guidelines -- for a long time as a matter of fact,

5   years -- there was the concept of related cases.  Then in

6   November of 2007, the guideline commission, as it has been my

7   experience it frequently does, changed its policy, gave

8   different advice about how to treat related cases.  They

9   decided for the time to eliminate the notion of relatedness

10  and instead replace it with single or separate.

11        But that doesn't change the fundamental underlying

12  nature of what those cases are and whether they're related.

13  Because the danger is this -- and it was why there was the

14  concept of relation and it hasn't changed -- the prosecution

15  can -- I'm not saying it would -- but it could take a gambling

16  conspiracy, cut it up into three or four pieces and wind up

17  jacking a defendant's guideline range into category VI any

18  time it wants under the present formulation of the guidelines.

19  Taking this advice allows that to happen.  And that's what the

20  doctrine of relatedness was ultimately conceptualized for, to

21  avoid that.  And some of what the government has said here, in

22  fact, plays into that, doesn't run counter to it.

23        It is striking when one reads the presentence report

24  that was prepared on July 22nd, 2011, in this case because the

25  description provided there is very telling.  Page 16 of that

1   report, the petition -- the probation department identified

2   what the prosecution has called the Infelise case, which was

3   before Judge Williams, which charged racketeering, the

4   operation of an illegal gambling business and related

5   offenses.  And on lines 348 to 352, the probation officer,

6   relying on everything that the -- it received from the

7   government and all the records it could obtain independently,

8   said that the defendant participated in racketeering activity

9   which included the operation of an illegal parlay card

10  bookmaking operation.  The racketeering activity included the

11  extortion of Mr. Tzivas.  The defendant communicated a threat

12  to inflict physical harm to Mr. Tzivas.  The defendant

13  demanded Mr. Tzivas pay a periodic street tax on the card

14  games he hosted at his club.

15          Now, in that plea agreement, which I was able to

16  obtain, and in the findings that Judge Williams made, it was

17  clear from the evidence that although that threat was made,

18  not only didn't anything ever happen, but Mr. Sarno never even

19  came back to Mr. Tzivas.  He saw him once.  No street tax was

20  ever actually collected.

21          The second offense, the so-called Castaldo case

22  before Judge Andersen, alleges essentially the same kinds of

23  things.  The probation office describes the Castaldo case in

24  the same way.  The defendant was a member of the Ferriola

25  Street Crew.  The defendant was involved in an illegal

1    gambling business which operated a parlay card bookmaking

2    business.  The defendant was involved in the collection of

3    juice loans and street tax and managing the printing of the

4    parlay cards for the crew.

5          Mr. Sarno pled guilty to both of those cases.  The

6    plea agreement and the government version in the Infelise case

7    makes it very clear that the dealings, short as they were,

8    with Mr. Tzivas happened in the fall of 1988.

9          Now, from the same dealings, there was another

10   individual referred to in the presentence report by the name

11   of Rios, where Rios apparently fell behind in some gambling

12   debts.  Rios took some juice loan; it's not clear to me from

13   all that I've read exactly from whom.

14         THE COURT:  Several sources apparently.

15         MR. STEINBACK:  Apparently.

16         THE COURT:  All at the same time.  Not wise.

17         MR. STEINBACK:  No.  And that happened sometime in

18   the fall of '87 into the fall of 1988.  So both offenses

19   involved an illegal parlay card bookmaking business.  Both

20   occurred during overlapping time.  Both involved efforts of

21   the collection of juice loans and street tax.  And while the

22   participations in one gambling event were -- participants were

23   different, the nature of the crime was the same.  The time

24   frame was the same.  The related offenses were near identical,

25   so much so that District Judge -- then-sitting District Judge

1    Andersen, using the applicable guidelines at the time of that

2    offense, those from 1995, found the 1990 and the 1993 cases

3    related and, thereby, did not add any points for the Infelise

4    conviction.

5           And as far as I can determine, the government didn't

6    appeal from that because, in fact, that was a proper

7    application of the guidelines.  That was the law of the case

8    with respect to Mr. Sarno in 1996, all the way up to November

9    of 2007.  A sentencing judge in this district appropriately

10   applied the then-guideline manual, established a proper

11   criminal history and imposed a reasonable sentence thereafter.

12          And it's, therefore, understandable that in the

13   initial presentence report of July 11th, the presentence

14   report said, Based on the judgment and commitment order issued

15   by Judge Andersen and the dockets that the United States

16   Probation Office looked at, the Infelise and Castaldo cases

17   are related and no points are added.

18          Now, I am not suggesting for one moment that the

19   Chapter 4 provisions under (a)(2) did not change in November

20   of 2007.  But it is disingenuous to think with a sentencing

21   commission -- to which I was for two years on the

22   practitioners' advisory board and involved myself with three

23   different guidelines -- it is disingenuous to think that that

24   will be the law two or three years from now.  Nobody knows.

