UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No.   08 CR 115 |
| v. | ) | Hon.  Ronald A. Guzman |
| | ) | |
| MICHAEL SARNO, | ) | |
| also known as, "Big Mike," "Mikey," | ) | |
| "Large," and the "Large Guy" | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
FOR COMPASSIONATE RELEASE**

The UNITED STATES OF AMERICA, by its attorney, JOHN R. LAUSCH, JR.,
United States Attorney for the Northern District of Illinois, respectfully responds as
follows in opposition to defendant Michael Sarno's motion for compassionate release.
Defendant's motion should be denied.  Defendant does not have a pre-existing condition
that puts him at particular risk because of the current pandemic, and due to his extensive
criminal history defendant should remain imprisoned where he cannot harm the public
any further.

**BACKGROUND**

A.    **Offense Conduct and Procedural History**

Defendant Michael Sarno along with multiple co-defendants was charged in an
indictment with conspiring to participate in the affairs of a criminal enterprise through a

pattern of racketeering activity (Count One) and operating an illegal gambling business (Count Two). R. 310.[1]

The defendant was the leader of a criminal enterprise that engaged in a wide array of organized crime over the better part of a decade. A centerpiece of the enterprise's criminal activity was illegal gambling. The video gambling operated under the guise of a business, Amusements Inc., which was owned and operated by defendant Szaflarski. While Amusements Inc. maintained the façade of a vending machine business that supplied video gaming devices solely for "amusement only," in actuality, Szaflarski entered into lucrative agreements with bar and restaurants owners in Berwyn and nearby towns to place and service video gambling devices ("VGDs") in their establishments (each known as a "stop") and to split the gambling profits from these machines. *E.g.*, Tr. 135-40, 199-217, 258-61, 296-303, 356-63, 720-37, 948-70, 1079, 1083, 1438-41.

Though Szaflarski was the nominal owner and public face of Amusements Inc., Tr. 3924, the decision-maker when it came to illegal gambling activity was Sarno. Sam Volpendesto advised Mark Hay in a May 17, 2005, consensually recorded conversation that Sarno had "good guys" running video gambling machines for him, and that as a result Sarno was "pretty safe," as opposed to others who had recently been "busted." Tr. 1473-74, 1694; GX Hay 5/17/05 Transcript at 4. Szaflarski told an employee of Amusements Inc. who did not want to put VGDs into a restaurant (the restaurant had a video

---

[1]     References to the record appear as "R. __." Reference to the trial transcripts appear as "Tr. __." References to trial exhibits appear as "GX __."

monitoring system) that "it wasn't up to" Szaflarski to decide where VGDs were to be installed. Tr. 679. Szaflarski instructed an employee not to take any money from Sarno for work done at Sarno's home because he was a "friend" of the company. Tr. 675-76.

The government obtained authority to intercept multiple telephones used by Sarno; these interceptions confirmed Sarno's authority over the illegal gambling. One of the telephones was subscribed in Sarno's name and home address; the others were subscribed under a fictitious name ("Joe Austin") and address, or had no subscriber information at all. Tr. 1940, 1991, 2493-2500. Sarno and his associates used code, such as a reference to "Alice" or "your buddy," to initiate conversations on the phones that were not subscribed in Sarno's name. Tr. 2493-2500. On October 8, 2007, the government intercepted a sequence of calls on these phones. During the first call, which occurred on the phone subscribed under Sarno's name, Sarno spoke to an associate, Raymond Rossi, who told Sarno that he was waiting for the "kid with the H3 to stop by here." GX Sarno 10/08/07-1 Transcript at 2. Szaflarski used a Hummer H3 vehicle to service his gambling route. Tr. 1952-66, 2503; GX SOS Szaflarski 1. Sarno asked Rossi if he had "problems with this," and Rossi asked Sarno to "try to get a hold of Alice for me." GX Sarno 10/08/2007-1 Transcript at 2. This call was immediately followed by another call between Rossi and Sarno, but this time Sarno used one of his "secret" phones to continue the conversation. During this second call over Sarno's secret phone, Rossi sought Sarno's approval to put gambling machines within a lounge. GX Sarno 10/07/2007-2 Transcript.

