UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | No. 08 CR 115-3 |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL SARNO | ) | |

**DEFENDANT'S REPLY IN SUPPORT OF COMPASSIONATE RELEASE**

The Defendant, MICHAEL J. SARNO, by and through his attorney, JOHN W. CHWARZYNSKI JR., replies to the government's response to his motion for compassionate release as follows:

**OVERVIEW**

Mr. Sarno is currently confined to a hospital bed in a medical facility. After being confined to a wheelchair the last 18 months, he requires a catheter and bedpan. He is in need of bi-lateral knee and shoulder replacements, he is suffering from renal failure, a chronic kidney disorder, hypertension, chronic obstructive asthma, and an empyema in the left lung. As result of these serious and debilitating medical conditions, he was taken out of Petersburg FCI in late April 2020 for emergency surgery and has been in an unknown private hospital since that time and going on four (4) months. These serious medical conditions alone constitute extraordinary and compelling reasons that warrant a sentence reduction under § 3582(c)(1)(A)(i),. However, Mr. Sarno's medical issues, in addition to the COVID-19 pandemic, creates further extraordinary and more compelling reasons to warrant a sentence reduction under the first and fourth factors of § 3582(c)(1)(A)(i). The government's response offers nothing to address Mr. Sarno's health problems and instead merely dismisses the well documented and undisputed severity of his medical issues as not being preexisting or not serious. The government points to no medical

1

opinion, or evidence to support its an assertion. The government, instead, attempts to simply rehash the facts of a gambling enterprise some fifteen years ago. Mr. Sarno's fragile state of health, coupled with the COVID-19 pandemic, constitute the type of extraordinary and compelling reasons that the First Step Act was passed for and designed to address. A sentence reduction is both consistent with the policy statements and is warranted by the 3553 factors.

## APPLICABLE LAW

In order to obtain relief under § 3582(c)(1)(A)(i), the defendant must show that:

> (1) he has requested relief from the BOP and exhausted any administrative appeals in that process;
>
> (2) there exists extraordinary and compelling reasons that warrant a sentence reduction;
>
> (3) the requested reduction is consistent with the policy statements issued by the sentencing commission in Guideline § 1B1.13, including the requirement that "the defendant is not
> a danger to the safety of any other person or to the community"; and
>
> (4) the reduction is warranted in light of the factors listed in 18 U.S.C. § 3553.

## ARGUMENT

### I. THERE IS NO DISPUTE THAT THE DEFENDANT EXHAUSTED HIS ADMINISTRATIVE REMEDIES

In its response to Mr. Sarno's motion for compassionate release, the government concedes that Mr. Sarno has exhausted his administrative rights. Dkt 987 at 16. The core of its argument in opposition to Mr. Sarno's motion focuses on their baseless assertions that there is a lack of "extraordinary and compelling reasons" and that his risk to the public that would allow this Court to deny-him a compassionate release.

## II. THERE IS OVERWHELMING EVIDENCE THAT EXTRAORDINARY AND COMPELLING CIRCUMSTANCES EXIST

Courts must first determine whether a defendant has extraordinary and compelling reasons warranting a sentence reduction. The Sentencing Commission outlines four situations where extraordinary and compelling reasons exist. Both the first and fourth conditions apply and are met in this case.

### A. There is overwhelming evidence that Mr. Sarno suffers from multiple serious medical conditions.

Extraordinary and compelling reasons exist if a Defendant suffers from a terminal illness or a serious medical condition, a serious functional or cognitive impairment, or experiences "deteriorating physical or mental health because of the aging process" that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover" *Id.* § 1B1.13 cmt. n.1(A).

Although Sarno does not claim to be terminally ill, his health problems are undoubtedly serious, chronic, and incurable, and have not only diminished, but have eliminated his ability to provide self-care within the environment of a correctional facility. In fact, his conditions are so severe that not even the BOP can provide the assistance required for the most basic daily life functions, requiring Mr. Sarno to require 24-hour medical care. Moreover, neither the fact of, nor the seriousness of Sarno's conditions are challenged by the government. Rather, the government's argument is that "None of the conditions defendant relies upon are ones identified by the Centers for Disease Control as putting an individual at increased risk from COVID-19." Dkt. 987, at 18. That is simply not true, and the government's argument is contradicted by Mr. Sarno's medical records. Despite the government's disingenuous argument, it does not in any

3

way mean that Mr. Sarno does not have serious medical conditions that rise to extraordinary and compelling circumstances.