25   This concept of relatedness is going to come back to haunt the

1   criminal justice system because some prosecutor is going to

2   break up a conspiracy into little itty-bitty parts and wind up

3   getting someone from a criminal history of I to a VI without

4   much effort.

5          Advice from the guidelines are going to change.

6   Policies are going to change.  The Demaree ruling, which is

7   unique to this circuit and has been criticized by virtually

8   every other circuit, is likely one day to change.  And no one

9   can sit here today and say that the guidelines advice provided

10  in Chapter 4 in 1996 will not once again, two or three years

11  from now, be the rule of the case.

12         The government says to your Honor, no, it's a

13  different case; it used outmoded guidelines, and it's accorded

14  to no deference.  But I wonder if the shoe was on the other

15  foot what the government would have said, your Honor.  What if

16  the guidelines had been in 1996 what they are now and what if

17  the guidelines are now what they were in 1996?  I wonder if

18  they would have said so quickly this is really a different

19  case and that a district judge's proper determination of the

20  guidelines is entitled to no effect whatsoever, no weight.

21         I understand what 4A1.2(a)(2) advises today, but it

22  doesn't mandate it.  And before November of 2007, it didn't

23  even advise it.  Now, it is an impact which cannot be

24  overstated because the criminal histories from a III to a VI

25  so dramatically change the view of this individual and these

1    guidelines that great care should be taken in so quickly

2    eschewing the determination of a district judge that was

3    appropriate at the time, the rejection of which could very

4    well create an ex post facto law in this instance.

5         Your Honor, it would be different if Mr. Sarno's

6    conduct in this case effectively substantively went in -- into

7    the time frame of November of 2007.  But what we have here is

8    a conspiracy from 2001 to 2006, with essentially -- although

9    the government talks about things happening in 2008 -- the

10   last substantive conduct relating to Mr. Sarno and his

11   personal involvement was in the summer of 2007, before that

12   guideline was enacted, in which video machines were put into

13   the two motorcycle clubs and that was in Kankakee.

14        THE COURT:  The Outlaws.

15        MR. STEINBACK:  The Outlaw Motorcycle -- Outlaw Club

16   clubhouse.

17        So we've objected to the adverse -- we think that the

18   advice from the current guideline manual is -- is to be, in

19   this instance, disregarded because its application effectively

20   countermands a written order by a judge in this district

21   consolidating those matters as related.

22        We also believe it creates, as I said, an ex post

23   facto law because it clearly places Mr. Sarno at a substantial

24   disadvantage as compared to the law as it stood when he

25   committed the crimes of which he has been convicted.

1          But beyond acting as a possible de facto law, beyond

2     the invalidation of a proper district court ruling, and other

3     technical considerations aside, there is the notion of being

4     fundamentally consistent, fundamentally fair.

5          The government talked so much about Mr. Sarno's

6     involvement in these different crimes.  He certainly

7     understood the impact and meaning of Judge Andersen's ruling.

8     It isn't like in Demaree where the court said what defendant

9     is going to understand what his guidelines were or how they're

10    going to be treated in any way.  Well, this defendant did

11    understand exactly how they were treated.  They were treated

12    by a valid order and suddenly, through no actions relating to

13    those two prior cases, they become career offender status

14    rather than related.

15         But that is just advice.  It is not mandate.  It is

16    not something your Honor must follow.

17         The government says that by us asking for your Honor

18    to consider a different guideline calculation with regard to

19    criminal history that we are asking your Honor to ignore the

20    statute, 3553(a) itself; we're asking your Honor to ignore the

21    guidelines themselves.  And I want to point out that the

22    guidelines themselves, 1B1.11(c) -- that's the current

23    guideline manual -- mandates that a court shall consider all

24    the 3553(a) factors taken as a whole.  And the background

25    commentary to that provision says, in effect, the last thing

1    the court must do is consider the prospect of variance.

2           So by asking the Court to do this, I am asking

3    precisely to follow what the current guidelines advise; in

4    fact, mandate.

5           It doesn't say anywhere in those guidelines that your

6    Honor is handcuffed to the Criminal History Category VI.  In

7    fact, the Supreme Court has repeatedly said just the opposite.

8    It expressly permits district judges to grant variances from

9    the guidelines, including from criminal history category, in

10   order to -- and even circumvent the stiff constraints that

11   departures once had, the confining nature that they had on

12   judges.

13          And in that connection, this circuit, as well as

14   every other circuit, has a case -- Simmons in this circuit,

15   others -- where a downward variance has been approved.  The

16   only difference in this circuit is, at least under some of the

17   cases, that departure is no longer a nomenclature that's

18   recognized.  They're all variances.  But variance, departure,

19   however, your Honor has the ability notwithstanding the change

20   in November 7 -- of November 2007 to remain consistent and

21   honor a prior ruling that was appropriate at the time and

22   certainly should be followed in connection with the current

23   circumstances.