Mark Hay, a cooperating defendant, confirmed that Sarno's approval was needed for illegal gambling activity. He testified that in 2002, his brother-in-law expressed

interest in installing VGDs in his bar. Tr. 1438-39. Hay asked Polchan if he could help obtain the VGDs. Tr. 1440. Polchan asked Hay where the bar was located, and after Hay told Polchan it was in Villa Park, Polchan said he would have to check with "my guy," whom Hay understood was Sarno. Tr. 1440. Polchan later told informed Hay that Sarno said that they could not install VGDs in DuPage County. Tr. 1440-41.

Henry Rendon testified about Sarno's authority when it came to illegal gambling. Rendon, an owner of Austin Liquors, testified that in 2004 or 2005 he had illegal gambling machines installed; Rendon called Jasper Marino, who said he would call Sarno about the machines. Tr. 720-23. Rendon received 50% of the profits on the machines, which were delivered by Szaflarski. Tr. 723-26. After some three months, when Rendon needed money to pay back taxes, he turned to Szaflarski for a loan. Tr. 731. Szaflarski told Rendon to be at his bar the next day. Tr. 733. Sarno showed up at the bar to meet Rendon. Tr. 733-34. Sarno agreed to loan Rendon $15,000, which was to be paid back through the money generated by the gambling machines. Tr. 734-35. After paying back some $8,000 on the loan, Rendon called Marino to tell him to take back the machines that Szaflarski had installed, Marino told him that Sarno, "the big guy," was going to be "pissed." Tr. 735-37.

Sarno discussed and planned future illegal gambling activity along with Polchan. The government obtained authority to intercept oral communications and visual conduct within Goldberg Jewelers, a business operated by Polchan. On April 20, 2007, Sarno told Polchan that "Casey" had told him "a little something about it," and thereafter informed Polchan that "we're going to get the whole stop." GX Goldberg 4/20/07 Transcript at 7.

4

In an April 6, 2007, conversation, Sarno and Polchan discussed placing illegal gambling devices at various Outlaw Motorcycle Clubhouses. Sarno told Polchan: "Buddy, it's like I said, let's do 2 or 3 at a time [install 2 or 3 VGDs]." Polchan responded: "You know. That's an option. I'd, I'd like to get the Westside, and I'd like to get the Southside [Outlaw Motorcycle Clubhouses]." Sarno added: "We put 'em, put 'em in every place, whatever comes out you know, the good will absorb the bad, you know." GX Goldberg 4/6/07 Transcript at 5. The next day, April 7, 2007, illegal gambling devices were delivered to Goldberg Jewelers by an individual who told Polchan "I work for Casey," and from there they were delivered to an Outlaws Clubhouse in Kankakee. GX Goldberg 4/7/07 Transcript; Tr. 2369-70. On April 20, 2007, Sarno told Polchan to "get like a running total every week, from somebody" concerning the money generated by the devices that were sent to the Outlaws clubhouse in Elgin, and encouraged the placement of machines in such locations: "That's what we want to hear. We want places like that. Elgin's kinda like that?" GX Goldberg 4/20/07 Transcript at 3-4. (On July 30, 2008, a search warrant at the Elgin clubhouse revealed gambling devices installed there. Tr. 2405-10.) Later that summer, Szaflarski was captured on video personally delivering VGDs to Goldberg Jewelers, showing Polchan how to operate the machines, and receiving an update from Polchan on where a machine was located. GX Goldberg 6/14/2007 Transcript.

Sarno and his confederates had a virtual monopoly over illegal gambling activity in the areas of Cicero, Berwyn, Lyons, McCook and Stickney. Tr. 395, 400. To maintain its hold over this territory, members of the enterprise resorted to threats and violence, including arson. The 47th Street Grill was a restaurant that was supplied with gambling

devices by Amusements, Inc. prior to the fall of 2002. GX SS Tax 15. After Vincent Dublino agreed to supply the restaurant with gambling devices on more favorable terms, Dublino was threatened by Sarno, who ordered him to "stay the fuck away from [the] 47th Street Grill stop." Tr. 394-95, 950, 959, 962-63. Dublino ignored Sarno's threat, and in February 2003, a pipe bomb ripped through Dublino's business. Tr. 850-91, 970, 1012, 1066. The bomb caused significant property damage. Tr. 1155-57. The bombing occurred because Dublino was putting gambling machines "where they shouldn't be" and the "Big Guy"—Sarno—was "looking for a way to send a message." Tr. 2672, 3464-65.