Moreover, the government's bald assertions regarding Mr. Sarno's medical conditions and risks is not only inappropriate as it is not supported by any medical opinion or medical record, but is wholly contradicted by Mr. Sarno's medical records (which are records kept through the Bureau of Prisons)[1], treating physicians, and other physicians that have reviewed his case. The debilitating effect that these conditions have on Mr. Sarno's most basic daily functions are well documented and uncontroverted.

Mr. Sarno is currently bedridden and has been for at least the last several months. (Exhibit 1: Sworn Statement)[2]. Mr. Sarno currently has a catheter in place and can only use a bed pan to use the bathroom. Id. Before he was bedridden, Mr. Sarno was confined to a wheelchair for the last 18 months before his current hospitalization. He has been informed that his knee may now be beyond surgical repair and that he will likely need to use a wheelchair for the rest of his life. Mr. Sarno also has been diagnosed with renal failure, a chronic kidney disorder, hypertension, chronic obstructive asthma, an empyema in the left lung and he will likely need dialysis soon. [3]

For the last seven years, Mr. Sarno has made numerous complaints regarding the condition of his left knee. Despite Mr. Sarno having multiple X-Ray's and CT scans of the left knee, and his doctor's indicating that Mr. Sarno's condition necessitated a total knee replacement, he has yet to receive that surgery. On multiple occasions, Mr. Sarno was scheduled for the knee replacement surgery, then only to find out the surgeries were canceled by the Bureau of Prisons. Mr. Sarno

---

[1] March 2020-May 2020 medical records provided by the BOP are attached as Exhibit 12.
[2] Counsel was unaware of the location of Mr. Sarno since May of 2020. With the assistance of the United States Attorney's Office, Defendant's counsel was finally able to schedule a phone call with Mr. Sarno on August 12, 2020 to be able to provide the Court with the most current medical condition.
[3] Renal Failure is also referred to as Chronic Kidney Disease. https://ada.com/conditions/chronic-renal-failure/

has just been informed that the damage to his knee may be so extensive that he may no longer be a candidate for a total knee replacement. This neglect and utter indifference took an operable condition and potentially made it inoperable not to mention the pain he was forced to endure over the years. Now this condition, has diminished the ability of Mr. Sarno to provide self-care within the environment of a correctional facility. Furthermore, the treatment Mr. Sarno has received and continues to require, much of which he has been waiting for years, makes clear that the medical care he requires cannot be provided either by Mr. Sarno himself or within the environment of a correctional facility.

On multiple occasions Mr. Sarno has fallen from his wheel chair while trying to ambulate to use the toilet. His medical records not only substantiate such but further indicate that over the last several months, he has had a decrease in his activities of daily living, which has resulted in pressure sores, the inability to control his bowel and urine as well the inability to bathe and clothe himself, and even avoidance of nourishment to avoid the painful and embarrassing experience of trying to go to the bathroom.(Exhibit 2: 4.27.20 BOP medical record). Mr. Sarno's medical records as well as the phone call on August 12, 2020 are clear indicators that Mr. Sarno's medical conditioned has steadily worsened in just the last four (4) months. He clearly has received inadequate medical treatment over at least the last three (3) years as evidenced by the medical records but more importantly in how his medical condition has deteriorated to the point he has been wheel chair bound for at least the last eighteen (18) months and was told, despite his required knee replacement being needed and put off for years by the Bureau of prisons, that his knee is beyond surgical repair and he likely will never be able to walk again. The treatment Mr. Sarno has received, or more so, the lack there of, compels the argument that he has been subject to cruel and unusual punishment.