24          The government goes on to say something else.  It

25   says that they are troubled, in a footnote.  They find the

 1    probation officer's reference to the prospect of a downward

 2    variance or departure troublesome.  That's what they say in

 3    their response, page 4, from February 1st of this year.  They

 4    say that effectively it's not the practice of the probation

 5    office to make such a recommendation that a defendant may

 6    warrant an upward departure so, therefore, the probation

 7    office should not make recommendations that benefit the

 8    defendant.  I don't know where that comes from because the

 9    presentence reports I read go both ways.

10           And I can tell this Court, although it isn't the

11    case, that if for argument's sake it was -- let's assume that

12    the guidelines somehow, based on changes, left Mr. Sarno in a

13    Criminal History Category II.  We would not have to wager much

14    to come to the conclusion that the probation department would

15    say that a Criminal History Category II substantially

16    understates Mr. Sarno's criminal history and would recommend

17    an upward departure.  There is no doubt about that.  I've seen

18    it in other cases.  And I doubt very much that the government

19    would be troubled or find troublesome a recommendation such as

20    that.  But in this case, what's happened is it's troublesome

21    because here these factors tend to tilt the scale downward,

22    not upward.

23           Everybody is quoting from somebody.  And my quote is,

24    what's sauce for the goose is sauce for the gander.

25           Now, the last thing the government does in connection

1   with our position here is say that by doing so, we are

2   effectively asking your Honor to overrule Demaree because

3   Demaree resolved the issue of ex post facto, however much it's

4   been criticized and however unique that is.  But we have to

5   live with that in this circuit.  But that doesn't end the

6   inquiry because there's a flip side of Demaree not discussed

7   but just as equally compelling.

8         Judge Posner expressly stated in the last two pages

9   of that decision, The sentencing judge is not required or,

10  indeed, even permitted to presume that a sentence within the

11  guideline range is the correct sentence.  The sentencing's

12  court -- the sentencing court's choice of sentence, whether

13  inside or outside the range, is discretionary.

14        And, finally, in connection with that, The freedom to

15  impose a reasonable sentence outside the range is unfettered.

16        So while the ex post facto argument in terms of

17  trying to start with a different book is foreclosed, after

18  that, it is not.  And there's nothing about our argument which

19  in any way seeks to overrule Demaree.  In fact, it is very

20  much consistent with the precise express language that Demaree

21  provides.  3553(a) allows your Honor to consider those factors

22  taken as a whole.  1B1.1(c) directs your Honor to review and

23  examine the prospect of variance, and Demaree itself expressly

24  invests in the Court the discretion to do so.

25        Now, what is going to make this Court -- however

1    inclined, even if your Honor determines that I'm right about

2    the law -- what is it that would prompt your Honor to say

3    about this individual, given the government's portrayal, that

4    any kind of leniency ought to be expended on Mr. Sarno?

5          I hear these comparisons.  They're written and cited

6    in the government's papers and in our papers to the Damico

7    case and to the Hanhardt case, where I am very familiar.  I

8    can tell this Court, Damico admitted that he was the leader of

9    a criminal organization involving the Chicago Outfit; and that

10   in connection with that, for 15 years, he oversaw a whole

11   panoply of crimes, including a gun crime to which he pled

12   guilty in connection with a planned robbery.

13         And although in that case Damico pled guilty, he

14   fought the government hammer and tong, very much minimizing

15   what it was he said.  And ultimately his sentence was 87

16   months for his role as a leader of the criminal enterprise and

17   60 months consecutive for the gun, for a total of 147 months.

18         I talk about the Hanhardt case in here.  That was a

19   plea, but Mr. Hanhardt did not receive acceptance of

20   responsibility until the matter was reversed and remanded by

21   the appellate court because, there, the fight was hammer and

22   tong as well.  And in connection with that, there was a

23   stipulation that organized crime ties were involved -- a

24   stipulation -- and an allegation that Mr. Hanhardt had engaged

25   in misconduct from the very end of his position as deputy

1    commissioner of the Chicago Police Department, for a period of

2    years far longer than those set out in this indictment, and

3    that he led a burglary crew that also involved -- although it

4    was disputed -- but found by the court involved an armed

5    robbery in which people were beaten.  His initial sentence was

6    188 months, subsequently reduced to 141 months.

7         With respect to what is meant by unwarranted

8    disparity, an individual needs to be compared to those not

9    within his case but, the Seventh Circuit makes clear, across

10   the spectrum of cases in this district and out.  And Damico

11   and Hanhardt, since they were discussed in our position

12   papers, come to mind as striking examples of people similarly

13   situated.

14        The government, as Mr. Gillespie has pointed out, has

15   left no stone unturned; has employed the good offices of some

16   of the finest investigators and joint cooperation between

17   agencies that one could imagine.

18        And when you look at what it is that the person did,

19   it is interesting and significant.  Even if on a legal

20   accountability theory, a person is held under these broad

21   sweeps to be responsible for a crime, looking at the nature

22   and circumstances of the offense, I take in this instance

23   Mr. Bhachu's acknowledgments at face value.  He didn't even

24   know much less personally participate in some of those

25   offenses.  That much is clear.  It would be a different thing,

1    would it not, your Honor, if he went in and shot the person,

2    stabbed the person?