Multiple members of the enterprise were enlisted to "send a message" to Dublino and in the efforts to obstruct the federal investigation of the bombing that followed. The explosives and fuse used in the bomb were supplied by Kyle Knight, who had extensive knowledge and experience in the use of explosives. Tr. 2586-2603. Knight provided these materials (along with advice on how to mix the explosives and place a bomb) to Sam Volpendesto. Tr. 2586-89, 2600-01, 3463-65. In a recorded conversation, Sam Volpendesto confirmed that Knight provided him with the "equipment" for the bombing, and that Polchan was involved in the bombing as well; for example, Sam Volpendesto explained that he didn't have to pay Polchan for his role in the bombing because "Mark was the original guy that knew what the fuck it was about . . . ." GX Hay 5/17/05 Transcript at 9-12. Sam Volpendesto was the one who advised Knight that the bombing was Sarno's way of sending a message to Dublino. Tr. 2672, 3464-65.

After the bombing, Berwyn police officer and fellow enterprise member James Formato sent a warning to Polchan via Mark Hay, another enterprise member, that

federal law enforcement was looking for a brown van seen near the bombing. Tr. 1461, 3634-35. Formato understood when he gave his warning to Polchan that a federal grand jury would probably be investigating the bombing. Tr. 3673-74. Sam Volpendesto confirmed in a consensual recording that he had received this warning, but added that he and Polchan had not been in a van on the night of the bombing: "we didn't have a van. (Laughs.) That's why we laughed the next day when we found out that they were saying it was a van." GX Hay 5/17/05 Transcript at 16-17. Knight called Hay, and instructed him to call Sam, and have him discard all bomb making materials, such as pipe, from his house so that they could not be recovered by federal law enforcement. Tr. 1462.

The enterprise members involved in illegal gambling and the bombing of Dublino's business were also involved in a spate of robberies and burglaries. As with the enterprise's illegal gambling activity, Polchan and his business, Goldberg Jewelers, was a hub for this activity. Polchan identified targets for robbery, burglary and theft; bank-rolled efforts to "case" potential targets; participated in multiple planned robberies and burglaries; acted as a safe-cracker; paid others at Goldberg Jewelers for goods acquired during this illegal activity; and stored stolen goods. Tr. 1211-1798, 2505-2885, 3456-91, 3592-3823.

Other enterprise members—including Sam Volpendesto, Hay, Knight, Formato and Anthony Volpendesto—participated in numerous robberies and burglaries by identifying potential stores and residences as targets, "casing" potential targets, entering stores and residences to take property by force or theft, and by acting as lookouts and getaway drivers. *Id.*

The robberies culminated with the robbery and shooting of a traveling jewelry salesman outside the Marry Me Jewelry Store, in LaGrange Park, on August 25, 2003. Knight, Hay and Anthony Volpendesto took over $645,000 in jewelry from the salesman after shooting him in the chest; Anthony identified the robbery target and acted as getaway driver. Tr. 1332-44, 2654-62, 3296-99, 3310-12. Polchan stored the jewelry and agreed to sell it for Hay, Knight and Anthony Volpendesto, but never paid them. Tr. 1343-45, 2661-62.

The enterprise used Goldberg Jewelers as a clearinghouse for stolen and fraudulently obtained goods. Hay explained that he worked at Goldberg Jewelers beginning in summer 2001, and during this time, Polchan purchased all manner of goods, including electronics, appliances, tools and clothing. Tr. 1205-06, 1374-91. Some of these goods, which came new in the box, were frequently delivered by what were known as "boosters," individuals specializing in theft from houses, cars and shops. Tr. 1376-82, 1391-93. One individual who supplied Polchan in this fashion was Tom, Tr. 1382, who explained to Hay that he obtained the goods through "what they call identity theft, using other people's credit card information, putting it on the card and using it to obtain merchandise . . . ." Tr. 1389-90. Polchan sold these goods at cut-rate prices. *E.g.*, Tr. 3547-52, 3563-82.