5

On the most recent occasion after being transferred to a medical facility and back to FCI Petersburg in April, the BOP placed Mr. Sarno in "quarantine" due to COVID. For clarification, quarantine in the BOP is placing an individual in solitary confinement, commonly referred to as the hole or SHU. During this so called "quarantine", when attempting to ambulate from his wheel chair to toilet, Mr. Sarno fell and could not get up. Mr. Sarno was lying on the floor with no help for nearly six hours (Exhibit 1: Sworn Statement). When Mr. Sarno was eventually found by a guard he was lying in his own feces. As a result, Mr. Sarno was rushed out of the facility and taken to an unknown hospital for surgery on a blockage in his bowel, a blockage he was advised caused his organs to start shutting down. This resulted in Mr. Sarno having a catheter surgically inserted and he has been on antibiotics for resulting infections. He is still in an undisclosed medical facility and has been in such since late April 2020. Mr. Sarno's medical records further indicate that it required the assistance of at least 5 health service staff and 4 custody staff to move the inmate from his wheelchair into the shower after he was discovered sitting in his own feces as he was unable to move. (Exhibit 2: 4.27.20 record). Not only is this verified in his medical records but also through two other inmates. (Exhibits 3-4: inmate letters). The attached statements from these inmates are confirmed in the BOP 's own medical records. (Exhibit 2: 4.27.20 BOP medical record) Furthermore, he has developed superficial decubitus breakdown. On April 27, 2020 his doctor stated Mr. Sarno requires nursing care. Due to his incontinence Mr. Sarno requires adult diapers, and requires assistance with standing, showering, going to the bathroom and does not ambulate. (Exhibit 5: 6.5.2020 BOP medical record).

Most recently, because the BOP has been unable to provide adequate care and treatment to Mr. Sarno, he has been sent to an undisclosed medical facility where he requires 24-hour care.

6

Mr. Sarno can no longer ambulate even from a wheel chair to the toilet, or from the bed to the toilet. He has not been given any prognosis of recovery.

As such, the government's contention that Mr. Sarno has not established that he suffers from a chronic medical condition, confirmed by medical records, presents "a serious physical or medical condition…that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover."[4] is meritless, disingenuous and quite frankly frivolous.

Mr. Sarno's medical records unequivocally provide that he suffers from multiple chronic medical conditions which have clearly resulted in Mr. Sarno unable to provide self-care within the environment of a correctional facility. All of these conditions are clearly evident in Mr. Sarno's medical records, his sworn statement, and discussed by two medical doctors who reviewed his records.

The government's interpretation of the relevant provisions of the First Step Act flies in the face of Congress's intent when it passed the legislation, which was to increase the availability of compassionate release. *See* § 603(b) of Public Law 115-391, entitled "Increasing the Use and Transparency of Compassionate Release." Pub. L. No. 115-391, 132 Stat. 5239 (2018).

As a result of this legislation, the "vast majority" of district courts around the United States, have held that, since the passage of the First Step Act, §1B1.13 "is not binding but is, rather, helpful guidance." *United States v. Almontes*, 2020 WL 1812713, at *3 (D. Conn. Apr. 9, 2020) (collecting cases). Even more recently, here in the Northern District of Illinois, joined that 'vast majority,' holding that:

---

[4] Dkt. 987 at 18

7

> while the criteria in § 1B1.13 provides useful guideposts, the court may look beyond the defendant's medical condition, age, and family circumstances, as delineated in the Sentencing Commission's guidance, to construe what constitutes extraordinary and compelling circumstances.

*Id.*, *United States v. Robert Cardena,* No. 09-CR-0332, slip op. at 6 (N.D. Ill. May 15, 2020) (ECF No. 1890); *United States v. Lewellen*, 09-CR-0332, slip op. at 6 (N.D. Ill. May 22, 2020) (ECF No. 1896). *United States v.* Rainone No. 09-CR-00206, slip op. at 4-5, United States v. *Rana* No. 09-cr-00830, slip op. at 6.

Courts around the United States including the Northern District of Illinois have rejected the government's interpretation of the First Step Act, and this Court should do the same. This Court is not bound by any particular compassionate release scenarios that the Sentencing Commission has prescribed in U.S.S.G. § 1B1.13. Rather, "district courts themselves have the power to determine what constitute extraordinary and compelling reasons for compassionate release." *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020). Hence, this Court has the power to grant the compassionate release that Mr. Sarno is requesting.