3          But from what I can tell, with all this investigative

4    artillery at their disposal, he never shot anybody.  He never

5    used a gun in connection with any crime.  In fact, as I

6    understand it, he never even possessed a gun.  Those things

7    matter.  You can't just ball them all up and just say because

8    he's associated with these people who do these things, he did

9    those things.  Okay.  I accept your Honor's ruling.  I respect

10   it.  He's responsible for them, going all the way back to

11   Pinkerton and the wide sweep that conspiracies have in being

12   able to hold people accountable.  But it is a far different

13   thing when we get down to what is the proper sentence and what

14   are the nature and circumstances of the offense as to exactly

15   what they did in connection with those things.

16          The government says he wasn't a personal participant.

17   And the government says he didn't even know about some of

18   those things.  So while he may have had some control over

19   things -- and that one piece of evidence that sticks out is

20   when he tells somebody not to rob someone.  And perhaps that

21   does show control.  But it also shows that he is not

22   willy-nilly going around agreeing to rob or authorizing to rob

23   or just going ahead and letting anybody rob anybody because he

24   is ruthless and has no stops.  Because he did stop those

25   things.  And it thrusts both ways.

1          When we get down to the traditions that attach to

2     sentencing, policies of lenity and parsimony always have said,

3     if there is any doubt, even a small one, err in favor of the

4     defendant.

5          The government has said in its papers, although they

6     don't reiterate it here, that part of this conspiracy involved

7     the corruption of police officers; and they put that in

8     connection with Mr. Sarno's involvement.  But I have read

9     thousands of pages of papers.  I have read everything the

10    government has written, and I'm not saying that the use of

11    corrupt officers who illegally convey information is a good

12    thing.  But the question is not whether that happened, but

13    whether Sarno had anything to do with that.  Did he corrupt

14    these individuals?  Are we to believe that these are young

15    innocents that naively fell under his spell and then suddenly

16    decided to forgo their oath?  Because there's not a shred of

17    evidence that he corrupted any of them.  When they decided on

18    their own to cross that bright line from adhering to their

19    oath and forgoing it, I don't know.  But I know this:  There's

20    no evidence that suggests that Mike Sarno had anything to do

21    with that.

22         Every time I have ever represented a police officer,

23    the principal argument in aggravation is that officers are

24    held to a higher standard because they've taken an oath to

25    enforce the law and then, beyond their public citizenship,

1  they've violated that oath.  And here it is used as an

2  argument, strained I suggest, against Michael Sarno.  But

3  there are no facts to support it, and it should not be

4  considered in aggravation despite the fact that it's in the

5  papers that the government has submitted.

6        Your Honor has read the character letters that have

7  been submitted.  And I have listened, somewhat painfully, to

8  the characterizations that the government has chosen to affix

9  to the character letters submitted.

10        I know that Gabrielle had a lot to do with talking to

11  friends and neighbors and family.  There isn't a person that

12  Michael Sarno went to and said, Write me a letter.  That's

13  conjecture, and it's not fact.  He didn't go to the people

14  sitting over here and ask for that.  Just the opposite.  We

15  did.  And the reason that we did it is because there is a

16  disconnect between the public persona as portrayed by the

17  government and to a certain degree brought on Michael by

18  himself and that person portrayed in these hundreds of letters

19  voluntarily written by people from all walks of his life, not

20  just family, not just friends, but people in the community,

21  people from the neighborhood.  And they don't just say he's a

22  pretty good guy, your Honor, give him a little bit of a break

23  if you could.

24        And there is so much content in those letters, it is

25  difficult to imagine that this individual is solely committed

1    to the commission of criminal offenses and nothing else.  The

2    government wants it to be an all or nothing, but it isn't.

3    Not in this case.  That would not be fair.  That would trump

4    the nature and circumstances of the offense over the history

5    and characteristics of the offender, which is in violation of

6    the mandate of the very statute that they say we have ignored

7    because they are considered equally and together in that

8    statute.

9          And if he has devoted his life to the Chicago

10   Outfit -- where the government didn't even charge the Outfit

11   as the enterprise here or any of the other people as being

12   that -- how is it that these hundreds of instances occurred

13   over the years he's been out?  What was he doing then?  He

14   certainly wasn't committing crimes.

15         You have the spectrum from children who are good kids

16   that didn't get that way by accident.  And everyone in the

17   family says they are the by-product of the guidance and

18   influences of Mike Sarno, their father.  He didn't go to

19   school beyond the tenth grade because unfortunately the

20   circumstances of his childhood didn't promote such things.