After the shooting of the jewelry salesman in the summer of 2003 and Polchan's failure to pay the robbery team, the enterprise's robbery activity waned and certain members of the enterprise were arrested by law enforcement. Polchan continued to use

Goldberg Jewelers to traffic in stolen and fraudulently obtained goods. For example, there was a recorded conversation in which Polchan sold cigarettes that had been stolen from a shipment destined for Japan. GX Hay 1/28/05 Transcript; Tr. 1423-25, 1817-27, 3919-20, 4103. The jury saw video recordings, including those made by an undercover ATF agent in 2007 and 2008, wherein Polchan purchased and sold gold fillings as well as new electronic merchandise at cut-rate prices. Tr. 3832-37, 3841-79. Polchan trafficked in goods that had been obtained through the fraudulent use of credit cards, Tr. 3573-74, 3591-92, and purchased goods from Tom, the booster who had done business with Polchan during Hay's employment years earlier. Tr. 3868-70.

As with the enterprise's illegal gambling activity, Sarno wielded authority over the enterprise's robbery and stolen goods activity. Sarno received a call concerning a robbery on November 22, 2007. During the call, Sarno's associate told Sarno "my house just got robbed," and asked Sarno to check with "your shops that these kids are bringing laptops to." GX Sarno 11/22/07-1 Transcript at 1. Sarno agreed to do so, *id.*, and called Polchan at Goldberg Jewelers. GX Sarno 11/22/07-2 Transcript. Sarno told Polchan that "they hit his house," and had taken laptops, TVs and jewelry. *Id.* at 1. Polchan said that the stolen goods had not been brought to Goldberg Jewelers, and Sarno said: "I wish they did." *Id.* Polchan also acknowledged he had a "boss" in the stolen goods operation. GX Goldberg 3/29/07 Transcript at 20 ("I take care of my boss.")

Hay testified that when he was deciding whether to rob a dice game, he consulted with Polchan. Tr. 1441-42. Polchan then told him, "Stay away from the dice game. His guy told for me not to get anywhere near it." Tr. 1442. Hay understood Polchan's "guy"

to be Sarno.  Tr. 1442.  Hay did not rob the dice game because "I knew if I robbed that dice game my life would be in jeopardy."  Tr. 1443.

Hay testified that in 2002, his son, Michael, was in possession of rare Michael Jordan rookie cards.  Tr. 1278-79. (Michael Hay had stolen these cards from a shop, and Sam Volpendesto had acted as his getaway driver.  Tr. 1278-79.)  Polchan was angry with Hay about Sam Volpendesto assisting his son, because Polchan would have to explain to "his guy," Sarno, if Sam Volpendesto was arrested.  Tr. 1278-80.

When LD Jewelers was robbed by enterprise members, the owner of LD Jewelers complained that Polchan was involved in the robbery.  Tr. 1330.  Polchan advised Hay that he had Sarno talk to the owner of LD Jewelers, and that Sarno had taken care of the problem.  Tr. 1330-31.

When Hay worked at Goldberg Jewelers from the spring of 2001 to February 2002, Sarno visited at least once a week.  Tr. 1430-31.  Hay saw Polchan provide Sarno with merchandise and cash.  Tr. 1431-34.  Polchan sometimes asked Hay to leave when Sarno visited, so that Polchan could talk to Sarno alone.  Tr. 1438.  In an interception from within Goldberg Jewelers, Polchan could be seen paying Sarno a wad of cash on April 11, 2007— and providing Sarno with merchandise.  GX Goldberg 4/11/07 Transcript at 4.