Mr. Sarno has shown that he is very ill, he is unable to care for himself in prison as a result of a medical condition, and has not been adequately cared for or treated by the BOP. *United States v. Gonzalez* No. 18 CR 232, 2020 WL 1536155 at *1-3 (E.D. Wash. Mar. 31,2020) (the district court reduced defendant's sentence because defendant had multiple chronic illnesses that were not being adequately treated while in custody); *United States v. Almontes,* No. 05 CR 58, 2020 WL 1812713, at *5-7 (D.Conn. Apr. 9, 2020) (the district court reduced defendant's sentence after finding that he required reconstructive spinal surgery; the BOP had failed to timely address defendant's need for that surgery; defendant begun to lose the ability to care for himself in prison; *United States v. Muniz,* No. 09 CR 199-1, Dkt. 578 at 3-4 (S.D. Tex. Mar. 30, 2020) (the

district court held that compassionate release was warranted given that defendant had renal disease [kidney failure], and was wheelchair bound). Mr. Sarno overwhelmingly meets the threshold for "extraordinary and compelling reason" for release under Section 3582(c)(1)(A)(i).

### B. There is overwhelming evidence that there are extraordinary and compelling reasons other than, or in combination with, the reasons stated above.

Extraordinary and compelling reasons exist if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." *Id.* § 1.B1.13 cmt. n.1(D). U.S.S.G. § 1B1.13 cmt. n. 1.

This fourth factor evinces broad discretion for the BOP and courts in determining what constitutes an extraordinary and compelling circumstance. The COVID-19 situation in BOP facilities places some inmates at a higher risk of developing serious complications in the event of exposure. A "once-in-a-century pandemic" is an "extraordinary and compelling" circumstance. *See* Bill Gates, *Responding to Covid-19—A Once-in-a-Century-Pandemic?* NEW ENG. J. OF MED. (Feb. 28, 2020.) Indeed, the U.S.S.G. commentary reinforces the grant of authority to decision-makers to determine what is an extraordinary and compelling circumstance: "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment." U.S.S.G. § 1.B1.13 cmt.n. 2.

The COVID-19 pandemic has killed 112,878 people in the United States, and nearly 2 million people in this country have contracted the virus.[1] A little over one month ago, an ABC News article citing sources from the BOP, reported that 70 percent of the inmates that the BOP had tested were positive for COVID-19.[2] While that percentage is alarming, the lack of transparency with the data that the BOP is, and is not, releasing, is equally as troubling. A Forbes article showed anomalies in the data, leading to the conclusion that the BOP is almost certainly

9

underreporting the number of inmates who are sick with COVID-19.3 The underreporting may not be due to any nefarious plot by the BOP, but may simply have been, or currently still is, a factor of the BOP not having sufficient resources to adequately test inmates. The likely misinformation is, nonetheless, alarming, and endangering the health and lives of inmates and staff in all BOP facilities. Many district courts, including the Northern District of Illinois, have repeatedly held that "A "once-in-a-century pandemic" is an "extraordinary and compelling" circumstance." *United States v.* Rainone No. 09-CR-00206, slip op. at 4, United States v. *Rana* No. 09-cr-00830, slip op. at 6.

The government's assertion that Mr. Sarno is not at risk for COVID is baseless and meritless. In fact, Mr. Sarno has a multitude of health conditions and ailments that place him not only at risk, but at a high risk of contracting Covid-19. Mr. Sarno's records indicate he has a BMI of 31. (4.21.2020 record). Two medical doctors have reviewed Mr. Sarno's medical records and have each independently rendered opinions that Mr. Sarno is at an extremely high risk of COVID-19 and if he remains incarcerated would most likely lead to his untimely death. (Exhibits 7-8: Medical Opinions).

The government's response could be summarized as "the BOP has this under control." First, the BOP does not have the situation under control, and any statement contrary should be treated with extreme skepticism. Second, COVID-19 has already reached all of the Federal facilities. Third, by their nature, prisons, and even a prison hospital, are not places where social distancing or ideal hygiene are particularly feasible. The definition of a jail is a place where people are confined together and not allowed to leave. The idea that prisons are a contagion tinderbox is recognized nearly universally, except possibly by the BOP and the United States Attorney's office.

Since, Mr. Sarno is at an undisclosed medical facility this Court should not assume that the facility housing Mr. Sarno is taking adequate measures to prevent exposure to COVID-19, instead this Court should assume that he is housed in a facility with a high percentage of COVID-19 outbreaks, like at Butner FCI, and FMC in Fort Worth. [5] (Exhibit 9: ABCNews).