21   Didn't allow for them.  Didn't have a father who gave a damn.

22   In fact, just the opposite.  Beat him any time he could.

23        But Michael broke that cycle of familial abuse; and

24   instead of being an abuser, as so many people do, what he did

25   was he said, Not my children.  And it wasn't just the children

1    that he and his wife bore by blood.  But the letters that are

2    written to your Honor, the outpouring of emotion from those

3    letters; from his sister when she had nowhere to go and three

4    little babies.  Does someone who is ruthless baby-sit three

5    little babies all day long?  Does he drive them to school?

6    Does he take them to all their doctors' appointments?  Does he

7    go to their school field trips?  Is he the person they say he

8    is?  Or is he the person that the family knows him to be that

9    made sure that there was a roof over their head, that there

10   was a father figure in their life and that they were given

11   opportunities he never had?  And he protected them and he

12   nurtured them and he loved them as if his own, and that's what

13   they wrote.

14          And the government says, that's not positively

15   reflective of his character.  They say we've gone to that well

16   too often and it's dried up.  Well, what does that mean?  Did

17   he stop loving his children?  Did he stop giving to his nieces

18   and nephews and the others not related even by blood who

19   consider him a father?

20          One person wrote -- 35 years old now -- to him he's

21   still Coach Mike because Mike started the basketball program

22   in the park district in his neighborhood.  And he didn't just

23   spend five minutes or give some money.  He grew it through

24   hard work.  He coached the kids.  He encouraged participation.

25   And he is to hundreds of kids from that area Coach Mike, not

1  the ruthless mobster the government says.  And that isn't

2  something that can be just thrown away.  And that person

3  didn't write that letter because Mike went back to the well.

4  He wrote it because he felt strongly about it.  He read about

5  this case in the paper and wanted to say something else.

6  　　　　　And does a ruthless criminal sit with a guy he's

7  known for a while but never was really that close to -- when

8  that guy tells him his brother is dying of cancer -- for nine

9  months almost nightly while that death spiral finally takes

10  that man's brother and be there at every step for him; not

11  just making some donation, which is easy, but giving of

12  himself, of his heart, of his concerns?  And when all that was

13  over, just some months before the trial began, that individual

14  finally said, you know, Mike, how are you doing.  And Mike

15  said, My only concern is for my family; I'll be okay.

16  　　　　　Now, this is not to suggest, your Honor, that people

17  do not go down wrong paths in life and don't regret them and

18  haven't lived to regret them.  And Michael is not the kind of

19  person that readily acknowledges such things, but it doesn't

20  mean he doesn't feel them.  Because he does.  And those paths

21  take you down a place, and sometimes the place that you're at

22  sticks.

23  　　　　　The government talks about commitments to the mob and

24  these oaths and all these other things.  But it acts as if

25  Mike Sarno himself has never been scared.  I'm not just

1  talking about scared of what's going to happen to him.  I am

2  talking a little bit about scared of what his prognosis is

3  because it is very guarded.  He's 54.  His father died at 61.

4  They're both diabetic.  He's struggled with obesity.  He has

5  hypertension.  He's been hospitalized recently for a wholesale

6  failure in his left lung.  How long is it that anybody thinks

7  he's actually got?

8            You know, I sat in Washington March of last year and

9  testified before the sentencing commission.  And the gentleman

10  who testified before me was the director of the Bureau of

11  Prisons.  And he was asked questions about what he thought the

12  implications of certain guideline changes were and in a very

13  apolitical way said, we are so overcrowded and overtaxed and

14  underfunded that in order to take care of the influx of

15  prisoners, given the sentences that have been imposed, we

16  would have to build between four and five new prison

17  facilities, federal prison facilities, a year to ameliorate

18  the overcrowding; and we simply just don't have the money.

19            What the government is asking your Honor to do is

20  sentence this man to life in prison without hope of ever

21  coming out, because he's not going to live 25 years.  Nobody

22  thinks that.

23            The government talks to your Honor about how

24  Marcello, in one of their written submissions, and Calabrese,

25  while they're in prison, they're talking about criminal

1  behavior.  A does it.  B does it.  Now, Michael Sarno was in

2  prison and has been several times before.  And after your

3  Honor revoked his bond when the jury found the guilty verdicts

4  on December 22nd of 2007, has remained in custody for 13 and a

5  half months.  I know this, your Honor:  If there was even a

6  hint of impropriety on his part, the government would be in

7  here with supplemental memoranda and other kinds of evidence

8  to suggest aggravating circumstances.  You cannot say because

9  A did something and B did something, therefore C will do

10 something and use that as an argument in aggravation.  Because

11 as wide a spectrum as your Honor has of discretion, pure

12 conjecture just isn't part of that; and that's all that that

13 argument was.  And it's belied by the facts.

14        There's no way to ignore, your Honor, Michael's

15 criminal past.  No way to obfuscate it.  No way to ignore the

16 other sentences in this case.  No way to suggest that that

17 doesn't bear negatively on his character or the prospect for

18 his future.