All defendants (including Sarno) who went to trial were found guilty, R. 519, 521-22.  At sentencing, the government presented evidence concerning defendant's extensive criminal history, including his membership in the Chicago Outfit, otherwise known as the Chicago mob.  Sarno pleaded guilty to membership in the Outfit's Ferriola Street crew, and further admitted to being involved in its illegal activities for a period of

10

approximately fourteen years.  R. 984-1 at 46-47.  Sarno pleaded guilty in a second case to his further involvement in Outfit activities.  *Id.* at 65-66.  As a part of the Ferriola street crew, Sarno and his confederates engaged in multiple acts of extortion, juice loan and street tax collections.  *Id.*  The government pointed out that membership in the mob is for life, which explained Sarno's actions in the instant case, including his directions to bomb a rival gambling business.  *Id.* at 49.

Based on the evidence presented at trial, this Court was "well satisfied" with the finding that Sarno was accountable for the robberies conducted by the enterprise, and that the evidence was more than sufficient to hold Sarno accountable for ordering the bombing of C & S Amusements.  R. 984-1 at 41.  This Court sentenced defendant Sarno to a total term of imprisonment of three hundred months.  R. 823.  The Seventh Circuit affirmed this Court's judgment on appeal.  *United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014).  Defendant's collateral attack on his sentence failed, and defendant now moves for compassionate release pursuant to 18 U.S.C. § 3582.

## B.    The BOP's Response to COVID-19

As reported on the BOP's website, in January 2020, the BOP began a course of action to respond to the spread of COVID-19.[4]  Phase One of this course of action included the creation of an agency task force working in conjunction with subject matter experts from the Center for Disease Control and Prevention ("CDC") and the World Health Organization to review guidance about best practices to mitigate transmission.  *Id.*  On

---

[4]    Federal   Bureau   of   Prisons   COVID-19   Action   Plan,   March   13,   2020, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited August 9, 2020).

March 13, 2020, as part of Phase Two of the course of action, the BOP began implementing various measures to mitigate the spread of the virus. These measures included suspending social visits, in-person legal visits, all inmate movement, and staff travel. The BOP also began implementing procedures to quarantine and screen inmates and staff for the virus, which included screening all newly arriving inmates for exposure risk factors and symptoms, quarantining asymptomatic inmates with exposure risk factors, and isolating and testing symptomatic inmates with exposure risk factors. *Id.*

Subsequent phases of the BOP's response included the authorization of inmate movement in order to avoid overcrowding at BOP facilities. However, such movements were limited to inmates who had been in custody for more than fourteen days and who had been subjected to exit screening to ensure that the prisoner had no COVID-19 symptoms (fever, cough, shortness of breath) and a temperature less than 100.4 F.[5] Subsequent phases of the course of action included the quarantine and isolation of all new inmates with asymptomatic inmates being quarantined for fourteen days and symptomatic inmates being isolated until testing negative for COVID-19, modifying operations to maximize social distancing, the maximization of telework for staff members, and conducting inventory reviews of all cleaning and medical supplies to ensure ample supplies were on hand and ready to be distributed as necessary at BOP facilities.[6]

---

[5] Updates to BOP COVID-19 Action Plan, March 19, 2020, https://www.bop.gov/resources/news/20200319_covid19_update.jsp (last visited August 9, 2020).

[6] Bureau of Prisons Update on COVID-19, March 24, 2020, https://www.bop.gov/resources/news/pdfs/20200324_bop_press_release_covid19_update.pdf (last visited August 9, 2020); COVID-19 Action Plan: Phase Five, March 31 2020,

On April 1, 2020, as part of Phase 5 of its COVID-19 action plan, the BOP secured all inmates to their assigned cells or quarters to decrease the spread of the virus.[7]  On April 13, 2020, as part of Phase 6 of its COVID-19 action plan, the BOP continued to secure all inmates to their assigned cells or quarters to decrease the spread of the virus.[8] Thereafter, on May 18, 2020, the BOP extended the implementation of Phase 7 of its COVID-19 plan until June 30, 2020.[9] Phase 7 extends all measures from Phase 6, including measures to contain movement and decrease the spread of the virus.  Further details and updates of BOP's modified operations are available on the BOP website at a regularly updated resource page: www.bop.gov/coronavirus/index.jsp.

## ARGUMENT

### A.    Legal Standard

As amended by Section 603(b) of the First Step Act of 2018, Pub. L. 115-391, Title 18, United States Code, Section 3582(c)(1)(A) provides:

---

https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited August 9, 2020).