The BOP cannot assure this Court that Mr. Sarno will not contract COVID-19. If he were to contract the virus, the consequences would be severe due to his chronic kidney disease, BMI, hypertension, empyema, chronic obstructive asthma, and significant list of other underlying conditions. Furthermore, the government is blatantly incorrect in its argument that "none of the conditions defendant relies upon are ones identified by the Centers for Disease Control as putting an individual at an increased risk from COVID-19" Dkt. 987 at 18. In reality, and supported by his medical records, and medical opinions by two medical doctors, Mr. Sarno has multiple underlying conditions that the CDC identified as putting an individual at an increased risk from COVID -19. Those underlying conditions are a BMI in excess of 30, and chronic kidney disorder (renal failure). Those conditions are evident in Mr. Sarno's medical records as well as clearly identified by the CDC. Moreover, Mr. Sarno has multiple other conditions that place him in the next category identified by the CDC. Those conditions are, hypertension, chronic obstructive asthma, and the empyema of the left lung.

The COVID-19 pandemic and Sarno's poor health are circumstances that allow the Court to use its discretion to grant a sentence reduction. Even if he is fortunate to not contract COVID-19, his myriad and chronic health problems make it likely that he will continue to have problems

---

[5] https://abcnews.go.com/Politics/tested-federal-inmates-positive-coronavirus/story?id=71275461

with self-care. And the strain of having many sick inmates makes it more likely that BOP will be unable to provide the kind of intensive medical care that a person as ill as Mr. Sarno requires.

The government's argument that Mr. Sarno does not suffer from serious medical issues is contradicted by the BOP's own medical records, the BOP medical providers and two independent doctors who review just a limited amount of Mr. Sarno's records. Further, the government offers no medical support whatsoever for its conclusion. If someone who cannot walk, is unable to maneuver from a wheelchair to a toilet continually falls, cannot control his own bowel movements, and is forced to sit in his own feces for hours at a time and is unable to care for themselves, then Mr. Sarno argues that the government's definition of being self reliant differ significantly from the legislature, the guidelines, and most of all, human decency.

The government, is not a medical professional qualified to diagnose or treat diseases nor does it offer any such medical support for their position and despite its disingenuous argument that Mr. Sarno's health does not rise to the level of- extraordinary and compelling circumstances, Mr. Sarno's medical records, sworn statement, and opinions from two outside medical doctors and the two statements from inmates at Petersburg tells a completely different story. Mr. Sarno is confined to his wheel chair or a hospital bed, he has a catheter in place, his hopes of a knee replacement are over, and he has multiple underlying conditions that are not in and of themselves extraordinary and compelling reasons justifying his release but they also put him at a significantly high risk of contracting COVID-19.

This Court could not have envisioned the COVID-19 pandemic, poor lack of medical treatment Mr. Sarno would receive, his future medical issues, or the cruel and unusual punishment he has since suffered from and has been subjected to at the time of his sentencing. But the reality of the virus is that due to his age and escalating health problems, Mr. Sarno is

12

highly susceptible to the virus's deadly effects. Furthermore, it is abundantly clear that Mr. Sarno can no longer care for himself in prison due to the neglect, indifference and poor medical treatment he has received thus far.

Mr. Sarno unequivocally not only meets the threshold but exceeds such for "extraordinary and compelling reason" for release under Section 3582(c)(1)(A)(i). Mr. Sarno has shown that he is very ill, he is unable to care for himself in prison as a result of a medical condition, and has not been adequately cared for or treated by the BOP. *United States v. Gonzalez* No. 18 CR 232, 2020 WL 1536155 at *1-3 (E.D. Wash. Mar. 31,2020) (the district court reduced defendant's sentence because defendant had multiple chronic illnesses that were not being adequately treated while in custody); *United States v. Almontes,* No. 05 CR 58, 2020 WL 1812713, at *5-7 (D.Conn. Apr. 9, 2020) (the district court reduced defendant's sentence after finding that he required reconstructive spinal surgery; the BOP had failed to timely address defendant's need for that surgery; defendant begun to lose the ability to care for himself in prison; *United States v. Muniz,* No. 09 CR 199-1, Dkt. 578 at 3-4 (S.D. Tex. Mar. 30, 2020) (the district court held that compassionate release was warranted given that defendant had renal disease [kidney failure], and was wheelchair bound).