19        But he was out on bond for 18 months.  And the end of

20 this conspiracy was -- depending on when you actually look at

21 what the evidence says -- middle 2007, maybe early 2008,

22 although the first indictment came down in February of 2008 --

23 but since that time, what is it exactly that he has done --

24 what is that? -- four years now -- to suggest that he cannot

25 comply with the dictates of the law?

1       When that indictment came down in February of 2008

2  and it didn't mention him, given what your Honor has found and

3  what the government has argued -- and I think Polchan and

4  someone else was charged -- shouldn't he have run away knowing

5  what was coming?  He self-surrendered.  He was let out on

6  bond, and there was not a single violation report filed.

7       While in prison his criminal -- his prison record is

8  pristine.  He has done nothing there to get what they call a

9  shot, to be sanctioned.  He has done nothing but follow the

10 rules.

11      You cannot consider the nature and the circumstances

12 of the offense without considering the character of the

13 offender.

14      One judge said that we don't just sentence crimes; we

15 sentence people.  How does somebody live, your Honor, without

16 even the faintest glimmer of hope?  How does somebody survive?

17 Maybe certain people don't deserve that.  And maybe your Honor

18 thinks that Mr. Sarno is one of them.  But there are a hundred

19 people, at least, who disagree.

20      The people who interested me -- and they didn't know

21 each other, but they wrote the same -- were those that said

22 that Michael had found and tried to restore his faith.  They

23 have spoken with him about it.  A fellow parishioner had

24 written about it.

25      Isn't it possible, your Honor, given what this

1    individual has done in connection with his children, his

2    nieces, his nephews, his neighbors, his friends, the young

3    children who played basketball, isn't it possible that in

4    there somewhere is a seed of hope from which your Honor can

5    provide some leniency?

6          54 years of age with a father who died at 61 from an

7    ailment that he has.  What is the prognosis for this

8    individual?  Maybe more than seven years.  10?  12?

9          Can the government and is this Court so certain that

10   it is not possible for this man to change?  You know, it takes

11   sometimes a lot of beatings before you're beat to the point

12   where you say no.  And sometimes you have to get older and you

13   have to get sick and you have to get scared, and you come

14   around.  I think the term is opsimath, one who learns late in

15   life.

16         The government says, yeah, but he hasn't learned

17   here; he went to trial; he showed no remorse.  And there's

18   nobody in this courtroom that's going to deny any individual

19   their constitutional right to go to trial.  And given the

20   statements that have been made today, after everything

21   everybody knows about this case, it would be hard-pressed for

22   some lawyer to say plead guilty to robberies you weren't

23   personally at and you didn't even know about.  That would be

24   tough.  And as hard as it is for the government to accept that

25   proposition, just maybe he went to trial because he didn't do

1  those things.  I'm not talking about the gambling, but that

2  wasn't the option.  He's accountable.  Your Honor has so

3  found.  I am not here to quibble.  But what are the facts of

4  his actual involvement?  And no one can suggest because an

5  individual exercises a right to go to trial that they do not

6  have remorse; that they are not filled with regret.  It's just

7  that your Honor is not given the opportunity to sit down with

8  a defendant, look in his eyes and ask that question and

9  satisfy yourself one way or the other about that.  But there's

10  a lot of people who do know him, who have written about him

11  and do think that.

12          His little girl is not going to see him walk down the

13  aisle like she wrote.  That's not going to happen.  We all

14  know that in this courtroom.  We're kidding ourselves to think

15  differently.  But the question is will she see him walk out of

16  prison?

17          In an old essay that I pulled out from Francis Bacon,

18  it was an observation, however antiquated, and it says, It is

19  a certain sign of wise government and careful process when it

20  can hold men's hearts by hopes when it cannot by restraints.

21  You take away hope, and there is no life.

22          People who have written about Michael and the lawyers

23  who have been with him much longer than I have formed opinions

24  about him.  My dealings with him show me that other side; show

25  me that it is genuine and there's some cause to believe in

1     this man.

2           One of the Supreme Court justices said, Wisdom oft

3     time never comes.  One ought not reject it merely because it

4     comes late.  And it cannot be rejected out of hand that

5     Michael Sarno is not wiser and understands that he's come to

6     the end of his rope.  I believe that wisdom has come to

7     Mr. Sarno, albeit late, but hopefully not too late.

8           So, your Honor, I join with those who have written in

9     Michael's behalf in asking your Honor to be as lenient as the

10    law permits.

11          Thank you, Judge.

12          MR. BHACHU:  Your Honor, may I have some brief

13    rebuttal on some points?  Some of them are for the record on

14    appeal, if I might, relating to the legal issue that was

15    raised.

16          THE COURT:  No.  Let's move forward.

17          Unless the defense has something else to add --

18          MR. STEINBACK:  Your Honor, I know that Mr. Sarno

19    has --

20          THE COURT:  That's my next step.

21          MR. STEINBACK:  -- something that he's prepared to

22    write -- or read.

23          THE COURT:  Mr. Sarno, you have an opportunity now,

24    sir, to make a statement if you wish to.  You do not need to

25    make a statement.  It will certainly not be held against you

1   if you do not.  However, if there is something you wish to

2   say, this is your chance.