[7]    COVID-19    Action    Plan:    Phase    Five,    March    31,    2020, https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp (last visited August 9, 2020).

[8]    COVID-19    Action    Plan:    Phase    Six,    April    13,    2020, https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited August 9, 2020).

[9]    Bureau    of    Prisons    COVID-19    Action    Plan:    Phase    Seven,    May    20    2020, https://www.bop.gov/resources/news/20200520_covid-19_phase_seven.jsp (last visited August 9, 2020).

[T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that—

(i)     extraordinary and compelling reasons warrant such a reduction; or

(ii)    the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Direct of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);

and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

Under this statute, a sentence reduction must be consistent with applicable policy statements issued by the U.S. Sentencing Commission. § 3582(c)(1)(A). In addition to finding "extraordinary and compelling" reasons for the reduction, the Court must also find that "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)" per U.S.C.G. § 1B1.13(2). Finally, the Court must the 18 U.S.C. § 3553 sentencing facts to the extent relevant. *Id.*

Congress directed that the Sentencing Commission issue policy statements defining the "extraordinary and compelling reasons" that might warrant a sentence

reduction under § 3582(c)(1)(A)(i). *See* 28 U.S.C. § 994(t) ("The Commission, in promulgating general policy statements regarding the sentencing modification provisions in section 3582(c)(1)(A) of title 18, shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples. Rehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason.").

Pursuant to this directive, § 1B1.3 of the Sentencing Guidelines Manual sets forth the Commission's policy statement relating to § 3582(c). Guideline § 1B1.13 provides that under § 3582(c)(1)(A), a court may reduce a term of imprisonment, after considering the § 3553(a) factors, if three criteria are satisfied; (1) "extraordinary and compelling reasons warrant the reduction"; (2) "the defendant is not a danger to the safety of any other person to the community"; and (3) "the reduction is consistent with this policy statement." Application Note 1 to Guideline § 1B1.13 identifies factors that may constitute "extraordinary and compelling" reasons for a sentence reduction.

Thus, in order to obtain relief under § 3582(c)(1)(A)(i), the defendant must show that:

    (1)    he has requested relief from the BOP and exhausted any administrative appeals in that process;

    (2)    there exists extraordinary and compelling reasons that warrant a sentence reduction;

    (3)    the requested reduction is consistent with the policy statements issued by the sentencing commission in Guideline § 1B1.13, including the requirement that "the defendant is not a danger to the safety of any other person or to the community"; and

(4)    the reduction is warranted in light of the facts listed in 18
U.S.C. § 3553.

**B.    Defendant Has Complied with § 3582(c)(1)'s Exhaustion Requirement.**

As indicated above, under 18 U.S.C. § 3582(c)(1), a defendant is free to bring a motion for compassionate release after he has exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf, or 30 days have elapsed since the receipt of such a request by the warden of the defendant's facility, whichever is earlier.

On April 4, 2020, an attorney for defendant submitted an email request for defendant's release.  Because more than 30 days have elapsed since defendant's request was received, defendant has exhausted his administrative remedies as required by § 3582(c)(1).

**C.    Defendant Has Not Established Extraordinary and Compelling Reasons Warrant a Sentence Reduction or His Release.**

Defendant has not met the statutory standard of presenting "extraordinary and compelling reasons" warranting a reduction in his sentence under the factors enumerated in 18 U.S.C. § 3553.  Guideline § 1B1.13, the policy statement that describes bases that might warrant a sentence reduction under § 3852(c)(1)(A)(i), provides that a court may reduce a term of imprisonment, after considering the factors set forth in 18 U.S.C. § 3553(a), if three criteria are satisfied: (1) "extraordinary and compelling reasons warrant the reduction," (2) "the defendant is not a danger to the safety of any other person or to the community," and (3) "the reduction is consistent with this policy statement." U.S.S.G. § 1B1.13. *See also*, *e.g.*, *United States v. Willis*, 382 F. Supp. 3d 1185,

16

1187 (D.N.M. 2019); *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019). Application Note 1 to Guideline § 1B1.13 identifies factors that may constitute "extraordinary and compelling reasons" for a sentence reduction, including a defendant's medical condition, age, family circumstances, and an open-ended category for "other reasons." Specifically, according to the policy statements, the Sentencing Commission concluded that "extraordinary and compelling reasons" were limited to the following four scenarios:

1.  The defendant suffered from a "terminal illness" or his physical or mental condition "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 cmt. n.1(A).