### III.   THE REDUCTION IS WARRANTED IN LIGHT OF THE FACTORS LISTED IN 18 U.S.C. § 3553

The Sentencing Commission also requires the Court determine whether a defendant is a danger to his community as provided in 18 U.S.C. § 3142(g). U.S.S.G. § 1B1.13(2). The relevant factors in this section are: (1) the nature of the charged offense; (2) the defendant's history and characteristics, including the person's character and whether the person was on parole or

probation at the time of the offense; and (3) the nature and seriousness of the danger to the community posed by the person's release. 18 U.S.C. § 3142(g)(1)–(4).

Considering Sarno's spate of hospitalizations and his serious, chronic illnesses, it is highly probable that upon his release he will have to focus his attentions fully on caring for himself. His health condition is troubling, and it is clear that he is truly sick. Mr. Sarno is a shell of the man that he was when your Honor sentenced him. It is Mr. Sarno's understanding that the Court cannot sentence him to home confinement, although he would accept such, but the Court can sentence him to probation or supervised release with conditions such as a curfew or other conditions your Honor deems necessary.

After determining that a sentence reduction is consistent with the Sentencing Commission policy guidelines, the Court turns to the § 3553(a) factors. Any sentence reduction must comport with the statute. These factors require courts to consider both utilitarian and retributivist principles in imposing sentences: defendants should receive sentences of adequate length relative to the severity of their crimes, but also long enough to make them examples to others who consider committing similar crimes. The factors require courts to consider the need to provide defendants with the necessary educational or vocational training, and also to incapacitate defendants who threaten the public. *See generally* 18 U.S.C. § 3553(a).

In this case, the most relevant factors include: (1) "the nature and circumstances of the offense, and the history and characteristics of the defendant;" (2) the need for the sentence imposed to provide the defendant with needed medical care in the most effective manner; (3) to afford adequate deterrence; and (4) to protect the public." *Id.*

Contrary to the government's argument, if this Court were to grant compassionate release, it would not undermine the goal of the general deterrence. Even the government cannot seriously

believe that in today's day and age, that a prospective offender would be emboldened to commit crimes based on Mr. Sarno leaving prison due to health problems and a global pandemic, after serving over 114 months in prison. Mr. Sarno walked into prison. If released he will leave on a stretcher or in a wheelchair. Most importantly, the crimes that Mr. Sarno was convicted of in the past, illegal gambling, coincidentally is now legal.

The government, furthermore, can't seriously believe that Mr. Sarno will go back into society and commit the crimes that he was accused of in the past. For one, the most recent conviction in which Mr. Sarno is incarcerated for is not for Mafia related activity, as much as the government attempts to mislead the Court. In fact, your Honor, found at trial and at sentencing that it was not a Mafia case. Therefore, the government's contention that Mr. Sarno is a risk to the public due to his previous criminal activity with the Mafia is not realistic. The Mafia has been dismantled, and for the crimes Mr. Sarno is currently serving his sentence for, he certainly will not be going back to society to commit crimes with them for the obvious reasons that, all those associated with him in the past are either in jail, or have become cooperating witnesses.

This Court could not have envisioned the COVID-19 pandemic, poor lack of medical treatment Mr. Sarno would receive, or the cruel and unusual punishment he was subjected to at the time of his sentencing. But the reality of the virus is that due to his age and health problems, Mr. Sarno is highly susceptible to the virus's deadly effects. Furthermore, Mr. Sarno can no longer care for himself in prison due to the neglect and poor medical treatment he has received thus far which is evident in his medical records.