3            THE DEFENDANT:  Thank you, your Honor.

4            To your Honor:  Judge, as I stand before you and

5   await my sentence, I've been told I have the right to make a

6   statement.  After much thought, I know what I want to say, but

7   I have serious doubts that I will be able to get through it

8   today, nevertheless, I will do my best.

9            I will not relive what we all went through during the

10  trial.  I don't believe that time is now.  I will simply

11  acknowledge that I have some deep regrets and leave the rest

12  to my lawyers and the process ahead.

13           But as we stand before you on this day, I want to

14  speak about a few things you'll never hear from the people at

15  the next table.

16           Despite hardships growing up, I was surely blessed to

17  have the love and support of so many and for having been

18  raised --

19     (Brief pause.)

20           MR. STEINBACK:  I think, your Honor, Mr. Sarno would

21  like me to finish his statement.

22           THE DEFENDANT:  Please.

23           THE COURT:  Go ahead.

24           MR. STEINBACK:  He is -- believes he's truly blessed

25  to have the love and support of so many and for having been

1   raised by a woman that went straight to heaven.  He writes

2   that he received the same such love and guidance from two

3   older sisters.  And in this life, her words come in many

4   shapes and sizes.

5         He writes that some of his rewards are as follows:

6   When his middle sister had trouble with her ex-husband, which

7   led to a divorce, he says, he was rewarded with her and her

8   three children moving in with him.  He says he was rewarded

9   with watching them grow into fine adults; awarded when they

10  married wonderful partners and was blessed with seven great-

11  nieces and nephews.

12        He also says he was rewarded when he wound up with

13  two great role models, two people that he says he could turn

14  to no matter how big a problem life sent his way.  He says

15  those two people just happen to be his mother-in-law and his

16  father-in-law.

17        He also, your Honor, says he was rewarded with two

18  healthy, fun-loving, wise-cracking kids that he could go on

19  for hours about; but for now he wants to keep it brief and

20  just will speak of the countless dance recitals that he and

21  the whole family all sat through waiting until it was his

22  little girl's turn to take center stage and how proud he was

23  then as he is now that she is about to finish college.

24        He says he's equally rewarded when he thinks on the

25  countless ballparks and basketball courts that he and his

1    family drove to and watched his little guy do his thing.

2    There is no reward, he says, quite like seeing your

3    12-year-old son hit a home run in Cooperstown, New York.  As

4    for his son, he says, college right now is no longer an

5    option; instead, he's found himself a job and he is helping

6    his mother.

7           Those, your Honor, he says are a few of the -- of his

8    blessings and rewards.

9           And, finally, he writes, on the eve of his 22nd

10   wedding anniversary, his greatest reward and blessing is his

11   partner, his best friend, his soulmate, his wife Nicole.  He

12   says she made him the luckiest man in the world 22 years ago

13   as well as 22 seconds ago.

14          He'd like to close by sharing with your Honor one of

15   his favorite sayings from his mother.  We've been through

16   thick and thicker.  It did not get any thicker than the trial

17   that my family and I and the many people who have supported me

18   all went through.

19          He ends by simply praying for the quickest way home

20   to the ones he loves and then says thank you.

21          THE COURT:  Very well.

22          The Court has, of course, reviewed the presentence

23   investigation report and its many supplemental reports as

24   well; the many filings of the attorneys from both sides,

25   including the reference and the character letters on behalf of

1    the defendant.  I take into account the arguments today of the

2    attorneys and the defendant's statement.  I also take into

3    account the evidence heard during the course of the trial.

4          Let me just specifically say that the hardship to the

5    defendant's family, his children, the people around him, the

6    Court has no doubt is real and is -- the word unfortunate

7    seems insufficient, but it's the only word I can think of.

8    For they, of course, have been accused and convicted of

9    absolutely nothing; and that they should suffer is indeed a

10    tragedy.

11          Taking into consideration all of the information

12    before me, the Court intends to enter the following sentence:

13    Pursuant to the Sentencing Reform Act of 1984, it is the

14    judgment of the Court that the defendant is hereby committed

15    to the custody of the Bureau of Prisons to be imprisoned for a

16    term of 240 months on Count One and 60 months on Count Two, to

17    be served consecutively, for a total sentence of 300 months.

18          The defendant is ordered to pay restitution in the

19    amount indicated by the government in its argument.  The Court

20    will impose no fine, waives costs of incarceration and

21    supervision.

22          Upon release from imprisonment, the defendant shall

23    be placed on supervised release for a term of three years on

24    both counts, to be served concurrently, for a total of three

25    years.

1    While on supervised release, he shall not commit

2  another federal, state or local crime; shall comply with the

3  standard conditions and the following additional conditions:

4  He shall refrain from any unlawful use of a controlled

5  substance; shall submit to one drug test within 15 days of

6  release from imprisonment and random testing thereafter, not

7  to exceed 104 tests per year.  The defendant shall cooperate

8  in the collection of a DNA sample.  The defendant shall not

9  possess a firearm or any other destructive device; and if

10  required by the probation officer shall participate in a

11  mental health treatment program related to gambling addiction.