2.  The defendant was at least 65 years old, experiencing a serious deterioration in physical or mental health because of the aging process, and served the lesser of 10 years or 75% of his sentence. *Id.* § 1B1.13 cmt. n.1(B).

3.  The defendant's family circumstances include either the death or incapacitation of the caregiver of the defendant's minor child or minor children or the incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner. *Id.* § 1B1.13 cmt. n.1(C).

4.  If there were "an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1B1.13 cmt. n.1(D).

The changes to 18 U.S.C. § 3582(c)(1)(A) made by the First Step Act altered the procedure through which compassionate release could be sought, that is, by allowing defendants to bring their requests to court after exhausting their administrative remedies, but they did not alter the grounds for granting relief.

The defendant argues that he is eligible for release because of his medical condition. He claims a variety of ailments, to include "empyema of the lungs, chronic obstructive asthma, iron deficiency anemia, benign hypertrophy of prostate, an enlarged gallbladder, renal failure, an elevated white blood cell count, is 100% incontinent, hypertension, osteoarthritis of the knees requiring two total knee replacements, and is unable to walk and ambulates with a wheel chair." Motion at 11. His arguments are meritless.

None of the conditions defendant relies upon are ones identified by the Centers for Disease Control as putting an individual at increased risk from COVID-19.[18] Of his conditions, his hypertension "might" carry an increased risk from COVID-19. Accordingly, defendant has not established that, in light of the pandemic, he suffers from a chronic medical condition, confirmed by medical records, presents "a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover," U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

The government recognizes defendant's legitimate concerns regarding the risk of infection, however, those concerns do not amount to extraordinary and compelling reasons to reduce his sentence, especially when evaluated against the Sentencing

---

[18] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fneed-extra-precautions%2Fgroups-at-higher-risk.html%20(last%20visited%20August%205,%202020).

Commission's policy statement set forth at Guideline § 1B1.13 and particularly the examples listed in Application Note 1. None of those examples support the notion that a generalized fear of a future illness, even during a pandemic, constitutes an "extraordinary and compelling reason" warranting relief under § 3582(c)(1)(A)(i). Indeed, multiple judges in the Northern District of Illinois, and courts across the country, have held that neither the COVID-19 pandemic generally, nor the presence of the disease in a particular correctional facility, in and of itself constitutes "extraordinary and compelling reasons" under § 3582(c)(1). *See United States v. Shannon*, No. 13 CR 535, 2020, at *1, 2020 WL 3489491, at *2 (N.D. Ill. June 26, 2020); *accord*, *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020) ("[T]he mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release."); *United States v. Eberhart*, 2020 WL 1450745, *2 (N.D. Cal. Mar. 25, 2020) ("a reduction of sentence due solely to concerns about the spread of COVID-19 is not consistent with the applicable policy statement of the Sentencing Commission as required by § 3582(c)(1)(A).").

### D. Defendant's Release Would Not Be Consistent with the Applicable Policy Statement or the Sentencing Factors Set Forth in § 3553(a).

Moreover, early release of defendant would be inconsistent with the relevant factors set forth in § 3553(a), which the Court must also consider. Both the nature and circumstances of the offense and the history and characteristics of the defendant, as well as the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, all militate strongly

against early release from prison in this case. Defendant has an admitted association with the Chicago Outfit. He has repeatedly engaged in acts of violence on behalf of La Cosa Nostra, including extortion, juice loan and street tax collection. His conduct in this case involved his supervision of an enterprise that engaged in multiple robberies and burglaries, and this Court found that Sarno himself ordered the bombing of a rival illegal gambling business. Defendant is a danger to society and his proven this again and again. As this Court found at defendant's sentencing:

> My finding is based upon the consideration of the sentencing factors contained in 18 United States Code, Section 3553(a). Specifically in that regard, the Court finds that the defendant has been twice previously convicted of felony offenses, one of those offenses a racketeering conspiracy and illegal gambling offense and thus a very similar offense to the case at bar. The other was for extortionate extensions of credit. Both of these convictions ended up in a total sentence apparently of 86 months of imprisonment, which, it is clear, unfortunately, failed to deter him in any way from further criminal conduct. On the contrary, it appears that the defendant, from the moment he was released from those prison sentences, embarked on a trail of forming the criminal enterprise that he has been convicted of in this current indictment.