Mr. Sarno poses no risk to his community; the government's argument that he is a mob boss and will be giving out orders to carry out violence could not be more far-fetched. The Chicago Outfit is dead and gone. The Family Secrets case crippled the Mafia and nearly

15

everyone who was previously associated with Mr. Sarno is either dead, or serving a life sentence. More importantly, the Northern District of Illinois has already addressed this issue in the Rainone case, when Judge Leinenweber found that it was very unlikely that the Defendant would pose a danger to his community. Most importantly, the government's contention that Mr. Sarno is a danger to society is no longer true. The common denominator to all of Mr. Sarno's convictions was illegal video gambling, which is now legal. There is no mafia or illegal gambling business for Mr. Sarno to go home too. Therefore, the government's ideation that Mr. Sarno is going to return to his old life is nothing but a mere fantasy. Additionally, the Northern District of Illinois has granted compassionate release for individuals convicted of far worse crimes. *United States v. Lewellen*, 09-CR-0332, (N.D. Ill. May 22, 2020) (ECF No. 1896). *United States v.* Rainone No. 09-CR-00206, United States v. *Rana* No. 09-cr-00830.

Despite the government's assertion that Mr. Sarno is a risk to the public, one might add that there has been no greater danger to the public than COVID-19, and any crimes that Mr. Sarno was convicted of in the past aren't comparable to the destruction that COVID-19 has brought to the public.

Mr. Sarno does not dispute that the crimes for which he was convicted of were serious; however, his illnesses and conditions would require him to focus his attentions on getting medical treatment and caring for his medical conditions not committing any further crimes.

Furthermore, Mr. Sarno will be living with his wife, children, and grand-child in the suburbs, who will be there with him and where they will focus his time on his health, and being with his family. (Exhibit 10: letters from family). In the event his health does get better, Mr. Sarno has been promised a job with Greco & Sons. (Exhibit 11: affidavit).

During his sentencing the Court stated:

>"Let me just specifically say that the hardship to the defendant's family, his children, the people around him, the Court has no doubt is real and is – the word unfortunate seems insufficient, but it's the only word I can think of. For they, of course, have been accused and convicted of absolutely nothing; and that they should suffer is indeed a tragedy."

One can both accept that your Honor got it right at the time of his sentencing, and *at the same time now* accept that subsequent developments have changed the calculus of what is now necessary for society. Now is the time where this Court can release the family who was accused and convicted of absolutely nothing, and give them the opportunity to move on and to care for the man they so deeply love.

It is evident that the BOP does not have the adequate resources to care for Mr. Sarno, therefore now is the time for this Court to end the burden that the BOP carries in providing care and resources to Mr. Sarno. Mr. Sarno's family can now accept that burden and will welcome that burden with open arms. It is also clear that Mr. Sarno was not sentenced to death, and by continuing to keep Mr. Sarno in incarceration is the equivalent of sentencing him to the death penalty, and every day he continues to remain incarcerated is a day he is waiting on death row.

An evaluation of the § 3553(a) factors demonstrates that a sentence reduction is warranted. Here, the most important factor is the need to provide medical care: Sarno's chronic health conditions tend toward granting a sentence reduction. There is no further deterrent value in forcing Sarno to serve the remainder of his sentence in BOP facilities notwithstanding the pandemic. Given his poor health, there is no need to keep him incarcerated for the protection of the public.

Finally, Sarno was sentenced to a term of years, not to death. He has completed over 114 months of his sentence; given his poor health and the extraordinary circumstances surrounding the pandemic, the most humane and reasonable course of action is to grant Sarno a shorter

17

sentence so that he can manage his ailing health with his family's help. Mr. Sarno recognizes the Court's inability to place him on home confinement, however, Mr. Sarno is willing to agree to any terms of probation or supervised release that this Court deems necessary. Also, Mr. Sarno, while on pretrial release, was placed on home confinement from June 16, 2009 to December 22, 2010, a period of nearly 18 months, and in that 18 months he never violated any terms of your Honor's orders or conditions to that release. That furthers Mr. Sarno's argument that there are conditions that could be put in place to assure the safety of the community as it worked before when he was a much healthier man and a man 12 years younger.

## **CONCLUSION**

WHEREFORE, Defendant, Michael J. Sarno, respectfully requests that this Honorable Court modify his sentence under 18 U.S.C. Section 3582(c)(1)(A)(i), and grant him compassionate release and/or grant him any additional relief that he might be entitled to by law, or that this Court deems just.

Respectfully submitted,

MICHAEL SARNO,

By: */s/ John W. Chwarzynski Jr.*
Attorney No. 6327836
HALE & MONICO, LLC
53 West Jackson, Suite 337
Chicago, IL 60604
(773) 307-3157
jwc@halemonico.com