12    The Court also imposes the statutory cost of $250 for

13  the conviction on the two counts, which is required by

14  statute.

15    I want to make a finding with respect to the sentence

16  as well.  The Court finds that the sentence of 300 months that

17  I have imposed with respect to the custody is appropriate in

18  this case even if it were to be found that the sentence

19  exceeds the properly calculated guideline range.

20    My finding is based upon the consideration of the

21  sentencing factors contained in 18 United States Code, Section

22  3553(a).  Specifically in that regard, the Court finds that

23  the defendant has been twice previously convicted of felony

24  offenses, one of those offenses a racketeering conspiracy and

25  illegal gambling offense and thus a very similar offense to

1     the case at bar.  The other was for extortionate extensions of

2     credit.  Both of these convictions ended up in a total

3     sentence apparently of 86 months of imprisonment, which, it is

4     clear, unfortunately, failed to deter him in any way from

5     further criminal conduct.  On the contrary, it appears that

6     the defendant, from the moment he was released from those

7     prison sentences, embarked on a trail of forming the criminal

8     enterprise that he has been convicted of in this current

9     indictment.

10           He appears to have had a single-minded determination

11    to continue to engage in criminal conduct of an organized

12    nature involving racketeering and gambling and, as a

13    by-product, violence.  The Court simply cannot ignore the fact

14    that during the course of this criminal conspiracy, the

15    defendant was an organizer, a supervisor, a leader of a group

16    of individuals who were responsible for criminal conduct in at

17    least four separate states.  Robbed victims, tied them up,

18    pointed guns at them, stabbed them, and shot them, and then

19    blew up a building on a public street in this community.

20           To sum it up briefly, the danger to the public, to

21    those people who are not his family members, are not people he

22    apparently loves, the danger to them from being stabbed, shot

23    and having bombs detonated on public streets is grave; and the

24    likelihood that the defendant will continue to engage in this

25    dangerous conduct appears to me from his history and all that

1    I have seen to be very great.  The need to protect the public

2    is therefore very high.

3           In addition, there is a clear need to send a message

4    to those waiting to follow in the defendant's footsteps that

5    it would be unwise to do so.  It would be detrimental to the

6    public interest for this Court or any other to leave the

7    impression that one can engage in a lifetime of crime in the

8    hope of avoiding capture and conviction until the very end and

9    then retire to some sort of peaceful existence after having

10   wreaked havoc and chaos among others.

11          For these reasons, I'm convinced that the sentence of

12   300 months in this case is appropriate regardless of the

13   propriety of the difficult guideline calculation in this case.

14          Are there any questions about the Court's intended

15   sentence?

16          MR. STEINBACK:  The only comment I would make or

17   request actually is that we be given a seven- to ten-day

18   period to obtain the records necessary to supplement the

19   medical history for Michael before the J and C goes out and he

20   is designated to make sure that the Bureau of Prisons knows

21   what they need to do.

22          THE COURT:  Granted.  Just advise us of when you've

23   accomplished that.

24          MR. STEINBACK:  Thank you, your Honor.

25          THE COURT:  I want, sir, to advise you at this time

1    that you have the right to appeal your conviction and also

2    your sentence as well if you believe there was some

3    fundamental defect in your trial or that the sentence itself

4    is somehow unlawful or inappropriate.

5            You have the right to file a notice of appeal.  You

6    have the right to apply for leave to appeal in forma pauperis,

7    which means without having to pay the usual fee, and the clerk

8    of the court will prepare and file a notice of appeal for you

9    if you request it.

10           With few exceptions, any notice of appeal that you

11   file, whether it be an appeal of your conviction or of your

12   sentence or both, must be filed within 14 days of the actual

13   entry of the judgment I have announced I intend to enter.

14           I assume you will be filing a notice of appeal on

15   behalf of the defendant?

16           MR. GILLESPIE:  Yes, your Honor.

17           THE COURT:  Very well.

18           Anything else?

19           MR. GILLESPIE:  Your Honor, as to us coming back on

20   Friday if we don't resolve this, you don't need the defendant

21   here, do you, sir?  On the monetary --

22           THE COURT:  On the forfeiture?  No.

23           MR. GILLESPIE:  Okay.

24           THE COURT:  All right.  I think that's it then.

25           MR. BHACHU:  Thank you, your Honor.

1          MR. DIAMANTATOS:  Thank you, your Honor.

2          MR. DONOVAN:  Thank you, your Honor.

3          MR. GILLESPIE:  Thank you, sir.

4          MR. STEINBACK:  Thank you, your Honor.

5                    *    *    *    *    *

6

7    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.

8

9
     */s/ Nancy C. LaBella*                    *July 13, 2012*
10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25