> He appears to have had a single-minded determination to continue to engage in criminal conduct of an organized nature involving racketeering and gambling and, as a by-product, violence. The Court simply cannot ignore the fact that during the course of this criminal conspiracy, the defendant was an organizer, a supervisor, a leader of a group of individuals who were responsible for criminal conduct in at least four separate states. Robbed victims, tied them up, pointed guns at them, stabbed them, and shot them, and then blew up a building on a public street in this community.

> To sum it up briefly, the danger to the public, to those people who are not his family members, are not people he

20

apparently loves, the danger to them from being stabbed, shot and having bombs detonated on public streets is grave; and the likelihood that the defendant will continue to engage in this dangerous conduct appears to me from his history and all that I have seen to be very great. The need to protect the public is therefore very high.

In addition, there is a clear need to send a message to those waiting to follow in the defendant's footsteps that it would be unwise to do so. It would be detrimental to the public interest for this Court or any other to leave the impression that one can engage in a lifetime of crime in the hope of avoiding capture and conviction until the very end and then retire to some sort of peaceful existence after having wreaked havoc and chaos among others.

For these reasons, I'm convinced that the sentence of 300 months in this case is appropriate regardless of the propriety of the difficult guideline calculation in this case.

R. 984-1 at 92-94.

As this Court has recognized, defendant's extensive criminal history strongly suggests that, if this Court gives defendant yet another opportunity to commit crimes against others, he will seize it. To Sarno and his other cohorts who have been associated with the Chicago Outfit, age is no impediment to committing violent crime. *See, e.g.,* *United States v. Scalise et al.*, 10 CR 290 (N.D. Ill.) (organized crime associates in their 70s planned armed robbery of armored car and robbery of residence prior to intervention by law enforcement); *United States v. Volpendesto*, 08 CR 115 (N.D. Ill.) (organized crime associate in his 80s personally participated in mob-related bombing); *United States v. Hanhardt*, 00 CR 853 (N.D. Ill.) (retired law enforcement officer and organized crime associate in his 70s personally participated in jewelry theft and robbery ring). Moreover, because of his recognized supervisory role in a criminal enterprise, defendant need not

even carry out acts of violence himself: Sarno is a mob boss who has a demonstrated history of ordering others to do his illegal bidding. Accordingly, any physical infirmity defendant suffers from does nothing to mitigate the risk he poses to the public. This Court should not give defendant another chance to harm the public, because this defendant has proven time and again that he will do so if provided the opportunity. Defendant has shown a blatant disregard for the welfare of others and the public should not be made to bear the risk of his early release. *Accord United States v. Robinson*, No. 06 CR 850, mem. order (N.D. Ill. May 18, 2020) (Kendall, J.), ECF #210 at 2 (relying upon defendant's lengthy and violent criminal history in denying motion for compassionate release).

## <u>CONCLUSION</u>

For the foregoing reasons, the motion should be denied.

Respectfully submitted.

JOHN R. LAUSCH, JR.
United States Attorney

By:    /s/ Amarjeet S. Bhachu
        AMARJEET S. BHACHU
        Assistant United States Attorney
        219 South Dearborn Street
        Fifth Floor
        Chicago, Illinois 60604
        (312) 469-6212

## CERTIFICATE OF SERVICE

The undersigned Assistant United States Attorney hereby certifies that the GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION FOR COMPASSIONATE RELEASE was served on August 14, 2020, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ Amarjeet S. Bhachu
AMARJEET S. BHACHU
Assistant United States Attorney
219 South Dearborn Street
Fifth Floor
Chicago, Illinois
(312) 469-6212